IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

ROBERT SIX, et al.,                    :
                                       :
            Plaintiffs,      :
                                       :
    vs.                                :       Case No. 2:11-cv-00698
                                       :       Judge Graham
ROBERT BEEGLE, et al.,       :       Magistrate Judge Abel
                                       :
            Defendants.      :

- - -

Deposition of ROBERT SIX, a Plaintiff called by the Defendants under the applicable Federal Rules of Civil Procedure, taken before Denise L. Shoemaker, a notary public in and for the State of Ohio, pursuant to notice and stipulations of counsel hereinafter set forth, at the law offices of Lavelle and Associates, 449 East State Street, Athens, Ohio, commencing on Thursday, April 11, 2013, at 10:19 a.m.

- - -

DENISE L. SHOEMAKER
RENO & ASSOCIATES
273 LITTLE THEATRE ROAD
WAVERLY, OHIO  45690
740.947.9001
FAX  740.941.4041

1    APPEARANCES:

2         Sky Pettey, Esquire
          Lavelle and Associates
3         449 East State Street
          Athens, Ohio   45701
4         740.593.3348
          spettey@johnplavelle.com
5
                   On behalf of the Plaintiffs.
6
          Brian A. Ball, Assistant Attorney General
7         Environmental Enforcement
          2045 Morse Road, Building C-2
8         Columbus, Ohio   43229
          614.265.6870
9         Brian.Ball@OhioAttorneyGeneral.gov

10                 On behalf of the Defendants Woods and
                   Josh Shields.
11
          Paul M. Bernhart, Esquire
12        Downes Fishel Hass Kim LLP
          400 South Fifth Street, Suite 200
13        Columbus, Ohio   43215
          614.221.1216
14        pbernhart@downesfishel.com

15                 On behalf of the Defendants Robert
                   Beegle, Adam Smith, Rick Smith,
16                 William Gilkey, Scott Trussell and
                   Brian Rhodes.
17
          Alexis K. Chancellor, Assistant Attorney General
18        OOCIC
          P.O. Box 968
19        Grove City, Ohio   43123
          614.277.1000
20        Alexis.Chancellor@OhioAttorneyGeneral.gov

21                 On behalf of the Defendants Greg Nohe,
                   Scott Parks, Jerry Peters and Roberts.
22

23
                                          (Cont'd)
24

1    APPEARANCES (cont'd):

2        Christopher P. Conomy, Senior Assistant
                Attorney General
3        Court of Claims Defense
         150 East Gay Street, 18th Floor
4        Columbus, Ohio  43215
         614.728.9474
5        Christopher.Conomy@OhioAttorneyGeneral.gov

6                On behalf of the Defendants Scott
                 Fitch and Jonathan Jenkins.
7
                    -  -  -
8
      ALSO PRESENT:
9
          Adam Smith, Defendant.
10
                    -  -  -
11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    THURSDAY MORNING SESSION,

2                    April 11, 2013

3                        - - -

4                    STIPULATIONS

5                    It is stipulated by and among counsel

6     for the respective parties that the deposition of

7     Robert Six, a Plaintiff called by the Defendants

8     under the applicable Federal Rules of Civil

9     Procedure, may be taken at this time in stenotypy by

10    the notary; that said deposition may thereafter be

11    transcribed by the notary out of the presence of the

12    witness; that proof of the official character and

13    qualification of the notary is waived; that the

14    examination, reading, and signature of the said

15    Robert Six to the transcript of his deposition are

16    expressly waived by counsel and the witness; said

17    deposition to have the same force and effect as

18    though signed by the said Robert Six.

19                       - - -

20

21

22

23

24

5

1                    INDEX TO EXAMINATION

2    EXAMINED BY                                    PAGE

3    Mr. Bernhart                                      6
     Mr. Conomy                                     245
4    Mr. Pettey                                     258

5                         - - -

6                    INDEX TO EXHIBITS

7
     EXHIBIT                                       MARKED
8
     Defendant's Exhibit A                           22
9    Defendant's Exhibit B                           65
     Defendant's Exhibit C                          130
10   Defendant's Exhibit D                          130
     Defendant's Exhibit E                          133
11   Defendant's Exhibit F                          152
     Defendant's Exhibit G                          153
12   Defendant's Exhibit H                          181
     Defendant's Exhibit I                          182
13   Defendant's Exhibit J                          185
     Defendant's Exhibit K                          188
14   Defendant's Exhibit L                          190
     Defendant's Exhibit M                          193
15   Defendant's Exhibit N                          195
     Defendant's Exhibit O                          201
16   Defendant's Exhibit P                          212
     Defendant's Exhibit P                          222
17   Defendant's Exhibit R                          238

18                        - - -

19

20

21

22

23

24

1     Thereupon,

2                    ROBERT SIX

3          being by me first duly sworn, as

4     hereinafter certified, deposes and says as follows:

5                    CROSS-EXAMINATION

6     By Mr. Bernhart:

7          Q     Good morning, Mr. Six.  Thank you for

8     coming today.

9          A     Uh-huh.

10         Q     We just met.  My name is Paul Bernhart.

11    I represent what I'll refer to as the Meigs County

12    defendants in the case.  You've brought this lawsuit

13    against a number of different deputies and various

14    law enforcement officers, various agencies.  I

15    represent the Meigs County defendants, as well as

16    Deputy Rhodes of Washington County.

17               There are attorneys here who represent

18    all of the other defendants in the case.  Everyone

19    will have an opportunity to ask you questions today,

20    but I'm going to take the lead in doing so.

21               Have you had your deposition taken

22    before?

23         A     No.

24         Q     We'll go over a few ground rules.  Your

1    attorney probably explained this to you, but we will

2    do it again.

3              You can see there is a court reporter

4    here.  So I'm going to need you to speak up so that

5    she can hear you and then give audible answers as

6    opposed to shaking of your head or huh-uh, uh-huh.

7    Yes and no would be better.

8              We can take as many breaks as you would

9    like today.  I just ask that we don't take a break

10   while a question is pending.  So if you need to take

11   a break, answer whatever question I've asked and then

12   let me know.  Do you understand those rules?

13        A    Yes.

14        Q    Are you currently under the influence of

15   any medication, drugs, alcohol, or any substance that

16   would impair your ability to testify truthfully

17   today?

18        A    No.

19        Q    What did you do to prepare for today's

20   deposition?

21        A    Well, I talked to Scott.  He told me --

22        Q    I don't want to know what you and your

23   attorney talked about.  Did you do anything besides

24   talking with your attorney?

8

1          A      Just tried to relax last night.

2          Q      Did you review any documents to prepare

3     for today?

4          A      Not yesterday.  I mean, I have the

5     documents that we filed, you know, the discovery and

6     so forth, but I didn't do anything special for today.

7          Q      So you haven't reviewed any documents in

8     the last week or two?

9          A      The gun list.

10         Q      Which gun list is that?

11         A      Well, there was a list that I had

12    compiled that listed some guns.  Then there was

13    another list that I didn't really think about until a

14    couple days ago that was prepared by Jagers, and I

15    went through those and reconciled those with the

16    discovery because there was some discovery documents

17    that -- to make a long story short, there were some

18    guns that he had listed as missing that weren't

19    missing, and I had to reconcile that list and then

20    add it to mine.

21         Q      You've prepared notes, and you've

22    compiled a list of guns that you believe are missing,

23    correct?

24         A      Correct.

1          Q      Are there any documents you have

2     relative to the case or any claims you have you

3     haven't provided to your attorney yet?

4          A      No, he has everything.

5          Q      Your attorney has everything --

6          A      Yes.

7          Q      -- that you have related to this case?

8          A      Yes.

9          Q      Have you talked to anyone besides your

10    attorney about your claims in this case?

11         A      Just my wife.

12         Q      Have you talked to Mr. Jagers about your

13    claims in this case?

14         A      I haven't seen him in years, no.

15         Q      I want to go over some background

16    information before we get into the substance of your

17    claims.

18                Mr. Six, do you go by any other aliases

19    or have you had any prior names?

20         A      No.

21         Q      Your middle name is?

22         A      Bernard.

23         Q      What is your current address?

24         A      26225 Rutherford Road, Albany.

```
1        Q      How long have you lived at that address?

2        A      Thirty-three years.

3        Q      Is that in Meigs County?

4        A      Yes.

5        Q      It's Meigs?

6        A      Meigs, uh-huh.

7        Q      Where did you live prior to that?

8        A      In Troy, Ohio.  Right there at Gearhart

9   Road in Troy.  I can't remember the number.

10       Q      Where is Troy, Ohio?

11       A      It's Montgomery, just north of Dayton.

12       Q      In Montgomery County?

13       A      I can't remember if it was Montgomery or

14   the next county north.  It's been a long time ago.

15       Q      I understand you've lived at your

16   current address since moving from Montgomery

17   County --

18       A      Yes.

19       Q      -- from Gearhart Street?

20       A      Yes.

21       Q      Are you presently married?

22       A      Yes.

23       Q      What is your wife's name?

24       A      Bobbi.
```

1          Q      What is her middle name?

2          A      Gail, G-a-i-l.

3          Q      And Six is her last name as well?

4          A      (Witness nods affirmatively).

5          Q      Yes?

6          A      Yes.   Sorry.

7          Q      What was her maiden name?

8          A      Jones.

9          Q      How long have you been married to Bobbi?

10         A      Thirty-two years.

11         Q      Are you presently living together?

12         A      Yes.

13         Q      Were you married here in Meigs County?

14         A      Yes.   No, let me take that back.   We

15    were married in Athens County.   Sorry about that.

16         Q      That's all right.

17         A      It's been a while.

18         Q      One of the other ground rules that I

19    failed to mention was that if there's anything I ask

20    you today that you can't remember and you remember

21    after leaving today's deposition, I would ask that

22    you let your attorney know so that we can supplement

23    the record and have a complete record.

24                It's also important that you understand

1    the questions I ask.  So if there's anything I ask

2    today that you don't understand, please let me know.

3    At some point your transcript will be submitted to

4    the court for a judge to review, and we want to make

5    sure that you understood the questions and that you

6    gave truthful responses.  Understand?

7         A    Yes.

8         Q    Great.

9              Do you have any previous marriages?

10        A    Yes.

11        Q    Who were you previously married to?

12        A    Let's see, Kathleen Gearon.

13        Q    Gearon?

14        A    G-e-a-r-o-n.

15        Q    When were you married to Ms. Gearon?

16        A    1977.

17        Q    How long were you married?

18        A    Three years.  Before that Elizabeth Jane

19   Flynn.

20        Q    How long were you married to Ms. Flynn?

21        A    Nine years.

22        Q    What was the basis of your separation

23   from Ms. Flynn?

24        A    It was a no-fault divorce.  Same with

1    Kathleen, no-fault divorce.

2         Q    Do you have children with either of your

3    previous wives?

4         A    Yes, from Jane, Elizabeth Jane.  My

5    daughter is Kimberly.  Kimberly Ann Marcum is her

6    name now.

7         Q    Marcum?

8         A    Uh-huh.

9         Q    Did she previously go by Kimberly Ann

10   Six?

11        A    Yes.

12        Q    Approximately how old is Kimberly?

13        A    She was born in '66, so she's 46.

14        Q    Born in 1966?

15        A    Yeah.  October 31st.

16        Q    Any other children from previous wives?

17        A    No, that's it.  Just one.

18        Q    Kimberly, does she live in the county?

19        A    No, she lives in Monroe, Ohio.

20        Q    Do you have any children with Bobbi?

21        A    No.

22        Q    Any other children?

23        A    No.

24        Q    Briefly describe your -- let's talk

1    about your education.  What is the last grade you

2    completed?

3         A    College one year.

4         Q    Did you obtain a degree or certificate?

5         A    No.

6         Q    Since you went to college, I assume you

7    graduated high school?

8         A    Yes.

9         Q    Where did you graduate?

10        A    Wilbur Wright in Dayton, Ohio.

11        Q    What year did you graduate high school?

12        A    1966.

13        Q    Where did you attend one year of college

14   at?

15        A    Sinclair in Dayton.

16        Q    What year was that, if you remember?

17        A    '67.

18        Q    So you went to Sinclair immediately

19   after graduating high school for a year?

20        A    Yes.

21        Q    Why did you not continue your schooling

22   at Sinclair?

23        A    Well, I was working full time because my

24   daughter -- I had my daughter and I was married, and

1    it just -- I couldn't keep up with working nights and

2    going to school in the daytime.  It just wouldn't all

3    reach.

4         Q    Where were you working at the time?

5         A    R.W. Six Carthage.  My dad had a

6    trucking company.

7         Q    R.W. Six?

8         A    Yes.  That's my father.  Carthage

9    C-a-r-t-h-a-g-e.

10        Q    What was the nature of the business?

11        A    Trucking company.

12        Q    Besides your one year at Sinclair, have

13   you received any other post-secondary education?

14        A    Law enforcement training and fire

15   service training and emergency medical technician.

16        Q    Let's take those in order.  Where did

17   you receive law enforcement training?

18        A    Vandalia Police Academy.

19        Q    Vandalia?

20        A    Yes.

21        Q    What year was that?

22        A    '71 into '72.

23        Q    Did you receive a certificate --

24        A    Uh-huh.

1        Q      -- from there?

2        A      Uh-huh.  Yes.  Sorry.

3        Q      Is there a name for the certificate that

4    you received?

5        A      It's just a certification, you know.  I

6    can't really remember what it was called.  Law

7    enforcement training certification.

8        Q      Did you ever attend the police officer

9    academy?

10       A      Yeah.

11       Q      Did you --

12       A      After they closed out, then we moved out

13   to Dayton.  I was a range officer.

14       Q      Did you become OPOTA certified at any

15   time?

16       A      I think that's what it was called, yeah.

17   I became a full-time police officer there in Oakwood,

18   which is a suburb of Dayton.

19       Q      What year was that?

20       A      After I completed school.  I was a

21   trainee while I was in school, but I was on -- I was

22   on the police department starting in 1971.

23       Q      With Vandalia or --

24       A      That was Oakwood.  Vandalia was the

1    training.   The police training school was Vandalia.

2    I was a police officer in Oakwood.

3         Q    I want to get back to that in just a

4    moment, but I want to finish talking about your

5    education.

6              You stated you received fire service

7    training?

8         A    Uh-huh.

9         Q    Where was that?

10        A    That was -- just a minute and I will

11   tell you.  Piqua.  Piqua had a fire training academy.

12        Q    And did you complete that training?

13        A    Uh-huh.

14        Q    Did you obtain a certificate?

15        A    Yeah.

16        Q    Was the certificate from Piqua?

17        A    Uh-huh.

18        Q    Piqua is a city?

19        A    Yes.

20        Q    In Montgomery County?

21        A    No, I don't think.  It was --

22        Q    Perhaps Miami?

23        A    I think it might have been Miami County.

24        Q    You further indicated that you received

1    EMT training?

2          A    Yes.

3          Q    Where was that?

4          A    Kettering Hospital in Kettering, Dayton.

5          Q    What year was the fire service training?

6          A    They were really close together, the

7    police and fire.  It was just one after the other.

8          Q    In the 1970's?

9          A    Yeah, uh-huh.

10         Q    Was the EMT training also in the 1970's?

11         A    Uh-huh.

12         Q    Did you obtain a certificate from going

13    through the EMT training?

14         A    Yes.

15         Q    Are your certificates still good, for

16    lack of a better word, in all three disciplines?

17         A    No, because you have to be recertified

18    periodically, and I didn't keep up with the

19    recertifications.

20         Q    For?

21         A    For any of them.  I left the profession.

22         Q    Were you ever employed as a fireman?

23         A    Uh-huh.

24         Q    Where at?

1          A      Oakwood.

2          Q      Was that at the same time you were a

3     police officer for Oakwood?

4          A      That's correct.

5          Q      How about an EMT?

6          A      Same.

7          Q      Oakwood?

8          A      Uh-huh.

9          Q      So when you were working for the City of

10    Oakwood or village --

11         A      City.

12         Q      -- City of Oakwood, you were a

13    policeman, a fireman, and an EMT officer?

14         A      That's right, uh-huh.

15         Q      Did you report to the same person for

16    each of those?

17         A      There was a city safety director that

18    headed all three departments.  So I think the answer

19    is yes.

20         Q      You ultimately reported to the city

21    safety director?

22         A      Well, there was a chain of command and

23    he's at the top.

24         Q      I understand.

1          A      Sergeant and captain and then on up the

2     way.

3          Q      Chief of police?

4          A      Yeah.

5          Q      So you worked for your dad's trucking

6     company in the late 1960's?

7          A      (Witness nods affirmatively).

8          Q      Did you have any employment between the

9     trucking company and the City of Oakwood?

10         A      I drove for Trojan Freight Lines.

11    Several different companies.  I was in the union.  I

12    was in the teamsters union.  I was sent out to

13    different companies.  That's the way it works in the

14    union.  You go into the workplace, if you're there 30

15    days, you become full time and so on.

16                I can't really sit here and name the

17    different companies, but Trojan was the first one I

18    worked for.  There were some other ones.  I'd have to

19    think about it a while.  It will come back to me.

20         Q      Did you go right from the trucking

21    industry to the City of Oakwood?

22         A      Uh-huh, yes.

23         Q      What was the reason for you leaving the

24    union or leaving employment in the trucking industry?

1        A      Well, I just wanted to try something

2    different, you know, then I went back to it after I

3    left Oakwood.

4        Q      Prior to going to Oakwood, were you ever

5    terminated from any job in the trucking industry?

6        A      No.  No.

7        Q      How long were you employed with the City

8    of Oakwood?

9        A      Five years.

10       Q      What were the reasons that you left

11   employment with the City of Oakwood?

12       A      I wanted to go back, I wanted to do

13   something else.  I didn't really -- I didn't care

14   that much for it.  I was away from home too much.  It

15   was too demanding.  It was taking a toll on my wife,

16   and ultimately we wound up getting divorced.  Just

17   wasn't working out.

18       Q      Did you resign from your position with

19   the city?

20       A      Yes.

21       Q      What year was that?

22       A      '76.

23       Q      Did you voluntarily resign?

24       A      Uh-huh.

1       Q     Yes?

2       A     Yes.

3       Q     Do you know whether you were under

4  investigation for anything at the time of your

5  resignation?

6       A     No, I don't remember being under

7  investigation for anything.

8       Q     Had you had any discipline with the

9  city?

10      A     Not that I can remember.  I pretty much

11  got pretty much glowing reviews, best I can recall.

12                     - - -

13          Thereupon, Defendant's Exhibit A was

14          marked for purposes of identification.

15                     - - -

16  By Mr. Bernhart:

17      Q     I'm going to hand you a couple

18  documents.  Take a moment and review the documents I

19  just handed you that have been marked as Exhibit A.

20      A     I don't remember receiving any of these

21  papers back then.

22      Q     Have you had a chance to review --

23      A     I read them.

24      Q     -- the four pages I have handed you?

1          A      Yes.

2          Q      Have you seen these documents before?

3          A      No.   This is my resignation letter.

4          Q      The first page, which is identified at

5     the bottom as P23, is your letter of resignation?

6          A      Uh-huh.

7          Q      The second page, which is identified as

8     Page P28, do you recognize receiving this document?

9     Do you remember receiving this document, I should

10    say?

11         A      No, I don't remember receiving it.   Now

12    that I look at it, I remember us discussing this at

13    the time.

14              MR. PETTEY:      Note an objection for

15    the record as to these documents and his employment

16    as a police officer back then.   There is no claim for

17    any lost wages or anything relating to his employment

18    as he is retired.   So we would object based on

19    relevance, but you can go ahead and answer the

20    questions.

21         Q      Okay.   I want to skip to the third page

22    for a moment and ask you about the fourth page, which

23    is marked P29 at the bottom.

24         A      Okay.

1          Q      Does this document help refresh your

2     recollection as to any discipline you received with

3     the department?

4          A      I don't remember receiving this

5     document.  January 18th of '74.  That was actually

6     earlier than the other documents you gave me.

7     They're from '76.  This one is from '74.

8          Q      The final documents you've just

9     described pertain to your resignation.  They're dated

10    1976.  This is from 1974.

11         A      Oh, all right.  I remember that now.  I

12    do remember what happened.  The date, January the

13    18th, I know what it was.

14              MR. PETTEY:     Again, I'll note an

15    ongoing objection to questions relating to these

16    documents, but you can go ahead and answer.

17         A      Yeah.  I went -- this is January 18th.

18    On New Year's Eve I was off duty and I went into the

19    department basically to tell everybody happy New

20    Year's.  And I got in there and they were drinking,

21    and they asked me if I wanted a drink and I said no,

22    I don't drink.  I don't drink.

23              Then somehow the department superiors

24    found out about it, and they pulled me in and they

1    threatened a bunch of stuff.  They said, you have to

2    tell us, you have to tell us.  I said, I'm not going

3    to tell you.  This isn't going to happen.  And that's

4    what generated this paper here.  I wouldn't tell on

5    who did what.

6         Q    So it's your understanding that all

7    three of these charges -- conduct unbecoming an

8    officer, conduct subversive or antagonistic to the

9    order and discipline of the department and

10   insubordination -- all relate to you refusing to --

11        A    Snitch.

12        Q    -- refusing to answer the questions of

13   your superior officers?

14        A    That's correct.

15        Q    Do any of these relate to the underlying

16   drinking at the department?

17        A    They were drinking on New Year's Eve.

18   I've never admitted that to anybody, but I'm telling

19   you today for the first time they were drinking.

20        Q    The other officers?

21        A    Yes.  I was off duty anyway.  Had I had

22   a drink, I think it would have been a violation since

23   it was in the police station, but I didn't drink.  It

24   wouldn't matter anyway because I was off duty.

1        Q     You weren't charged with --

2        A     No.  All they wanted me to do was say,

3    you know, what do I know, what did I see, and who did

4    what and all that.  I said, no, that's not happening.

5        Q     Did you receive discipline for this?

6        A     I can't remember if they did anything to

7    me over that or not.

8        Q     Did you attend a predisciplinary

9    hearing?

10       A     You know, it's just been too long.  I

11   can't remember what came out.  I just barely remember

12   that incident, you know.  After I looked at this

13   date, then it rang a bell.  It took them a couple

14   weeks to find out about it.  I don't know how they

15   found out about it.

16       Q     So sitting here today, you cannot

17   remember whether you received any discipline from the

18   department?

19       A     I might have got some time off over it

20   or something because I wouldn't tell.

21       Q     Some type of suspension?

22       A     Yeah, uh-huh.

23       Q     Now, I would ask that you turn to the

24   page before that, which is the third page of Exhibit

1    A and it's identified at the bottom as Page 21.  Mr.

2    Six, you previously testified that you were not under

3    investigation at the time of your resignation.  Does

4    that document help refresh your recollection as to

5    whether there was an investigation pending against

6    you internally?

7         A    You know, I remember them coming up with

8    all these charges.  To tell you the truth, after this

9    incident here in '74, they didn't really care for me

10   anymore.  Not the guys I was working with but the

11   hire-ups.

12        Just like this, I'm not -- I probably

13   shouldn't volunteer this.  But I was involved in

14   cockfighting and it was legal until 1976.  That's

15   when the law changed, for example.

16        Prostitution, the only prostitution was

17   when we were investigating a lady's clothing

18   establishment there in Oakwood that was a front for

19   prostitution.

20        Involvement with marijuana and other

21   drugs, what I told them when I hired in was that I

22   had smoked it in high school.

23        Moonshine, we had a party at my house

24   and the chief came out and they were asking me -- my

1    wife was from Tennessee, and they asked me, "Can you

2    get some moonshine?"  I said, "Well, I'll see."  My

3    mother-in-law got a bottle of it, and we had it at

4    the New Year's Eve party and the chief drank it right

5    along with everybody else.

6                Point 5, I lived on a farm and I shot

7    dogs that were in my chickens, sure.  They didn't --

8    the charges didn't go any place.  They tried to make

9    it look like it was a big deal, but basically what

10   they wanted me to do was leave.

11        Q    So --

12        A    They offered me $10,000 if I give them

13   my resignation.

14        Q    Wait a moment.  Let me ask my question.

15   Apart from the prostitution charge, it seems like you

16   acknowledged at the time engaging in some of the

17   other behaviors?

18        A    Yeah, it wasn't illegal.  Cockfighting

19   was legal until '76.

20        Q    So you disputed whether that violated

21   any type of departmental policy?

22        A    It didn't until it was illegal.  Then

23   they said, "Are you going to quit?"  I said, you

24   know, there was a lot of police officers involved in

1    it at the time.

2         Q     This seems to indicate that there was an

3    investigation going on against you.  The subject of

4    this memo is Internal Investigation, Patrolman R.

5    Six.

6         A     I don't know who -- I'm not sure what

7    "investigation" means.

8         Q     This document, what is the date of it?

9         A     April 5 of '76.

10        Q     The first page of Exhibit A is your

11   letter of resignation?

12        A     April 9th, yeah.

13        Q     So four days after this memo was issued?

14        A     Uh-huh.

15        Q     Had you seen a copy of this memo prior

16   to your resignation?

17        A     I don't remember seeing one.  In fact,

18   it's not addressed to me.

19        Q     Like you said, you were aware of the

20   allegations being leveled against you?

21        A     Yeah.  I was a little surprised that

22   they came up with this stuff because, you know,

23   involvement in moonshine, you know, I was sitting

24   there drinking with the chief.  Okay.  If that's

1    involvement with moonshine, then fine.  Again, I

2    didn't drink it because I don't drink, but they

3    wanted me to get it for them.

4         Q    Were you asked by your superior officers

5    to resign from --

6         A    They offered me $10,000 if I turned in

7    my resignation.

8         Q    Did you understand that you were going

9    to be disciplined if you did not resign?

10        A    They were going to try to.  My attorney

11   said, you know, he was going to take it public and

12   make a big deal out of it.  I didn't particularly

13   want to go through that either.

14        Q    So you resigned instead of having to go

15   through that?

16        A    Yeah, give me money and I am out of

17   here.

18        Q    The city gave you $10,000?

19        A    Yes.

20        Q    Some type of severance package?

21        A    Uh-huh.

22        Q    Did you sign any type of agreement with

23   the city as part of receiving that severance package?

24        A    I think so, and they give me a letter of

1          recommendation and all that stuff that was part of

2          the package.

3                    Q      Do you happen to have that?

4                    A      No, I don't.  I don't have the letter.

5                    Q      Not the letter of recommendation, the

6          agreement that you signed with the city.

7                    A      No.  No.

8                    Q      Do you have any documents related to

9          your employment with the City of Oakwood,

10         particularly dealing with your resignation or any

11         other discipline you received from the city that I

12         haven't already handed you?

13                   A      No, I didn't have anything until this

14         discovery stuff came up.

15                   Q      So you don't maintain copies of any

16         records?

17                   A      No.  Been through too many places.

18         That's 40 years ago, you know.

19                   Q      After you resigned from the City of

20         Oakwood, where was your next job at?

21                   A      Very next job?

22                   Q      If you remember.

23                   A      IML.

24                   Q      What does IML stand for?

1          A       It was Inter-Mountain Mobile Transport.

2     They're long gone, but it was another freight

3     company.   I went over the road after that,

4     over-the-road driver.

5          Q       After resigning from the City of Oakwood

6     in 1976, you went to work -- you went back to work in

7     the trucking industry?

8          A       Uh-huh, yes.

9          Q       And did you work in that industry until

10    your retirement?

11         A       Yeah.   No, that was it.   Just the

12    transportation industry.

13         Q       So you never went back to work for law

14    enforcement?

15         A       No.

16         Q       Or EMT?

17         A       No.

18         Q       Or fire service?

19         A       No.

20         Q       As part of your resignation from the

21    City of Oakwood, did anything happen to the

22    certification you had received?

23         A       I don't know.   I'm not sure what you are

24    asking.

1          Q      Fair enough.  As part of your

2     resignation or this agreement that you entered into

3     with the city, were you required to relinquish your

4     certification?

5               MR. PETTEY:    I will note an objection

6     as to relevance.  You can go ahead and answer.

7          A      I don't recall having to give anything

8     back like that.

9          Q      Is it your understanding that you could

10     have gone to work for another law enforcement agency?

11          A      Yes, I had a letter of recommendation.

12     I think that would have probably helped me get in the

13     door.  But, you know, I was starting to feel bad, you

14     know.  I couldn't tell if it was all physical or just

15     the problems with my wife.  So truck driving is

16     demanding, but in a different way.  Law enforcement

17     is demanding.

18          Q      If you recall, who signed that letter of

19     recommendation?

20          A      Captain Weaver and Chief Kelly.

21          Q      After leaving the City of Oakwood, did

22     you apply for any job in law enforcement?

23          A      No, I was done with that.

24          Q      Did you apply for any other job at any

1    time dealing with EMT or fire services?

2        A    No.

3        Q    Mr. Six, I forgot to ask you, what is

4    your date of birth?

5        A    12-10-47.

6        Q    During your time in the trucking

7    industry, I believe you indicated you were a member

8    of the teamsters union?

9        A    Uh-huh.

10       Q    Yes?

11       A    Yes.

12       Q    Did you go back to becoming a member of

13   the teamsters union when you reentered the trucking

14   industry in 1976?

15       A    Yes.

16       Q    As a member of the teamsters union, were

17   you subject to collective bargaining agreements?

18       A    Yes.

19       Q    As you've described it, and as I

20   understand it, the teamsters union would send you to

21   different trucking businesses to work at?

22       A    Uh-huh.

23       Q    Approximately how many different

24   businesses were you employed by from this 1976 time

35

1    frame until the date of your retirement?

2         A    I would have to estimate about six, but

3    some of them were just one and two days, you know,

4    depending on -- it used to be you'd go to the union

5    hall, sign a board, companies would call in that

6    needed an extra, and they would go down the board,

7    you would go here, you go here.  Some of them were

8    just one or two days.

9         Q    Were there any particular companies that

10   you worked for for an extended period of time?

11        A    Quick, I worked for them -- I went to

12   work for them in 1980 and worked for them until 1986.

13        Q    What were the circumstances of you

14   leaving Quick?

15        A    They went out of business.

16        Q    Did you ever receive discipline while

17   working for Quick?

18        A    No.

19        Q    Were you ever terminated from any of the

20   trucking companies?

21        A    No, not terminated.  Didn't get called

22   to work again at a particular company, but not a

23   termination letter per se, not that I can remember.

24        Q    Were you ever suspended by any of the

1    trucking companies?

2          A    No, no.  Spent some time on picket lines

3    and so forth.

4          Q    What was the date of your retirement?

5          A    It would have been 1986 from Quick.  I

6    was injured on the job and went on workers' comp at

7    that time.  Actually I was injured before they went

8    out of business.

9          Q    That was going to be my next question.

10         A    I thought I better explain that.  I went

11   back and I was working what they called light duty

12   when they went out of business.  Then after that, I

13   couldn't get back into a trucking company because I

14   had a back injury and you have to have a Class A back

15   to get a DOT physical, and I couldn't pass the

16   physical.

17         Q    Was that back injury, is that the reason

18   that you were receiving workers' comp and were placed

19   on light duty?

20         A    Right.

21         Q    What did you do to your back?

22         A    Herniated some discs.

23         Q    Lifting boxes?

24         A    Trying to open a trailer door actually.

1    It was stuck, and I gave it a big pull and collapsed

2    right there on the dock.

3         Q    Did you receive random drug testing

4    while employed with these trucking companies?

5         A    They didn't used to do that that I can

6    remember.  It's possible, but I don't think there was

7    much of that done back then, as I can recall.

8         Q    Did you ever fail a drug test with any

9    of those companies?

10        A    No.

11        Q    You previously testified that you were

12   subject to a collective bargaining agreement with the

13   union.  Did the union ever have to grieve a potential

14   discipline against you?  Do you understand what I

15   mean by grieve?

16        A    Did I ever file a grievance?

17        Q    Right.

18             MR. PETTEY:    Note an objection as to

19   relevance, but you can go ahead and answer.

20        A    I don't remember if I filed a grievance.

21   I think we filed some collectively.  I don't think I

22   filed any individual grievance.

23        Q    The grievances you filed collectively,

24   were those related to work conditions?

38

1          A      Yes.

2          Q      So sitting here today, you can't

3     remember fighting a grievance over proposed

4     discipline against you?

5          A      Huh-uh.

6          Q      No?

7          A      No.

8          Q      So after Quick goes out of business in

9     approximately 1986, you indicated that you were not

10    able to pass a physical to go back to the trucking

11    industry?

12         A      That's correct.

13         Q      How many attempts at passing a physical

14    did you make?

15         A      One or two.  Seemed kind of pointless

16    because I knew I wasn't going to pass after that.

17         Q      The back injury wasn't getting better?

18         A      I could walk again, but I couldn't bend

19    over or touch my toes.  Couldn't lift anything, you

20    know.  I was restricted to five pounds.  You're not

21    going to do much when you have a five-pound

22    limitation.

23         Q      Was that part of the light-duty

24    assignment --

1          A       Yeah.

2          Q       -- the lifting restriction?

3          A       I just worked weekends.  You know, I

4     took -- all I did was take a load to Chicago and drop

5     it and pick up one and come back.  That was it.  That

6     was tough because I had a lot of trouble sitting in

7     the truck.

8          Q       For that period of time?

9          A       Yeah.

10         Q       Was all that employment based out of

11    southeastern Ohio?

12         A       Dayton.

13         Q       Dayton?

14         A       Uh-huh.  They had terminals in Dayton,

15    Cincinnati and Columbus.  Dayton was my hometown, but

16    I did run out of the other terminals as well.

17         Q       Were you living here during that period

18    of time?

19         A       The address I gave you on Gearhart Road

20    in Troy, I was living there.  The terminal was in

21    Vandalia, and Troy and Vandalia is not that far.

22         Q       At some point during your employment in

23    the trucking industry, did you move to Meigs County?

24         A       Then I had a long drive to get back and

1    forth to work.

2         Q    So you had to drive to Dayton?

3         A    To pick up the truck.  So I only got

4    home once ever couple weeks.

5         Q    Why did you move to Meigs County?

6         A    My wife inherited the farm and nobody

7    was living there, so my mother-in-law wanted us to

8    move down there.

9         Q    So your wife inherited the farm you

10   currently live on?

11        A    Yes.

12        Q    Since 1986 have you held any employment?

13        A    No.  My wife had to carry the load.

14        Q    Have you received any type of

15   compensation or benefits following your retirement to

16   this day?

17        A    I get social security retirement.

18        Q    Did you begin receiving that in 1986?

19        A    No, no.  When I turned 62.

20        Q    Did you receive any type of compensation

21   or benefits between 1986 and the time you turned 62?

22        A    No.

23        Q    Have you ever --

24        A    Workers' comp, I did get workers' comp.

1    I can't remember the year actually.

2         Q    How long did you receive workers' comp?

3         A    It was a lump sum payout.

4         Q    In approximately 1986?

5         A    I believe it was '86.

6         Q    It was related to your injury --

7         A    Yes.

8         Q    -- at the time?

9         A    Uh-huh.

10        Q    Did you receive unemployment after Quick

11   went out of business?

12        A    No, I don't think I got unemployment

13   because it wasn't over work.

14        Q    Where is your wife currently employed?

15        A    She's not.

16        Q    She's not?

17        A    No.

18        Q    Is she retired?

19        A    No.  She lost her job last July.

20        Q    Who was she working for?

21        A    ED MAP in Nelsonville.  She was a

22   supervisor.

23        Q    They do telemarketing-type activities?

24        A    Uh-huh.  Sell college textbooks is what

1    they do.

2           Q      Do they sell it local?

3           A      All over, everywhere.

4           Q      Hocking?

5           A      They have a list of universities that

6    they deal with.  I couldn't tell you all the

7    universities.

8           Q      Do you know why she lost her job?

9           A      Yeah.  She had, I guess you would call

10   it, an emotional outburst, I think you would call it.

11          Q      She was terminated over the outburst?

12          A      Uh-huh.

13          Q      How long had she been unemployed by the

14   company?

15          A      Seven or eight years, something like

16   that.

17          Q      Do you know where she worked directly

18   prior to that?

19          A      World's Best Bagel.  She owned it here

20   in Athens.

21          Q      How many years did she work there?

22          A      From '96 until 2003, I think.  About

23   seven years, six or seven years.

24          Q      Was she the owner during that entire

1     time?

2          A     No, she started out as an employee.

3          Q     How did she become an owner?

4          A     The owner was interested in selling.

5     She started working there, and she wound up being the

6     manager.  Then the owner was interested in buying

7     another business, and so they made an agreement and

8     she bought it on what you would call land contract.

9     She paid it off in five years.

10          Q     Where was the World's Best Bagel?

11          A     It was 31 North Court Street.

12          Q     What happened in 2003?  Did she sell the

13    business?

14          A     Yes, she sold it.

15          Q     Do you know approximately how much she

16    sold it for?

17          A     $65,000, I think.

18          Q     Do you know what she bought it for?

19          A     60.  She paid a thousand a month for

20    five years to pay it off.

21          Q     The farm you live at, is it a working

22    farm?

23          A     No, no.  It's just -- it's our house is

24    there.  We had it logged, and we've got oil wells and

1   stuff like that.  We don't any livestock other than a

2   flock of chickens and our dogs.

3          Q    So you don't grow anything on the farm?

4          A    No.

5          Q    Or sell anything off of the farm?

6          A    Dogs.  Haven't in the last good number

7   of years.  It's a registered kennel.  We have

8   registered dogs.  We used to sell puppies, but the

9   last ones were four years ago.

10         Q    These oil wells that you have, do you

11  have leases for them?  How does that work?

12         A    We get a percentage of what they

13  produce.  It's the oil company put them in.  It's oil

14  and natural gas.  We get a percentage.  For example,

15  oil today is $97 a barrel.  They pick up between 80

16  and hundred barrels.  Oil pumps about one barrel a

17  day.  We get a percentage of the revenue of the oil

18  and the natural gas.

19         Q    So the property produces or the well

20  produces one barrel a day and it's currently selling

21  for $97 a barrel?

22         A    Uh-huh.

23         Q    What percentage would you receive?

24         A    We get an eighth.

1        Q       An eighth?

2        A       Yeah.

3        Q       Did you receive an initial lump sum when

4    you leased the wells or sold the wells to the oil

5    companies?

6        A       You know, I think there was, but I can't

7    remember the amount.

8        Q       How long ago was it that you sold to the

9    oil companies?

10       A       It's been about three years since they

11   put the -- since the well started producing.  It took

12   a while to get it drilled in and stuff.  I think

13   there was a sign -- some kind of a signing bonus, but

14   I can't remember now.  That was -- my wife would have

15   got that money.  She might have shared it with the

16   family.  I couldn't tell you.

17       Q       Does her family still own the farm?

18       A       No, she owns the farm.

19       Q       She received it through the inheritance?

20       A       Uh-huh.

21       Q       How many acres is it?

22       A       Ninety-six.

23       Q       Are all 96 acres in Meigs County?

24       A       Uh-huh.

1        Q     Have you ever served in the military?

2        A     No.

3        Q     Have you ever been arrested before, not

4     pertaining to the August 5th, 2009 incident?

5              MR. PETTEY:     I'll object just to

6     relevance, but you can go ahead and answer.

7        A     Traffic.

8        Q     So minor traffic infractions?

9        A     Yeah.

10        Q     Speeding tickets?

11        A     Yeah, but not in the last 20 years.  I

12     had a speeding ticket last May. That was in

13     Indianapolis.  I was on my way to Chicago.  I ran

14     with a guy, we wanted to get there before the

15     Indianapolis 500 traffic.

16        Q     I understand.  Other than traffic

17     infractions, have you ever been arrested and charged

18     with a crime --

19        A     No.

20        Q     -- other than the August 2009 incident?

21        A     No, no.

22        Q     Were you arrested in 1977 and charged

23     with aggravated trafficking?

24              MR. PETTEY:    Again, note an objection

1       as to relevance, but you can go ahead and answer.

2               A       I think so.

3               Q       Did you later plead guilty to carrying a

4       concealed weapon?

5               A       Yeah.

6               Q       Are there any other -- any other times

7       you were arrested and charged with a crime?

8               A       No.  I'm embarrassed to say that now

9       'cause I forgot about that.

10              Q       That helps refresh your recollection?

11              A       Yeah.  I don't remember any others, but

12      if you have a refresher, go ahead.  I don't remember

13      any others.

14              Q       And that was in Montgomery County?

15              A       Yep.

16              Q       What was the nature of the charge or

17      what were you arrested for?

18              A       It was a traffic stop.

19                      MR. PETTEY:     I'll note an ongoing

20      objection to this line of questioning.

21              Q       So noted.

22              A       It was a result of a traffic stop.  That

23      was right after I got divorced and had given up my

24      job.  I was paying on my van, and I took this guy's

1    car in trade on my van and we hadn't finalized it.  I

2    was driving his car, he had my van.  There was a

3    warrant for him.  So here I come driving down the

4    road and they run the license plate and there's this

5    warrant.  So they pull me over thinking I was him.

6                    They searched the car, and it was dirty,

7    which was -- I should have looked.  But I was

8    carrying a .25 automatic in my pocket, which I had

9    been in the habit of doing since I had been on the

10   police department.  Just never stopped carrying it.

11        Q    And you were charged with aggravated

12   trafficking?

13        A    Yes.

14        Q    Were there any other weapons in the

15   vehicle?

16        A    No, not that I can recall.

17        Q    Was there any other contraband in the

18   vehicle?

19        A    No, just what we found in the trunk.

20        Q    What was in the trunk?

21        A    Whatever I was charged with.  It's been

22   a long time.

23        Q    Was it marijuana?

24        A    No, I don't think it was marijuana.  I'm

1     not sure.  I really can't remember.  It must have

2     been pills or something.

3             Q     And the pills were seized?

4             A     Oh, yeah, they took the car and

5     everything.

6             Q     Was there anybody else in the vehicle

7     with you?

8             A     No, just me.

9             Q     What sentence did you receive after

10    pleading down?

11            A     Got probation.

12            Q     How long?

13            A     I think it was nine months.  Spent nine

14    months on probation.

15            Q     Did you serve any time in the Montgomery

16    County Jail?

17            A     Just initially that's where they took

18    me, yeah.

19            Q     But your sentence didn't -- you didn't

20    receive any jail time as part of your sentence?

21            A     No.

22            Q     This was your first conviction?

23            A     It was my one and only, yeah.

24            Q     Have you been arrested and charged with

1    a crime since 2009 not pertaining to the August

2    incident?

3          A      No.

4          Q      Mr. Six, I want to go back and ask you,

5    we talked about your employment a little bit, and I'm

6    looking at your letter of resignation, which is

7    marked Exhibit A.  At the top of the exhibit there's

8    letterhead indicating Robert B. Six --

9          A      Doing business as.

10         Q      -- DBA Arsenal Gun Shop.

11         A      Uh-huh, I owned two gun shops.

12                MR. PETTEY:     I will note an objection

13   to this line of questioning, but you can go ahead and

14   answer.

15         A      Yeah, I owned two gun shops at the time.

16   This is Xenia, then I had one on North Main Street in

17   Dayton.

18         Q      You were employed at these two gun

19   shops?

20         A      I owned them.

21         Q      Did you have employees working for you?

22         A      Yeah.

23         Q      Did you receive income from owning the

24   gun shops?

1          A      That was the idea.  It didn't work out

2      too well, but it was a for-profit adventure.

3          Q      You realized both gains and losses?

4          A      You got it, yeah.  It was a partnership.

5          Q      Who was your partner?

6          A      Maddox was his name.

7          Q      What was his first name?

8          A      Bob.

9          Q      You owned both gun shops with Bob

10     Maddox?

11         A      No, this one was just me.  This was in

12     my home.  This is my address and telephone it went

13     through.  In 2003, that was a partnership.

14         Q      What were the time frames of you owning

15     these two gun shops?

16         A      Same time I was on the Oakwood Police

17     Department.

18         Q      In the 1970's?

19         A      Uh-huh.

20         Q      Did you sell both gun shops?

21         A      Let's see, did we sell it or just close

22     it up?  I think the one on Main Street we just folded

23     it up and took a loss.

24         Q      Approximately what year?

1          A        '74, '75.

2          Q        In the 1970's?

3          A        Uh-huh.

4          Q        Did you sell the Xenia gun shop?

5          A        No, that was my home.  Well, I sold the

6    house, yes, but the license and so forth went with

7    me.  I moved it to Sharts Road in Franklin.

8          Q        You sold guns out of your house, you did

9    business out of your house; is that accurate?

10          A        Well, I was licensed to do that, but

11    mostly I did it out of the retail store, you know.  I

12    could have done it out of my house as a retail

13    outlet.

14          Q        When did that cease operations?

15          A        Which one we talking about here?

16          Q        Xenia.

17          A        '76, I think.  Probably the same, the

18    same year as I resigned there.  That was a bad year.

19    I got divorced.  It was downhill.

20          Q        You moved, I understand?

21          A        Sharts Road in Franklin, yeah.

22          Q        Did you continue doing business as

23    Arsenal Gun Shop?

24          A        Yes.  I kept my FFL, yeah.

1          Q       How long did you continue to do business

2     as Arsenal Gun Shop out of that address?

3          A       To tell you the truth, I think it was

4     less than a year.

5          Q       Did you own any gun shops after that

6     time?

7          A       No.

8          Q       Did you continue to sell guns after that

9     time?

10         A       No, I gave up my license about that time

11    too.

12         Q       Is that a federal license you have to

13    hold to sell guns?

14         A       Yes.

15         Q       Why did you give up your federal gun

16    license?

17         A       I sold my house, and there was just too

18    much going on to keep up with.

19         Q       Did the criminal charges that were filed

20    against you in Montgomery County in 1977 have any

21    bearing on you giving up your federal gun license?

22         A       Yeah, I gave that up before the

23    conviction, before the probation, all that came up.

24         Q       Was it part of your plea deal?

54

```
 1        A      No, I had already given up my license
 2    before that.
 3        Q      After being charged but before entering
 4    into the plea deal?
 5        A      No, I give up my license before -- you
 6    know, I can't remember for sure, but I think I had
 7    already given it up.  I was pretty much on a downhill
 8    slide.
 9        Q      So before you were arrested, you gave up
10    your license?
11        A      No, I think I had already given that up
12    because at the time I was arrested, I was living in
13    an apartment in West Carrollton.  I remember that
14    because I was on my way there when I got pulled over.
15    I never had a license in my apartment.  So I had
16    already given my license up.
17        Q      What is the name, the specific name of
18    the license that you held at the time?
19        A      01.
20        Q      It's called an 01?
21        A      Dealer.
22        Q      Federal dealer's license?
23        A      Uh-huh.
24        Q      Federal firearm dealer?
```

1          A      With a Class 3 taxpayer.  01 federal

2     firearms dealer license and Class 3 taxpayer.

3          Q      Have you held that license again?

4          A      No.

5          Q      Have you held any type of firearms

6     dealer license since that time?

7          A      I hold an 03, which is a firearms

8     collector.

9          Q      So the 01 is a federal firearms dealer's

10    license, and the 03 is a federal firearms collector's

11    license?

12         A      Yes.

13         Q      Does the 03 allow you to sell guns?

14         A      It allows me to buy, sell, and trade but

15    not for profit.

16         Q      What does that mean "not for profit"?

17         A      You can only buy, sell, and trade to

18    enhance your collection, build your collection.

19                Look at it from the standpoint that if

20    you buy a gun for $100 and sell is for $200, the $200

21    has to go for another gun that goes into your

22    collection.  There's no profit, per se.

23                The way it works is at the point and

24    time when you retire and you sell out your

1    collection, there may be a capital gain to pay on

2    what you take in for your collection.  It almost

3    works like a deferred account, an I.R.A. or

4    retirement account, something like that.  The I.R.S.

5    set it up.  Of course now it's under justice.

6         Q    Now, are you required to maintain

7    business documents related to this licensure?

8         A    Oh, yeah.

9         Q    What documents do you maintain?

10        A    What they call -- what the ATF calls a

11   big book.  It's a dealer record book of what you buy,

12   who you bought it from and if you dispose of it, who

13   you dispose of it to.

14        Q    Is that the same as a federal firearms

15   dealer's logbook?

16        A    Basically it is.

17        Q    There's no separate logbook --

18        A    It has --

19        Q    -- or is there?

20        A    This could be a logbook if you made it

21   out and kept that information I just told you

22   (indicating).

23             But everybody buys a record book that

24   has the categories on it, or you can get a DVD and do

1      it on your computer, keep it on your computer if you

2      want.

3          Q      So the laws or regulations as you

4      understand them only requires information be held.

5      It doesn't have to be in a particular --

6          A      They don't issue a book.  You're

7      responsible for buying the book.  They give you the

8      format, what the book is supposed to look like, but

9      they don't give you the book.  You are required to

10     buy your own book.

11             MR. CONOMY:      If I may clarify for the

12     record.  When you said "this could be a logbook," you

13     were referring to the yellow legal pad in front of

14     you?

15             THE WITNESS:      Yeah.  If I made

16     columns here, Column 1 was the date, 2 was who I

17     bought it from, 3 was who I sold it to, as long as

18     it's a bound book.

19     By Mr. Bernhart:

20         Q      So as long as it's a bound book and

21     meets requirements --

22         A      It has these categories:  Who you bought

23     it from, who you sold it to --

24         Q      As part of this --

```
1          A      -- and when.

2          Q      Okay.  As part of this lawsuit, you've

3    produced a number of dealer logs to me.  Are those

4    the same logs that we're talking about?

5          A      Yes.

6          Q      We'll get to some of those later.   I'm

7    going to have some questions about those later.  You

8    referred to it as a big book?

9          A      Uh-huh.

10         Q      Does any governmental agency audit those

11   books?

12         A      Uh-huh.

13         Q      Who is that?

14         A      Alcohol, Tobacco and Firearms.

15         Q      ATF?

16         A      Uh-huh.

17         Q      Do they have any type of regimen or

18   schedule for auditing the books?

19         A      Generally with 03's, they audit once a

20   year.  You may be aware that if you hold a federal

21   firearms license, it's an open-door policy.  They can

22   show up any time.

23         Q      Twice a year if they want to?

24         A      In theory, they can come every day.
```

1    Normally they come once a year, and they can look at

2    anything they want.  Like I said, they can walk in

3    your house and look at everything, look at all your

4    guns, look at your records, match your guns up with

5    your records.

6            Q    Do the same standards apply to the 01

7    federal firearms dealer's license?

8            A    Pretty much.  They are subject -- I

9    don't know if they can go in.  I think they might go

10   a little more often.  You know, it's been a while

11   since I held an 01.

12           Q    Had you ever had your books audited on

13   your 01 license?

14           A    Oh, yeah.

15           Q    Did you ever encounter any problem with

16   the auditing?

17           A    No.

18           Q    Were any guns ever seized from you by

19   ATF --

20           A    No.

21           Q    -- on your 01 license?

22           A    No.

23           Q    Did your conviction for carrying a

24   concealed weapon in 1977 prohibit you from holding an

1    01 license?

2         A    I didn't try to -- I don't know if it

3    would have or not.  I think not because I applied and

4    got an 03, and the same standards apply to 01 and 03.

5    If you can get one kind, you can get another.

6              MR. PETTEY:    Note an objection to the

7    question.  Calling for a legal conclusion.

8         Q    So noted.

9              Your understanding is that they have the

10   same eligibility requirements?

11        A    Yeah.  I never applied for an 01 after I

12   gave my 01 up.  I only applied for an 03 and got

13   that.

14        Q    Is there an 02?

15        A    Yeah, yeah, that's a manufacturer.

16        Q    Have you ever held an 02?

17        A    No.

18        Q    Have you ever held anything besides the

19   01 that you've already talked about and the 03 you

20   currently hold?

21        A    No.  Just the Class 3 taxpayer.

22        Q    I'm assuming that you still hold the 03;

23   is that accurate.

24        A    Yeah.

1        Q        Now, you applied to have your conviction

2   sealed in the Montgomery County court in 1986; is

3   that accurate?

4                 MR. PETTEY:      Objection, continuing

5   objection about the prior conviction.  You can go

6   ahead and answer.

7        A        I don't remember the year.

8        Q        Did you ever apply to have the record

9   sealed?

10       A        Uh-huh, I just don't remember the year.

11       Q        Why did you apply to have the record

12  sealed?

13       A        Who wants that hanging around your neck?

14  If you said it was '86, is that what you just told

15  me?

16       Q        I'm asking you if you recall.

17       A        I don't recall what year it was.  But,

18  see, in order to get a DOT, you can't have a felony

19  conviction on your record or any kind of conviction

20  like that.

21       Q        A DOT, what is that?

22       A        Department of transportation

23  certification to drive a freight truck.  It about had

24  to been a lot earlier than that when this record was

1    sealed or I wouldn't have been working.

2        Q    So you believe that the record was

3    sealed closer to the conviction in 1977?

4        A    Yeah.

5        Q    Prior to working in the trucking

6    industry?

7        A    Yeah.

8        Q    Did you apply to have it sealed so that

9    you could obtain the DOT to work in the trucking

10   industry?

11       A    Yeah.

12       Q    Are there any other sealed criminal

13   records that we haven't talked about today?

14       A    No.

15       Q    Mr. Six, have you been involved in a

16   civil lawsuit before?

17       A    No.

18       Q    Do you understand the difference between

19   criminal litigation and civil lawsuits?

20       A    Uh-huh.

21       Q    You understand this is a civil

22   lawsuit --

23       A    Right.

24       Q    -- that you are pursuing?

1              Have you ever had any other court

2    appearances or have you ever testified in court

3    before?

4         A     Well, I was a police officer, so I was

5    in court a lot.

6         Q     Other than your employment as a police

7    officer, have you ever testified in court?

8         A     No.

9         Q     Have you ever testified in any other

10   type of legal proceeding?  You've already indicated

11   you never had your deposition taken before.  You've

12   never testified in court.  Other than related to your

13   employment with Oak Hill, have you ever testified

14   under oath in any other type of proceeding?

15        A     No.

16        Q     Were you called to testify in the Meigs

17   County court related to the drug charge, the drug

18   possession charge?

19        A     I was called to court often, but I don't

20   remember being on the stand.  The judge asked some

21   questions, you know, while I was sitting, but I don't

22   think there was any testifying going on.  It never

23   went to trial, you know.

24        Q     Have you ever been involved in any

1    other -- any other lawsuits we haven't talked about?

2         A    No.

3         Q    Have you owned any businesses other than

4    what we've already talked about?

5         A    No.

6         Q    I want to talk about the August 5, 2009

7    incident.

8              On August 5, 2009, did you have or prior

9    to that date, had you ordered a package to be

10   delivered through the U.S. Post Office to your

11   residence?

12             MR. PETTEY:     Note an objection as to

13   relevance.  You can go ahead and answer.

14        A    Had I ever ordered a package at all for

15   the post office to bring?

16        Q    No.  Around August 5, 2009, had you

17   ordered a package to be delivered by the U.S. Post

18   Office to be delivered on or about August 5, 2009?

19        A    No.

20        Q    You did receive a package from the U.S.

21   Post Office on that date; is that correct?

22        A    Yes.

23        Q    And you signed for receiving that

24   package?

1          A      I think so.

2          Q      Rather than make you think so, why don't

3    I hand you an exhibit.  They are not stapled.  I ask

4    that it be marked as Exhibit B.

5                      - - -

6          Thereupon, Defendant's Exhibit B was

7          marked for purposes of identification.

8                      - - -

9    By Mr. Bernhart:

10         Q      Mr. Six, take a moment and review what

11   I've handed you and has been marked as Exhibit B.

12         A      That's obviously my signature on this

13   one.

14         Q      On the second page of Exhibit B?

15         A      Uh-huh.  I don't know what the other one

16   is.

17         Q      Sure.  Have you had a chance to review

18   both pages of Exhibit B?

19         A      Yeah.

20         Q      Does this help refresh your recollection

21   as to whether you signed for a document or signed for

22   a package on August 5, 2009?

23         A      Yeah.

24         Q      You, in fact, did sign for a package on

1    that date?

2         A     Uh-huh.  Well, it doesn't have a date on

3    it.

4         Q     Did you or did you not receive a

5    package?

6         A     Yeah.  I'll never forget that day.  I'm

7    looking at the paperwork here.  I signed for

8    something on that day.

9         Q     And you took that package into your

10   house?

11        A     He helped me bring it in.

12        Q     It's your testimony you did not order a

13   package to be delivered on or about that date?

14        A     I didn't order one.  I wasn't expecting

15   anything, no.

16        Q     Did you wonder why the package was then

17   delivered to your house?

18        A     Yes.

19        Q     Why did you accept the package?

20        A     Well, my wife told me before she went to

21   work that day that she had some soap coming.  So I

22   was expecting something to be delivered.  She didn't

23   say who was bringing it or anything, you know.  There

24   was something coming, but she didn't say if it was

1    UPS.

2         Q    What did the packages arrive in?

3         A    A van.

4         Q    Were they boxes?

5         A    Yeah, there was a box.

6         Q    It was one box?

7         A    There was two boxes.

8         Q    Approximately what size were the boxes?

9         A    They were like this (indicating).   Three

10   feet.   They were big and heavy.

11        Q    Several feet by several feet?

12        A    Yeah.

13        Q    And heavy?

14        A    Yeah.

15        Q    You opened at least one of the boxes?

16        A    Yeah.

17        Q    What was inside the boxes?

18        A    All these little Styrofoam things

19   started flying out.   I had -- I hate those things.

20   So I just closed the box back up.

21        Q    The packing material?

22        A    Yeah.

23        Q    So you observed the packing material but

24   nothing else inside the box?

1        A       I could see there was something inside

2    the box, but I didn't -- I was getting ready to take

3    a shower.  I had been doing yard work that day.  I

4    was going to go take a shower, and right then I was

5    down to my pants, you know, I was getting....

6        Q       Before we go further, just let the

7    record reflect that Mr. Six has knocked on the table.

8    Does that indicate a knock on your door?

9        A       The doorbell doesn't work.  So they had

10   to knock on the door.

11       Q       What time of day was it?

12       A       It was 4:00.

13       Q       4 p.m.?

14       A       Uh-huh.  Because I was getting ready to

15   go take a shower and right then a TV show came on and

16   it was interesting, so I just stopped for a minute

17   and I was watching that.  All I had on was my pants.

18   I was going to shower.  So I know it was 4:00 because

19   the show was just coming on.

20       Q       What TV show was it, do you remember?

21       A       The Untouchables.  It was in reruns

22   then, of course.  I like that show.

23               So I went and opened it up, and there's

24   this guy with these packages, you know.  I bring them

1      in and I saw that stuff and I thought, I'm going to

2      take my shower and then I'm going to haul them

3      outside to open them up, because the stuff was just

4      flying, you know, the Styrofoam peanuts.

5          Q      Was it a U.S. postal worker or someone

6      you believed to be a U.S. postal worker delivering

7      the items to you?

8          A      Uh-huh.

9          Q      He had his U.S. Postal --

10         A      He had a shirt on.

11         Q      You said he brought or helped you bring

12     the boxes into the house?

13         A      Uh-huh.

14         Q      Did he stay inside the house while you

15     opened them?

16         A      No, no.  He went on down the road.

17         Q      What specifically did you observe inside

18     the box other than the packaging material?

19         A      Well, you could see the top of

20     something, you know.  It was a plastic top of like a

21     bucket or something.

22         Q      So you observed a plastic bucket?

23         A      Yeah, I started -- I was looking for a

24     packing list because the package itself was addressed

1     to our account.  I was expecting soap.  She gets soap

2     all the time, but not that much.  I mean, it was a

3     huge amount of soap.  So I kind of dug around a

4     little bit for a packing list.  Those things started

5     flying out, and I wasn't going -- I didn't want them

6     all over the living room.

7          Q     Does the soap that she receive typically

8     come in plastic containers?

9          A     Yeah, but -- yeah, it comes in usually

10    like two gallon, you know, bottles.

11         Q     Did this appear to be a two-gallon

12    bottle?

13         A     No, it looked bigger.  It was like a

14    five-gallon top.  I could see what was in there.  I

15    thought, well, something is messed up here.  She

16    never got that much soap before.

17         Q     Did you open at least one of these

18    five-gallon bucket tops?

19         A     Nope, I didn't open it.  I didn't want

20    those Styrofoam things flying around the living room.

21    So I closed it back up and went on -- I was going to

22    go take my shower, like I said, then take them

23    outside because I've got packages with foamy stuff in

24    them before and they just fly around.  You have to

1    take them outside to open them to keep from having a

2    big mess in the house.

3         Q    Mr. Six, look at Exhibit B that I have

4    handed you.  On the first page of Exhibit B, up in

5    top right-hand corner there's what appears to be a

6    sender's name.  Do you see that?

7         A    Yes.

8         Q    What is that name?

9         A    It looks like Roberts.

10        Q    Did you know a Roberts?

11        A    No.

12        Q    When your wife had soap delivered, who

13   did -- who would she have that delivered from?

14        A    Usually a place called drugstore.com.

15        Q    Did you ever sign for packages for your

16   wife when she had soap delivered?

17        A    Don't usually require a signature.

18        Q    Are they usually sent by some other

19   means besides the U.S. post office?

20        A    Yes.

21        Q    Who are they sent by?

22        A    Usually UPS.

23        Q    So was it uncommon to be receiving a

24   package -- uncommon for you to be receiving a package

1       through the U.S. Postal Service that you had to sign

2       for on this date?

3               A       Yeah, I would say it was pretty unusual.

4               Q       And you did not know the sender's name?

5               A       No.

6               Q       And you weren't expecting a package?

7               A       Huh-uh.

8               Q       But accepted it nonetheless?

9               A       Yeah.  You know, in hindsight I wish I

10      hadn't, but I did.  We were outside when he came up,

11      we were outside on the deck and it was real bright

12      sun.  I couldn't really read it.  I couldn't hardly

13      see what I was signing for.  And I asked him, I said,

14      "What is this?"  He said, "It's yours.  Just sign for

15      it."  I said okay.

16              Q       Was anybody else outside with you?

17              A       No, just him.

18              Q       Was anybody else at the house at the

19      time?

20              A       No.

21              Q       Or on the property?

22              A       No.

23              Q       Your wife was at work at the time?

24              A       Uh-huh.

1          Q      Yes?

2          A      Yes.

3          Q      Were you able to go take that shower

4     that you were intending to do?

5          A      No, I didn't get to shower for a couple

6     days.

7          Q      Why don't you tell me what happened.

8     You open the package, you're watching The

9     Untouchables, you're intending to go take a shower,

10    what intervenes?

11         A      I heard somebody yell outside.

12         Q      What did you hear?

13         A      Just I heard a voice.  I heard somebody

14    yell something.  I couldn't really tell, you know.

15    Where I live, our neighbors, we're not inside of each

16    other.  It's not unusual for a neighbor to come over

17    and either honk the horn or if they walk over,

18    they'll holler or bang on the door.

19              So I heard somebody yell, and I thought,

20    here we go, you know, I'm never going to get in the

21    shower.  And I said, "Just a minute," and I went, I

22    was heading for the door and right then kabam, you

23    know, got hit real hard.  Tore out the doorjamb and

24    everything.

1        Q      Was that the same door that you had

2   received the package through?

3        A      Same door.

4        Q      Front door to the house?

5        A      It was on the deck side.  It's on the

6   side of the house.  It's the main entryway, but it's

7   not on the front of the house, it's on the side.

8        Q      It's the main door to the house?

9        A      Right.

10       Q      On the side?

11       A      Uh-huh.  And it was kabam, you know, and

12  I could see somebody because the door didn't open all

13  the way.  The doorjamb and stuff was still hanging

14  on.  And I could see somebody out there, and I said,

15  "What did you do that for?"  And then kabam, he hit

16  it again and knocked it right into my hands, you

17  know.

18            All I see is this guy wearing this black

19  mask and all this, and it really looked like a

20  fireman.  I knew the house wasn't on fire.  I

21  couldn't quite figure it out.

22            So he came in the door and he threw down

23  his battering ram, you know, and hit the table and

24  broke the floor tile, and then I saw the gun.  He

1    says, "Down on the floor.  Down on the floor."  I was

2    down on the floor.

3         Q    Did you recognize the individual behind

4    the mask?

5         A    I couldn't even see his face at that

6    time.  Now later I saw him without the mask.

7         Q    So you're down on the floor.  What

8    happened next?

9         A    Well, it's like here's the door and I'm

10   lying with my head that way (indicating).

11        Q    So you're laying with your face away

12   from the door?

13        A    Away from the door down on the floor,

14   and somebody came over and all I had on was my pants.

15   He grabbed me by the ponytail and by my belt and

16   pounded me on the floor.

17        Q    Your face was down?

18        A    Yeah.  It wouldn't have been so bad

19   except my dining room is tile and my living room is

20   carpet, and there's a metal strip that runs between

21   the carpet and the tile.  I was laying across that

22   metal strip.  So when he pounded me, it broke some

23   cartilages here in my ribs.  They were sore for a

24   period of months.  I had trouble sleeping.  It was

1    hurting.

2         Q    At that time were you told you are under

3    arrest?

4         A    No.

5         Q    You were just told to get down on the

6    floor?

7         A    Yeah.

8         Q    Were you placed in handcuffs?

9         A    Not right off.  They helped me up off

10   the floor and sat me in a chair.

11        Q    You're saying "they" at this point.

12        A    There were a whole bunch of other people

13   that came in too after that.

14        Q    Did those individuals have ski masks on

15   as well?

16        A    No, no, they didn't.

17        Q    Did you recognize any of those

18   individuals?

19        A    No, I didn't.  I didn't know any of

20   them.

21        Q    Approximately how many individuals had

22   entered the room at this time?

23        A    Probably six or eight at that time.

24        Q    Are we talking just within a couple

1    minutes --

2         A    Just --

3         Q    -- couple seconds?

4         A    Like, you know, they had been blown out

5    of a cannon.  All of a sudden the house was full of

6    people.

7         Q    Within less than a minute?

8         A    Yeah, I would say so.

9         Q    At any time do these individuals inside

10   your house identify themselves as law enforcement

11   officers?

12        A    No, but it was pretty obvious.  I could

13   see the badges and uniforms.

14        Q    So they had their badges out?

15        A    Yes.

16        Q    And that indicated they were --

17        A    Yeah.

18        Q    Their badges and uniforms --

19        A    Yes.

20        Q    -- indicated to you that there were law

21   enforcement officers inside your house?

22        A    Right.

23        Q    At what point are you handcuffed?

24        A    Well, somebody came up out of the

1    basement and said he had -- he said he could smell an

2    ammonia smell.  And I said, "That's my dog down there

3    in the pen, she's pregnant."  And then at that time

4    somebody said, "Get him out of here."  So then they

5    put me in handcuffs and told me I was a detainee and

6    took me outside and put me in the back of a patrol

7    car.

8         Q    So you are placed under arrest?

9         A    No.

10        Q    Put in handcuffs?

11        A    No, no.  Detainee was the word he used

12   pending their investigation.

13        Q    Did you understand that to mean you

14   could leave --

15        A    Well --

16        Q    -- if you'd like?

17        A    I suppose if I could have got out of the

18   handcuffs and out of the back of the patrol car I

19   might have left.  I think they intended for me to

20   stay there.

21        Q    Approximately how long is this after the

22   initial entrance into the house?

23        A    Oh, 10, 15 minutes, something like that.

24        Q    During the 10 or 15 minutes while you

1    were in the residence, were you not handcuffed?

2         A    Right.   I was surprised when they put

3    handcuffs on me.

4         Q    Were you asked to stay in a particular

5    location?

6         A    Just I was sitting in my chair and they

7    said, "You just sit there in your chair."  So I sit

8    there in my chair.

9         Q    So the officers asked you to sit.   Where

10   is the chair located at?

11        A    Well, it was right next to where I was

12   laying on the floor.  It was my easy chair.  I still

13   got the bad back to contend with, and I sit in that.

14   It's a recliner.  I can kind of --

15        Q    Is it in the corner of the room?

16        A    No, it's right in the middle.

17        Q    Right in the middle of the room?

18        A    Yeah.  I know there's pictures in

19   discovery if you look at them.  It's the blue chair.

20        Q    Blue chair?

21        A    Uh-huh.

22        Q    Tell me what you observed during these

23   10 or 15 minutes while you're sitting in the chair.

24        A    Everybody running around the house.  It

1    was up and down the basement and up and down the

2    hall, you know.  They were busy.

3         Q    Busy doing what?

4         A    It just looked like they were running

5    back and forth, you know.  I would assume they were

6    wanting to see if there were any other people in the

7    house would be my suspicion.

8         Q    What is the approximate size of your

9    house, square footage?

10        A    It's 30 by 40, two bedrooms.

11        Q    Two bedrooms, 30 by 40?

12        A    Yeah, the whole house is 30 feet by 40

13   feet.  It's a two bedroom house, ranch house with a

14   basement.

15        Q    Do you know the total square footage?

16        A    1,200.

17        Q    It's your belief during these 15 or 10

18   minutes the officers are trying to locate any other

19   individuals inside the house?

20        A    That would be the standard procedure,

21   yes.

22        Q    And you understood that from your

23   background in law enforcement?

24        A    Yeah.

1          Q      But nobody else was there, correct?

2          A      No.

3          Q      What else did you observe?

4          A      Well, then they took me outside and put

5    me in a patrol car.  What did I see after that?  That

6    was all that I saw in the few minutes that I was

7    still in the house is them running around in the

8    house looking.

9          Q      For 10 to 15 minutes?

10         A      Maybe that's too long.  Maybe it was

11   five or ten.

12         Q      It doesn't --

13         A      It was a blur to me.  Actually, you

14   know, I was still trying -- to tell you the truth, I

15   thought maybe I was dreaming.  If you've ever had a

16   nightmare, some of them are pretty vivid.  It didn't

17   really seem like it was really happening.

18         Q      Approximately how many officers did you

19   see inside the house?

20         A      Six or eight at that time.

21         Q      Well, it doesn't seem to me it would

22   take six to eight officers 10 to 15 minutes to search

23   a 1,200 square foot house --

24         ·A      Well --

1          Q      -- for other occupants.

2          A      No, it probably was less than that.  But

3     then they took me outside, and there were six or

4     eight more of them outside too.

5          Q      The six to eight more you saw outside,

6     did you see them inside the residence?

7          A      Yes, ultimately everybody was going in

8     and out of the house.

9          Q      Did you observe that while you were

10    sitting in the chair?

11         A      No, after I was in the patrol car.

12         Q      So while you are sitting in the chair,

13    you only see six to eight officers inside the house?

14         A      Correct.

15         Q      Then when you're taken outside, you see

16    six or eight more officers standing out there?

17         A      Yeah, at that time.

18         Q      And while you're out there, outside, you

19    observe those same six to eight officers go into the

20    house?

21         A      Yes.  As well as four more that arrive

22    after that.

23         Q      While you are sitting in the chair, do

24    you have any communication with any of the officers

1    inside?

2         A    Yeah, that's what I was telling you.  I

3    told them when they came up out of the basement and

4    he said he smelled an ammonia smell, I said, "That's

5    my dog down there.  She's pregnant," because she was

6    due to have puppies just any time.

7         Q    Other than that conversation, do you

8    have any other conversations inside the house while

9    you're sitting in the chair?

10        A    No.

11        Q    Did any officer explain to you why they

12   were there?

13        A    No.

14        Q    While you're sitting in the chair, do

15   you have any guns inside the house in plain view?

16        A    Disassembled.  There was two

17   disassembled in the living room that I had sent out

18   and had Parkerized.

19        Q    What does that mean?

20        A    That's refinished.  It's an exterior

21   finish.  Parkerizing is what they put on

22   military-type weapons.  It's rust resistant and

23   damage proof and so on.  I had sent these two guns

24   out and had them Parkerized.  They were on a hassock

84

1       about where I could reach them but in the same room.

2       I was going to reassemble and hadn't done that yet.

3            Q     Other than these disassembled guns in

4       the living room, are there any guns inside the

5       residence that are in plain view of those -- of

6       anyone walking through?

7            A     No.

8            Q     So it's your contention all the guns are

9       stored away and would need to have something opened

10      to be able to see them?

11           A     Yes.

12           Q     Do any of the officers ask you about the

13      disassembled guns in the living room?

14           A     Well, the officer with the battering

15      ram, the one that pounded me on the floor, he asked

16      me if I had any guns on me, and I said no.  Because

17      he patted me down as well and still asked if I had

18      any guns on me, and I said no, I didn't.

19                 Then when he went over and found the

20      ones, the disassembled guns, he came back over and he

21      got right in my face like nose to nose and he said,

22      "Why didn't you tell me those guns were here?"  I

23      said, "You asked me if I had any guns on me.  That's

24      what you asked me."  He was really irate.

1          Q     So now we have identified a second

2    conversation you had?

3          A     I had forgot about that one.

4          Q     Are there any other conversations that

5    you had with the officers while you are still inside

6    the house?

7          A     Let me think a little so I don't mess

8    up.  The one about the dog in the basement.  That's

9    all I can remember.

10         Q     You don't recognize any of the officers

11   that are inside the house?

12         A     No, I didn't know any of them.

13         Q     Do you know who the Meigs County Sheriff

14   was at the time of this?

15         A     Beegle.  Him I knew.  I didn't see him.

16         Q     Was he inside the house at the time

17   you're sitting there?

18         A     No.

19         Q     And he wasn't part of the initial raid?

20         A     I saw him outside, but I couldn't really

21   tell you if he was there initially or if he came

22   later because there were some outside that didn't

23   charge right into the house.  To my recollection, the

24   ones that were outside were all pretty much Meigs

1   County deputies.

2        Q    Did you see any Meigs County deputies on

3   the initial raid or -- were any of the six to eight

4   individuals who were inside the house while you were

5   sitting in there, were any of those Meigs County

6   deputies?

7        A    They could have been, but not all of

8   them were in uniform.  Some of them out of uniform

9   could have been Meigs.

10       Q    Was there anyone in uniform inside the

11  house, the initial six to eight?

12       A    The guy that had all the black stuff on,

13  he had his uniform on underneath it.

14       Q    Did you recognize the agency that he was

15  from?

16       A    No.  Again, by the time I had been

17  pounded on the floor, I was pinching myself literally

18  thinking that, you know, this isn't real.

19       Q    Did you observe the officers looking

20  inside of drawers or cabinets --

21       A    No.

22       Q    -- when you were in there?

23       A    I was outside by the time they did all

24  that.

1          Q     What did the officers tell you about the

2     disassembled gun on the floor other than asking you

3     about it?

4          A     Well, it wasn't on the floor.  It was on

5     a hassock.  There were two of them there that had

6     come back.  The only conversation we had about those

7     two was with the officer, I just call him officer

8     battering ram because I don't know who he was.  He

9     said, "Why didn't you tell me those guns were there?"

10    I said, "That's not what you asked me."  It wasn't.

11    He asked me if I had any guns on me, which was pretty

12    obvious I would think.  All I had on was my pants.

13         Q     Did the officers ask you if there were

14    any other guns inside the residence?

15         A     No.

16         Q     Were there any drugs or other contraband

17    in plain view inside the residence at the time the

18    officers were in there and you are sitting on the

19    chair?

20         A     I don't think so.

21         Q     Did you later learn what was inside the

22    package that was delivered to you that day?

23         A     Oh, yeah.

24         Q     What was inside the package?

1          A       Marijuana.

2          Q       How much marijuana?

3          A       That, I really couldn't tell you.  I was

4    charged with possession of 1 to 5,000 grams.  That's

5    what they charged me with.

6          Q       Do you know how many pounds of marijuana

7    that is?

8          A       Somewhere less than -- between two

9    pounds and ten pounds, something like that.

10         Q       Did you observe the officers looking

11   inside the package while you were there, while you

12   are inside the house?

13         A       No.

14         Q       At some point you are told that you're

15   being detained and put into handcuffs --

16         A       Yeah.

17         Q       -- at the time?

18                 The first time you were placed in

19   handcuffs is when you were being escorted out of the

20   house?

21         A       Yeah.

22         Q       So the whole time you are in the house

23   sitting on the chair, you're not in handcuffs?

24         A       Well, briefly, you know.  I mean, they

1    put me in handcuffs while I was -- I think I was

2    still sitting.  I might have been standing and then

3    sat down for a little bit.

4                   Then after we had -- after the dog

5    conversation, you know, I can't remember if he asked

6    me about the dog and handcuffed me or handcuffed me

7    and then asked about the dog, but then they said,

8    "Take him out of here."  Somebody said, "Take him out

9    of here."

10        Q    Did the conversation about the

11   disassembled guns in the living room, was that before

12   or after the conversation about the dog in the

13   basement?

14        A    After.  Because somebody came up out of

15   the basement.  The initial search they ran through

16   all the rooms looking for other people, including the

17   basement, and came up.  By the time I had the

18   conversation about the disassembled guns, that guy

19   that asked me about that had taken off his black suit

20   and his helmet and so on.

21        Q    Did you recognize him after he took

22   his --

23        A    Never saw --

24        Q    -- mask off?

1        A        -- him before then and never saw him

2    after that.

3        Q        Is there anything else you can tell me

4    that you specifically remember observing while you

5    were still inside the residence other than what

6    you've already told me today?

7        A        Before they took me out.  I don't

8    remember anything else that I saw before they took me

9    out.  I was standing when I had the handcuffs on and

10   he asked me about the weapons on the hassock.  I

11   told -- we were nose to nose.  He was a good bit

12   shorter than me.  So I know I was standing, or I

13   wouldn't have been able to ascertain that.

14       Q        How tall are you, Mr. Six?

15       A        6 foot 3.

16       Q        I know you testified that you did not

17   recognize the officers that were inside your house at

18   the time.  Did the six to eight individuals inside

19   your house, did they all appear to be law enforcement

20   officers?  I know you testified that there were some

21   badges that were shown and some were in uniform.  I

22   guess my question is:  Was there anyone that you

23   observed that did not appear to be law enforcement?

24       A        Well, the plainclothes detectives were

1    not in uniform.  From their demeanor, their behavior,

2    the way they conducted themselves when I went through

3    the residence, I knew that they were.

4         Q     You knew they were detectives?

5         A     Uh-huh.

6         Q     Do you know who they were?

7         A     There's one right there (indicating).

8         Q     Let the record reflect that Mr. Six has

9    looked at the end of the table where Deputy Adam

10   Smith is sitting.

11        A     I didn't know who he was at the time,

12   but we had some hearings in Meigs County.

13        Q     You recognize Deputy Smith was somebody

14   that was inside your house at the time?

15        A     Yes.  In fact, there's pictures of him

16   in there in discovery.  If you look at the pictures,

17   he's holding some of my guns.

18        Q     Did you observe any of the officers

19   handling any of your guns while you were inside the

20   residence?

21        A     No.

22        Q     Did you observe any of the officers

23   handling any other contraband or property of yours

24   while you were inside the residence?

1        A     No.

2        Q     It's your testimony that the same person

3    that initially grabbed you upon entrance into the

4    house, that was the same person that took you

5    outside?

6        A     No, I don't think he was the one that

7    took me outside.  There was more than one that

8    escorted me out to the patrol car.

9        Q     How many were there?

10       A     Escorting me?

11       Q     Yes.

12       A     I think at least three.

13       Q     So three officers?

14       A     It's a pretty small house.  There wasn't

15   a lot of room.  I think they were going outside

16   anyway because there were so many of them there.

17       Q     You don't know who it was that was

18   telling you you were being detained?

19       A     No, not initially.  But ultimately when

20   I saw Sheriff Beegle, I knew who he was.  I knew who

21   the sheriff was.

22       Q     How did you know who the sheriff was?

23       A     Well, from the election, you know, and

24   so forth I recognized him.  Plus he had his name

1    right there on his shirt.

2         Q    Did you ever have any interaction with

3    Sheriff Beegle prior to him being at your house that

4    day?

5         A    No, no.  Just voted for him for sheriff.

6    That was it.

7         Q    Besides former Sheriff Beegle, did you

8    recognize anybody else?

9         A    No, I didn't know any of them.

10        Q    Where were you taken to after you are

11   let out of your house?

12        A    I better correct that.  Later on the DNR

13   officers showed up, Woods and Shields.  I knew Woods

14   for a long time, and he introduced me to Shields.  He

15   was the new boy at the time.

16        Q    When you say "later on," did you observe

17   them arriving at the scene?

18        A    No.  See, I was passed out then.  When I

19   came to, they were there.  I don't know when they

20   showed up.

21        Q    You did not observe them in your house

22   while you were still inside there?

23        A    Right.  They weren't there for the

24   initial part of the raid.

1          Q      Did you observe them when you were

2     brought out of the house?

3          A      No, they weren't there.

4          Q      Did you observe Robert Beegle being

5     there when you were led out of the house?

6          A      I don't think he was there yet.  I don't

7     think he was.

8          Q      At this point you don't know anybody?

9          A      I don't know anybody.

10         Q      Either inside the house or outside the

11    house?

12         A      I'm still pinching myself trying to wake

13    up.

14         Q      What door are you led out of the house

15    through?

16         A      The side door.  The front door goes into

17    the dog pen.  There's no place to go there.  You have

18    to go in an outside door.

19         Q      Where are you taken to?

20         A      The patrol car parked in the driveway.

21         Q      The patrol car, was it labeled?

22         A      Meigs County.

23         Q      So it was a Meigs County Sheriff patrol

24    car?

1          A      Uh-huh.

2          Q      What color was it?

3          A      Black, black and gold, gold decorations.

4          Q      These three individuals who led you out

5     of the house, were they the same three that put you

6     inside --

7          A      Yeah.

8          Q      -- the patrol car?

9          A      Yeah.   They marched me out and put me

10    inside the car, yeah.

11         Q      You don't know who these three

12    individuals are?

13         A      No, not to this day.

14         Q      Can we eliminate Deputy Smith as being

15    one of those individuals?

16         A      Well, you know, I don't know.   There was

17    one behind me, you know.   If I was to guess, I'm just

18    guessing, I don't think he was.   I think they were

19    all uniforms that took me outside, but I wouldn't

20    swear to that.

21         Q      By your account at least 10 or 15

22    minutes passed from the initial entry to the time you

23    were place in the car?

24         A      Yeah.   That's about right, yeah.

1        Q    Was anyone inside of the car, in the

2    front seat?

3        A    No.

4        Q    Where were you placed?

5        A    Backseat.

6        Q    Handcuffs on?

7        A    Yes.

8        Q    You said all you had on at the time of

9    the entrance was pants.

10        A    And socks.

11        Q    Pants and socks?

12        A    Uh-huh.

13        Q    Is that the same thing you were wearing

14    when you were placed into the back of the patrol car?

15        A    Yes.

16        Q    No shirt?

17        A    No shirt.  They wouldn't let me put my

18    moccasins on.  I wanted to put my moccasins on.  They

19    shoved me, no, you just get on out of here.  That was

20    officer battering ram.

21        Q    What was the distance that you walked

22    from the entryway to the house to the patrol car?

23        A    It's probably 75 feet, three stairs

24    downhill to the driveway.  Maybe not that far.  I

1      would say less than 75 feet.

2           Q      More than 50?

3           A      Yeah.

4           Q      More than 50 but less than 75?

5           A      Yeah.  Never really measured that.

6           Q      Can you see the residence from the

7      driveway?

8           A      Oh, yeah.

9           Q      Could you see the residence from the

10     backseat of the patrol car sitting in the driveway?

11          A      Yes.

12          Q      Approximately how many other vehicles

13     were in the driveway or parked near the driveway at

14     the time you were led out of the house?

15          A      It was a parking lot.  I'm telling you,

16     it was a parking lot.  They were parked in the yard

17     and in the grass and alongside the driveway.  To

18     answer your question in terms of numbers, there were

19     probably six to eight vehicles there in addition to

20     mine.

21          Q      Were any of those vehicles marked or

22     detailed as law enforcement agencies?

23          A      Most of them actually.

24          Q      Which law enforcement agencies were they

1    marked as?

2         A    Meigs County and DNR.  The dog warden,

3    he was out there.  DNR came later.  After I came back

4    to and sat up, all these individuals were parked

5    there.

6         Q    My question to you was:  What vehicles

7    did you observe between your transport from the house

8    to the back of the Meigs County patrol car?

9         A    There were a couple plain ones and some

10   marked ones both at the time they took me out.  Then

11   there were a lot more of them after I regained

12   consciousness.

13        Q    So the DNR vehicle was not there?

14        A    Not there yet.

15        Q    Was the dog warden's vehicle there?

16        A    He wasn't there yet.

17        Q    So at this point is it only unmarked

18   vehicles and Meigs County vehicles?

19        A    I couldn't tell you if they were all --

20   if all the marked ones were Meigs County, I couldn't

21   tell you that at all, no.

22        Q    Sitting here today, you don't recall

23   seeing any other law enforcement agency vehicles

24   sitting there?

1          A      Well, there were marked law enforcement

2     agency vehicles there.  I don't know if they were

3     Meigs County or not.  The one they put me in was

4     Meigs County.

5          Q      How do you know that for sure?

6          A      It said so on the door.

7          Q      You saw it as you were being placed into

8     it?

9          A      Yeah.

10         Q      Did you have any communications with the

11    officers as you were being led out from the residence

12    to the Meigs County patrol car?

13         A      Not that I can recall, no.

14         Q      Could you hear them talking?

15         A      No.  The ones that were escorting me

16    out, no.  They were talking, but they weren't talking

17    to me.

18         Q      What were they talking about?

19         A      I don't know.  They were just voices.

20         Q      Could you hear any communications

21    outside during that transport?

22         A      Not really.  I mean, just, you know, you

23    go here, you go there.

24         Q      While sitting in the back of the Meigs

1    County patrol car, could you hear people talking?

2         A    Yeah.

3         Q    Anyone in particular?

4         A    Well, the sheriff, I remember Sheriff

5    Beegle, but this was after I regained consciousness.

6    I sat up in the car and he said, "Somebody get down

7    there to that car.  I don't want a dead detainee in

8    my patrol car."

9         Q    Who was he talking to?

10        A    I don't know.  One of the other

11   deputies.  Then someone came down and opened the

12   door, and it was like a breath of fresh air because

13   it was -- I was sweating so much I could slide around

14   on the seat.  It was just greasy wet.  Even the

15   handcuffs came off.  I was so dehydrated, they just

16   came right off.

17        Q    So at some point the cuffs come off.  So

18   you're uncuffed in the back of the car?

19        A    Yeah.

20        Q    Sheriff Beegle sees you, asks that the

21   doors be opened and the doors are opened?

22        A    Yeah.  Then I said --

23        Q    Approximately how long was this after

24   you had been placed into the vehicle?

1          A     It was a couple hours.

2          Q     A couple hours?

3          A     Yeah.

4          Q     Did you have any other conversations

5     with anyone?

6          A     Yes.

7          Q     Did you have any conversations with

8     anyone while you were in the car for that period of

9     time?

10         A     Not until they opened the door.

11         Q     So for a couple hours you're back there,

12    and you have no communications with officers?

13         A     No, I couldn't.  I was handcuffed.  I

14    couldn't get -- I thought they're not going to just

15    leave me here.  My conversation was with myself.

16    They're not just going to leave me in here.  It was

17    August.

18         Q     You indicated that you could see people,

19    you could see the residence from the back of the

20    patrol car.  Could you see officers going in and out

21    of the residence?

22         A     Yeah, they were just one continuous

23    line.  They were carrying my guns out, and they had

24    three pickup trucks lined up along side the driveway,

102

1    and they were just walking them out, carrying all

2    they could leading up to the pickup trucks, and they

3    were wheeling -- I had had ammo in the basement, and

4    they were wheeling out all my ammo boxes and all my

5    parts and everything and loading them all up.  I

6    watched it.

7         Q    How long after being placed in the

8    vehicle did you observe officers taking items, taking

9    property out of your house?

10        A    Well, I hadn't been sitting there too

11   long when they started.

12        Q    Five or ten minutes?

13        A    Probably.  It might have been a little

14   longer.  Then I saw -- the last one I saw the deputy

15   was walking out, he had an AR-15.  He was carrying it

16   by the handle, and I could tell by he look on his

17   face it was like a kid in a candy store, you know,

18   walking out with that gun.  Then I lost

19   consciousness, and I just went down.

20        Q    How long was that after you had been

21   placed into the patrol car?

22        A    Probably 15, 20 minutes.  Something like

23   that.

24        Q    These initial 15 to 20 minutes before

1    you lost consciousness, tell me specifically what you

2    observed going on outside.

3        A      They were loading, loading up my guns in

4    the pickup truck.

5        Q      Into a pickup truck?

6        A      Three of them, I think there were three

7    of them.  The house sits like so, the driveway is

8    here with the patrol car, and then there was three

9    pickup trucks (indicating).

10       Q      Mr. Six, let me stop you for a moment.

11   You're diagramming something that's going to be very

12   difficult for the court reporter to take down.

13       A      If I said the house is facing east --

14       Q      I will make it easy on you, Mr. Six.

15   I'm going to hand you a piece of paper, if you want

16   to, to draw what you're trying to describe.

17       A      Okay.

18       Q      That would perhaps make it easier on the

19   court reporter.

20       A      I'm not an artist.

21       Q      Let the record reflect that Mr. Six has

22   drawn a schematic of what I believe to be his

23   property.

24       A      Very rough.  This is the house, and the

1    door is on this side, this is a deck.  The door goes

2    out to an elevated deck.  There's a couple steps

3    right here that go down to the ground, and you walk

4    out this way and over to the driveway to get to the

5    car.

6                These are three pickup trucks that were

7    parked over here in the grass adjacent to the

8    driveway.  They were carrying stuff out the door

9    here, and also the house has a walkout basement.

10   They were carrying stuff out of the basement loading

11   it into these three pickup trucks (indicating).

12        Q    From the back of the patrol car you had

13   an unobstructed view of the house and the three

14   pickup trucks; is that accurate?

15        A    That's accurate.

16        Q    You observed the officers --

17             MR. CONOMY:    Just to clarify the

18   geometry here.  The patrol car that you're seated in,

19   the car is facing toward -- along the driveway in the

20   direction of the house facing west on your diagram?

21             THE WITNESS:    No, he was facing

22   east -- or facing west, sorry, yes.  This is the

23   front of the car.  I was in the backseat.

24             MR. CONOMY:    You're in the backseat.

1    So you're facing --

2              THE WITNESS:    I could look out the

3    side window and the side window and the windshield

4    from the backseat (indicating).

5              MR. CONOMY:    So you didn't have to

6    turn around to see all this?

7              THE WITNESS:    No.

8              MR. CONOMY:    It was in front of you.

9    I wanted to clear that up.

10   By Mr. Bernhart:

11        Q    You've identified six to eight officers

12   inside the house when you were there, another six to

13   eight officers outside the house.  Did you observe

14   those officers who were outside the house then going

15   into the residence?

16        A    Yeah, they pretty much -- they were all

17   carrying stuff out.

18        Q    Did you observe anyone's uniform that

19   you could identify in particular as that who was

20   bringing items out of the house?

21        A    Well, I could see that they were in

22   uniforms.  I couldn't really read -- I couldn't see

23   what agency they were from, but I could see they were

24   in uniforms.

1          Q      Other than guns, did you observe any

2     other items being taken out of your house?

3          A      Oh, yeah.   All the ammo cans that I had

4     in the basement that were filled with ammunition and

5     parts.

6          Q      You could differentiate that between the

7     guns?

8          A      Oh, sure.   The guns were in cases and

9     boxes, and they used my boxes that I had them stored

10    in to carry a lot of them out, and the cases that I

11    had them in, they carried them out in those cases.

12               The ammo in the basement was in ammo

13    cans.   They used my two wheeler to wheel out the ammo

14    cans out of the basement.

15         Q      A dolly?

16         A      Yeah.

17         Q      What were the guns stored in inside the

18    residence?

19         A      Well, I had a gun cabinet and I had some

20    foot lockers and some were just in cartons.   Like

21    Smith & Wesson boxes.   The Beretta one would be

22    Mauser.   I had them separated.

23         Q      Was it a wood box?

24         A      There was both.   There was a wooden foot

1    locker and some of them were just in cardboard boxes

2    in zipper pouches.  Each one had its own pouch.  They

3    weren't just jumbled together.  As a collector, you

4    have to -- you want them to be nice.  So each one was

5    in its own zipper pouch.

6        Q    Were all of these boxes and lockers

7    locked?

8        A    The room itself that I keep them in is

9    locked.

10       Q    Which room is that?

11       A    That would be -- there's two bedrooms, a

12   big one and a small one.  The small bedroom was the

13   one where I kept my guns.

14       Q    So in the small bedroom all of the guns

15   you contend were stored in there?

16       A    Not all of them.  My wife has her guns,

17   and they were in her room.

18       Q    The large bedroom?

19       A    Yeah.  Then there was a shotgun in the

20   dining room in the corner in a case that I kept for

21   hawks, coyotes and any type of thing that would get

22   after the chickens, I kept it handy.

23       Q    In the corner of the living room?

24       A    Dining room.

1          Q      What type of box was that stored in?

2          A      It was in a case, a zipper case.

3     They're cloth and they have a spongy lining, a felt

4     lining on the interior.

5          Q      Can you see what's inside the bag --

6          A      No.

7          Q      -- from outside of it --

8          A      No.

9          Q      -- without opening it up?

10         A      No.  Anybody who knows guns would

11    recognize a gun case, but I'm not saying everybody

12    would know it was a gun case.  I don't know what else

13    you would store in a case that long.

14         Q      Law enforcement officers --

15         A      Law enforcement officers would know that

16    was a gun case.  But it was like in the very corner

17    next to an island where it's got pots and pans and

18    all that stuff in it.  So it's not really readily

19    visible from there.

20         Q      Besides the two bedrooms and the one gun

21    that's in the dining room, did you have guns stored

22    in any other area of the house?

23         A      No.

24         Q      None in the basement?

1        A       No, no, it's too humid down there.

2        Q       None in the living room?

3        A       Just the two that were disassembled.

4    They weren't stored.  They were, you know, they were

5    going to be put back together and put with the

6    others, you know.

7        Q       Besides the -- I apologize.  I forget

8    what you called them, the ammo barrels?

9        A       Cans.

10       Q       Ammo cans --

11       A       Uh-huh.

12       Q       -- and guns, did you observe from the

13   backseat of the patrol car any other items being

14   taken out of the house?

15       A       Oh, they did take my -- I had a box

16   where I kept all my important papers, deeds and

17   transfers, you know, death certificates and all that

18   kind of stuff and my tax records, I saw them carry

19   that out.

20       Q       You recognized the box?

21       A       Yeah, uh-huh.

22       Q       This is before you were unconscious?

23       A       I don't know if it was before or after.

24       Q       Are there officers standing near the

1   patrol car while you are sitting in it?

2         A     No, everybody was busy visibly carrying

3   stuff out.

4         Q     Did you try to get out of the patrol car

5   at any time?

6         A     Not until they opened the door.

7         Q     You've testified that your cuffs came

8   off.  So you were uncuffed.  You weren't placed under

9   arrest, correct?

10        A     Correct.

11        Q     Did you make any attempts to get out of

12  the patrol car?

13        A     Not that I can recall.  There's no door

14  handles or anything.  I mean, I knew from my own

15  experience, the only way you could possibly have

16  gotten out would be to kick out the window or

17  something.  I was not likely to do that in stocking

18  feet.

19        Q     What about when the door is open?  The

20  door is open, you're not under arrest, you don't have

21  handcuffs on, did you try to get up and leave?

22        A     I wanted to breath then.  No, I was, you

23  know, I was trying to -- I just wanted to breathe,

24  and I asked them for something to drink.  I couldn't

1    have stood upright then anyway.

2         Q    Who did you ask for something to drink?

3         A    The guy that opened the door.

4         Q    You don't recall who it was that opened

5    the door?

6         A    No.  He was a Meigs County deputy

7    though.  I said, "I've got to have something to

8    drink."  He went up -- they all had pizza and stuff,

9    you know, right then.  He went up and he brought me a

10   cup of root beer or pop of some kind.  I said, "I

11   can't drink that.  As thirsty as I am, it will make

12   me sick."  He said, "We don't have any water."  I

13   said, "Well, there's bottled water in my refrigerator

14   in the kitchen.  If you will go up there and bring me

15   one, I sure would appreciate it."

16              He went and got me a bottle of water and

17   brought it out to me.  That was a very considerate

18   officer right there.  He wasn't like the first bunch.

19   Plus he saw what kind of shape I was in, I imagine.

20        Q    You stated that you saw them eating

21   pizza up there.  What did you observe?

22        A    I didn't know who he was, but Matt

23   Donahue showed up and he had a big stack of pizzas,

24   and they all had pizza and pop and everything there.

1      Q     Who is Matt Donahue?

2      A     Prosecutor.

3      Q     How did you know who he was?

4      A     Well, after -- I mean, I didn't know

5    that day who he was, but then when we got to court

6    and started the proceedings.

7      Q     I understand.  You observed who you

8    later knew to be Matt Donahue carrying pizzas up to

9    the residence?

10     A     No.  I seen the delivery guy, but he was

11   wearing a white shirt, plus they don't deliver pizzas

12   out where I live.

13     Q     Did you recognize the pizza company?

14     A     No, I don't know where he got them.

15     Q     Is there anything else sitting here

16   today you recall observing while you were sitting in

17   the back of the patrol car other than what you have

18   already told us?

19     A     Well, the dog.  The guys came and they

20   brought a dog and, of course, my dog -- one of my

21   dogs was out, you know.  I wasn't sure if that was

22   going to be a good deal or not because this was a

23   black German Shepherd, nice dog.  They took him and

24   they walked him all over the place, you know.  He was

1    smelling trying to find, you know, probably a drug

2    dog.  Nobody said.  He was probably a drug dog.  They

3    walked him all over place.  He was a K-9 handler, you

4    know.

5          Q     I understand there was marijuana seized

6    from the residence, correct?

7          A     Yeah.

8          Q     There was not only the large containers

9    of marijuana that were in the packages, but there

10   were other small amounts of marijuana seized from the

11   residence; is that accurate?

12         A     Uh-huh.

13         Q     Was that your marijuana?

14         A     No.

15         Q     Do you know whose it was?

16               MR. PETTEY:     I'll object as to

17   relevance.  You can go ahead and answer.

18         A     Yeah.  I have a cramp in my leg.  That

19   happens sometimes.

20         Q     If you want to answer the question, we

21   can take a quick break.

22               Do you knew who the marijuana inside the

23   residence belonged to?

24         A     It was my wife's.

1                          - - -

2                     Recess taken.

3                          - - -

4    By Mr. Bernhart:

5         Q    Back on the record.

6              Mr. Six, before we took a break, we were

7    talking about your observations from the back of the

8    patrol car you were being held in, and you testified

9    that you observed various items being taken from the

10   house and placed into vehicles.

11        A    (Witness nods affirmatively).

12        Q    Apart from the pickup trucks, did you

13   observe items being placed in other vehicles?

14        A    Well, the dogs in the dog warden's

15   truck.

16        Q    Dogs were taken from your residence?

17        A    Yeah, they took my dogs.

18        Q    Did you get them back?

19        A    Yeah, my wife went and got them the next

20   day.

21             MR. PETTEY:    I was going to

22   interrupt.  I forgot.  There was something that

23   Robert brought to my attention during the break.  I'm

24   not sure if it was even asked, I can't remember if

1       the question was even asked, but it was something

2       about while he was in the patrol car, and I know we

3       discussed that at some length.  So, Robert, why don't

4       you tell them what you were telling me.

5               A       You asked me if I tried to get out.

6               Q       Yes.

7               A       I took that to mean physically tried to

8       open the doors or something like that, which, you

9       know, would be felony escape.  Risky to do that.

10              Q       Mr. Six, your testimony has been that

11      you were not placed under arrest?

12              A       Right.  I was a detainee.  To tell you

13      the truth, we didn't have detainees that I can recall

14      back in the seventies.  I hadn't heard that term

15      until that day.

16              Q       Did you take being told that you were a

17      detainee to mean the same thing that you were under

18      arrest?

19              A       No, but I took it to mean that I

20      couldn't leave, you know.  Not that I could anyway

21      because the patrol car was locked and didn't have any

22      door handles.

23              Q       Let me ask you.  I've seen patrol cars

24      in Meigs County, and my understanding is that they

1      have levers to roll down the windows and open the

2      door.  Are you telling me that the cruiser that you

3      were in that day did not have those mechanisms?

4          A      That's correct.

5          Q      Did you look around to see whether it

6      had those mechanisms?

7          A      Yes.

8          Q      What did you do to check for them?

9          A      Well, I just looked at the door,

10     interior of the door.

11         Q      Would you be surprised to know that the

12     cruiser you were being held in or all Meigs County

13     cruisers have door handles in the backseat?

14         A      Do they function?

15         Q      I'm asking you would you be surprised if

16     you knew --

17         A      Yes, I would be surprised because, you

18     know, even back in the seventies, the back doors

19     didn't have operating or functioning door handles or

20     window cranks.

21         Q      I understand your experience in patrol

22     cars is that you didn't understand them to have door

23     handles and window levers, but I'm asking you would

24     you be surprised to know that the Meigs County

1    cruisers have those mechanisms?

2         A    Yes, I would be quite surprised.

3         MR. PETTEY:    Now, that wasn't what we

4    had talked about.  So why don't you go ahead and talk

5    about what we talked about.

6         A    The other possible interpretation of

7    your question as far as getting out goes was did I

8    try to get someone's attention to open the door, and

9    I did do that.  I couldn't believe that they put me

10   in there in August with all the windows rolled up.  I

11   was sure somebody was going to come back in a few

12   minutes and roll down the window or turn on the car,

13   start the air conditioner or something.

14              I was sitting in there like this

15   (indicating), and when they walked by, I was, you

16   know, jumping up and down, you know, trying to get

17   their attention, even yelling, but it was almost like

18   they never really looked at me or heard me.

19              MR. PETTEY:    For the record, he's

20   sitting there with his hands behind his back as if

21   he's handcuffed.

22         A    Like this in handcuffs (indicating).

23         Q    Let the record reflect that Mr. Six is

24   bobbing up and down in his chair.

1          A      Uh-huh.

2          Q      So your previous testimony that you

3    didn't have communications with any of the officers,

4    are you now saying that's not accurate, you did

5    communicate?

6          A      Attempted to communicate, but I had no

7    communication.  They did not acknowledge that I was

8    in the car.

9          Q      Besides bobbing up and down in your

10   seat, what did you try to communicate to the

11   officers?

12         A      I yelled something, you know, "Don't

13   forget me," you know.  "Can you roll down the

14   window," I think is what I was yelling, as I recall.

15   If they would just opened the window, it would have

16   helped.

17         Q      You've also testified that during the

18   entire time that you sat in the back of the patrol

19   car, you observed officers going in and out of the

20   house?

21         A      Not the entire time.  I did -- they were

22   going in and out before I passed out.  Then they were

23   still going in and out when I regained consciousness.

24         Q      You didn't really think they were going

1    to leave their cruiser with you in it on your

2    property, did you?

3         A    No.  I figured, you know, either they

4    were going to let me loose or let me go back in the

5    house, you know.  I was a little bit surprised when

6    they took me to jail.

7         Q    How long had -- approximately how long

8    were you in the cruiser before one of the deputies

9    opened up the door?

10        A    To my best estimate, a couple hours.

11        Q    You've already testified that it was

12   4:00 when the initial raid occurred.  So a couple

13   hours later, we are into the early evening by this

14   time?

15        A    (Witness nods affirmatively).

16        Q    Yes?

17        A    Yes.  It was 6:00 or so.

18        Q    What was the weather like that day?

19        A    It was hot, sunny.  August.  August 5th,

20   you know.  It was real hot in the police car.

21        Q    Did you have any observations whether

22   the sky was clear?

23        A    It was sunny.  It was clear.

24        Q    Even into the early evening hours?

1         A      Yeah, you know, August it stays

2    daylight.  I think it was like 7:00 or so before we

3    left and got down to the Meigs County Jail.  I think

4    it was still daylight, you know.  Waning, but it was

5    still daylight.

6         Q      Do you have trees on your property?

7         A      Yeah.

8         Q      How close are the trees located to the

9    driveway?

10        A      There's one -- if you look at my diagram

11   here, there's one right here.  This is a redbud tree.

12   It's right here (indicating).  It's not big enough

13   tree to shade anything unless you just sit right

14   under it.  The driveway is exposed to sun.  There's

15   no shade.

16        Q      Did you observe any shadows on the

17   property while you were in the back of the patrol

18   car?

19        A      No.  I wasn't looking for shadows, you

20   know.  You mean shadows from?

21        Q      Did you observe any shadows on the

22   property while you were being -- while you were held

23   in the back of the patrol car for several hours?

24        A      No, I wasn't.  I wasn't -- you mean like

1    people walking in the house were they casting

2    shadows?  Probably, but it wasn't, you know, it

3    wasn't the focus of my attention.

4         Q    There were pictures taken -- I'll

5    propose to you that there were pictures taken at the

6    scene of your residence that day, and if it was a

7    sunny day, I would suspect that there would be plenty

8    of shadows from at least the tree --

9         A    If they took some outside.  All the

10   pictures that I saw were taken inside the house, as I

11   recall.  There may have been some outside.

12        Q    While you were being held in the back of

13   the patrol car, other than the officers who you don't

14   recognize and former Sheriff Beegle, who did you

15   recognize?  Did you observe anyone else on the

16   property?

17        A    Other than law enforcement?

18        Q    Correct.

19        A    No.

20        Q    So there was nobody you knew who you

21   observed?

22        A    No.

23        Q    Who's Todd Anderson?

24        A    He was my neighbor.  He told my wife

1    that he had come by the house and saw all the

2    commotion and stopped and asked what was wrong.  I

3    never saw him because he obviously came while I was

4    passed out in the back of the car.  So I never saw

5    him, but he told my wife he stopped by.

6         Q    Have you spoken with Mr. Anderson about

7    this case?

8         A    No.

9         Q    Is he still your neighbor?

10        A    Yeah.  I haven't talked to anybody about

11   this case.

12        Q    Do you talk to Mr. Anderson?

13        A    Oh, yeah.  Christmas card exchanges and

14   the whole bit, but never about this.  He did ask my

15   wife what had happened.  She talked to him about it a

16   little bit but not, you know.

17        Q    And he told your wife that he stopped by

18   your residence that day?

19        A    They told him to get on down the road or

20   they were going to arrest him.

21        Q    You've spoken about being passed out for

22   a period of time in the back of the patrol car.  How

23   long do you believe you were passed out.

24        A    Somewhere close to two hours would be my

1    guess.

2         Q    Was there a clock in the patrol car?

3         A    No, no clock.

4         Q    Did you have a watch on at the time?

5         A    No, just my pants and socks.  What I'm

6    going by is we arrived at the police station about 7.

7         Q    Where do you get that from?

8         A    They had a clock in there, where they

9    signed in, and I looked at the clock.

10        Q    So by your estimate, you're placed in

11   the back of the patrol car around 4:15 in the

12   afternoon?

13        A    Uh-huh.

14        Q    And you're held in there until sometime

15   before 7:00 because 7:00 is the time that you were in

16   the police station?

17        A    Yeah.

18        Q    How long of a drive is it from your

19   residence to the Meigs County Sheriff's Office?

20        A    Twenty-six miles.

21        Q    Is that where you were taken to?

22        A    Uh-huh.

23        Q    So that's where you saw the clock?

24        A    Uh-huh.

1        Q      Approximately how long does it take to

2   make that drive?

3        A      Half hour depending on weather.  It was

4   a sunny, dry day.  It was probably a half hour drive,

5   thereabouts.

6        Q      So you had to leave the residence by

7   6:30 to make it there by 7:00?

8        A      That's a fair estimate.

9        Q      You've testified that you were passed

10  out by your estimate for a couple hours.  If you were

11  only in the police car from around 4:15 until 6:30,

12  are you contending you were passed out the whole time

13  you were in there?

14       A      Most of it, yeah.  I couldn't have

15  been -- maybe 15, 20 minutes in there before I passed

16  out.  It got hot very fast.

17       Q      How long were you in the patrol car

18  after they opened up the door until the time you

19  left?

20       A      Not very long.  They opened it up and

21  there was a couple guys that came and sat in the

22  front of the car and asked me questions and stuff.

23  Then we left.  There was still a bunch of people

24  there, but we went ahead and left.

1        Q      Do you know who those officers were?

2        A      No.

3        Q      What did they ask you?

4        A      I can't remember.

5        Q      Had you woke up by the time they got

6   into the car?

7        A      Yeah, I think that's what woke me up was

8   them getting in, opening the door, and I felt the

9   air.  I told one of them, I said, "Don't get

10  excited," I kept my hands behind my back even though

11  the handcuffs had come off.  I said, "Don't get

12  excited here, but the handcuffs came off," and I went

13  like that (indicating).  He said, "You have to have

14  your handcuffs on."  I said, "Please don't put the

15  handcuffs on."  He said, "Well, we'll cuff you in

16  front."

17              They cuffed my hands in front.  Because

18  that position, I got the bad back and sitting in that

19  position and laying in that position when I passed

20  out, I was pretty miserable because my ribs were

21  hurting.

22       Q      Did you inform those officers you were

23  passed out in the back of the car?

24       A      No.  I imagine -- I don't know, but I

126

1      would suspect they would come back and looked in on

2      me.   Like I said, when I was a cop, we did not leave

3      prisoners unsupervised.   If we had somebody arrested,

4      we had to stay with them in the car.   Somebody

5      stayed.   Maybe that's changed since then, but that's

6      the way we did it.

7           Q      But it's your understanding you had not

8      been arrested at that time?

9           A      That's true.

10          Q      Besides the communication about your

11     handcuffs being off, what else did you communicate

12     with those officers who were in the front of the car?

13          A      Well, that's what I'm saying, he was

14     asking me stuff, but I can't remember what he asked.

15          Q      Approximately how long were you in the

16     car before you observed the officers eating -- before

17     you saw Mr. Donahue arrive with the pizza?

18          A      I don't know.

19          Q      Was it in the first few minutes or --

20          A      No.   When I -- when I woke up, at the

21     time when I woke up and looked out, I saw him and the

22     pizza boxes.   I don't know what time that was.   It

23     might have been -- I couldn't even guess because I

24     didn't have a watch or anything, but he probably

1    knows what time it was.

2         Q    You've testified that at one point the

3    officers asked you if you would like something to

4    drink.

5         A    I told them I got to have something to

6    drink.  I'm just bone dry.

7         Q    Approximately how long had you been in

8    the car when that occurred?

9         A    It was, I'd say close, to a couple

10   hours.  I would say that was probably around 6.  The

11   pizza thing was already over with.  He said, "All we

12   got left is some pop."  He brought me that.  I said,

13   "I can't drink that.  It's too sweet."  I was too

14   hot.  If you've ever been that hot where soda just

15   wouldn't do it, I was there.  I had to have water.

16        Q    So you're awake to observe the officers

17   taking property, taking guns out of your house.

18   You're awake observing officers taking the boxes of

19   ammo out of your house.  You're awake when the pizza

20   arrives.  You're awake to be asked if you want

21   something to drink.  It sounds like maybe you were

22   awake a little longer than 10 or 15 minutes in the

23   back of the patrol car; is that fair?

24        A    What I'm saying is I was awake for 10 or

128

1    15, 20 minutes.  I was awake before I passed out.

2    Then I was awake for a while before we left.  That's

3    when he offered me -- it was after I had been in the

4    car for whatever period of time that he offered me

5    the drink.

6        Q    By your account you were in the car a

7    total of two hours and 15 minutes, thereabouts,

8    before being transported.

9        A    That's probably -- yeah, I think that's

10   right.  Because it was a little after 4, and then we

11   got to the police station at 7.

12       Q    Do you recall who transferred you back

13   to the police station?

14       A    No.

15       Q    Were they Meigs County deputies?

16       A    Yes, they were Meigs County deputies

17   uniformed.

18       Q    Was there anyone else in the car?

19       A    There were two of them in the car.

20       Q    The two deputies in the front seat?

21       A    Uh-huh.

22       Q    Anyone else in the backseat?

23       A    No, just me.

24       Q    On the way to the sheriff's office where

1       the jail is, did you have any communication with

2       those two officers during the transport?

3              A     No.  They were holding a conversation,

4       but I couldn't tell you what it was about.

5              Q     You didn't communicate with them?

6              A     No.  I was feeling pretty bad actually.

7              Q     When you arrived at the jail, did you

8       ask to speak with a doctor?

9              A     I don't think -- no, I don't believe I

10      asked for a doctor.

11             Q     Did you ask to speak with a nurse?

12             A     No, I didn't think they had one.

13             Q     Are you feeling better by the time you

14      got back to the jail?

15             A     No, not really.  When they put me in the

16      general population, I was doing this (indicating).

17      One of the other prisoners said, "Is there something

18      wrong?"  I said, "Yeah, my side really hurts."  He

19      said, "Well, there's no point in asking for a

20      doctor," he said, "they won't even take you down

21      until tomorrow or the next day."  I didn't know

22      better.

23             Q     Before being admitted into the jail, did

24      you complete a medical questionnaire?

1          A      Uh-huh.

2          Q      On that medical questionnaire, did you

3     indicate any injuries from being held in the back of

4     the police car?

5          A      I don't remember.  I can't recall.

6                        - - -

7          Thereupon, Defendant's Exhibits C and D

8          were marked for purposes of identification.

9                        - - -

10    By Mr. Bernhart:

11         Q      I've marked the diagram that you

12    sketched Exhibit C.

13                Mr. Six, take a moment and review

14    Exhibit D.

15                Have you had an opportunity to review

16    that?

17         A      Uh-huh.

18         Q      Do you recognize this document?

19         A      No, not really.

20         Q      Is this the medical questionnaire that

21    we were just talking about that you acknowledge

22    completing upon being admitted into the jail?

23         A      I completed this?

24         Q      I'm asking you.

1          A      No, I don't think that I did.

2          Q      Is that your handwriting on this

3     document, Mr. Six?

4          A      No.

5          Q      Is there a medical questionnaire which

6     you acknowledge you completed prior to being admitted

7     into the jail that's different than this medical

8     questionnaire?

9          A      One I filled out, you're asking me that?

10         Q      You testified that you did complete one.

11         A      I did.

12         Q      That's what you just testified to, sir.

13         A      Oh, I don't remember me filling out a

14    medical document.

15         Q      Did somebody ask you questions?

16         A      Yes.   These are obviously my answers.

17    This is not my writing.

18         Q      Fair enough.   These are your responses

19    to questions?

20         A      These are my responses to questions.

21         Q      Is there anywhere on here, sir, you can

22    point out where you informed the person completing

23    this questionnaire about injuries sustained being

24    held in the back of the police cruiser?

1          MR. PETTEY:    I'll note an objection.

2     There's nowhere on this form to indicate that.  You

3     can go ahead and answer the question.

4          A     Would you repeat that?

5          Q     Sure.

6                         - - -

7          Previous question read by the reporter.

8                         - - -

9          A     No, I can't see any question on here

10    about that.

11         Q     Okay.  Had you ever been to the Meigs

12    County Jail prior to August 5, 2009?

13         A     No.

14         Q     Upon being admitted, were you placed

15    into what they called general population with all the

16    other inmates?

17         A     Yeah.

18         Q     How long did you remain in general

19    population?

20         A     Until the next morning.

21         Q     So from approximately 7:00 on the

22    evening that you were retained until?

23         A     Midmorning.

24         Q     On August 6th?

1          A       Uh-huh.

2          Q       How were you removed from general

3     population?

4          A       Taken to the courthouse.

5          Q       You were released on bond?

6          A       Yeah.

7          Q       A few minutes ago you talked about being

8     placed in segregation.  I'm wondering when that

9     occurred.

10         A       I did?  I said segregation, I was

11    segregated?

12              MR. PETTEY:     I think the record will

13    reflect he said he was placed in general population.

14         Q       Okay.  Let me ask you:  Were you ever

15    placed apart from the other inmates into a cell by

16    yourself?

17         A       No.

18                     - - -

19         Thereupon, Defendant's Exhibit E was

20         marked for purposes of identification.

21                     - - -

22    By Mr. Bernhart:

23         Q       Mr. Six, have you seen this document

24    before?

134

```
1          A     No.

2          Q     Is that your signature in the middle of

3     the document next to Inmate Signature?

4          A     Yes.

5          Q     Do you know whose signature that is at

6     the bottom?

7          A     No, I can't even read that.

8          Q     That indicates that it's a

9     supervisor/officer or officer in charge.

10         A     Uh-huh.

11         Q     Do you know why you signed this

12    document?

13         A     Why he signed it?

14         Q     You just testified that was your

15    signature --

16         A     Yeah.

17         Q     -- in the middle of this page.

18         A     Yeah.

19         Q     I'm asking if you remember why you

20    signed this document?

21         A     I don't remember signing it, no.  I

22    don't remember ever even seeing it.  I've read it.  I

23    see what it is.  It says that I request admission for

24    protection.  That didn't happen.  I was put in
```

1     general population.  I really don't know what that's

2     about.

3          Q     So it's your testimony that you remained

4     in the general population during your entire stay --

5          A     Yeah.

6          Q     -- at the Meigs County Jail?

7          A     Yeah.

8          Q     During that time from the evening around

9     7:00 on August 5th until the time that you went to

10    court the following morning, did you ask to see a

11    doctor or a nurse?

12         A     I don't believe so.  As I said, the

13    other inmates said it was a waste of time.

14         Q     Who was that other inmate?

15         A     I don't know who they were.  There were

16    seven or eight guys in the cell.

17         Q     Mr. Six, would you go back to exhibit,

18    it was the Inmate Medical Questionnaire.  Do you have

19    that in front of you?

20         A     I have it.

21         Q     On Question 21, would you read the

22    question?

23         A     "Do you have any other medical

24    problems?" and it's not checked.

1        Q      There's an indication here that you

2   reported what appears to be cirrhosis, the second one

3   I can't read.

4        A      Hemachromatosis.

5        Q      And two bad discs.

6        A      Right.

7        Q      Is there any reason you wouldn't have

8   reported injuries sustained in the back of the police

9   car at the time you reported these medical

10  conditions?

11       A      I don't remember him asking me that.  He

12  asked me about medical conditions.  I don't think he

13  asked me about any injuries I sustained.

14       Q      Do you contend that you sustained any

15  injuries by being held in the back of the patrol car?

16       A      I was sick for quite a while after that,

17  not to mention the pounding on the floor.  You can

18  still feel those knots.

19       Q      That's not what I am asking about.  I'm

20  asking about the time you were held in the back of

21  the patrol car.

22       A      Permanent injuries, I think not, but it

23  was pretty rough there while I was in the car.  Then

24  I was sick for a good time after I got home after

1    that too.

2         Q    Did you see a doctor?

3         A    Yeah.

4         Q    What doctor did you see?

5         A    Dr. Carin.

6         Q    Doctor?

7         A    Carin, C-a-r-i-n, Steven Carin, but he

8    died May 15th the following year.  He had been my

9    doctor since '94.

10        Q    During the course of this litigation, we

11   had requested records for you to obtain from Dr.

12   Carin.  Do you recall that?

13        A    Yeah.  He's dead.

14        Q    Your response was that no records exist?

15        A    That's right.

16        Q    Do you have any explanation for why no

17   records exist for him seeing you?

18        A    He died.  They said at his office that

19   he had not filled out that paperwork prior to his

20   death.  He hadn't entered into my patient -- the only

21   paper I had was the one that I was there and not his

22   diagnosis.  He was notoriously slow on paperwork.  He

23   was the team physician for Ohio University football

24   team, and he was just a busy guy.

1          Q       Where did you see Dr. Carin at?

2          A       At the Castrop Center is where his

3     office was next to O'Bleness.

4          Q       Where?

5          A       Castrop Center.  He worked for Ohio

6     University Medical Associates was the name of the

7     outfit.

8          Q       When did you see Dr. Carin?

9          A       It was like ten days or so after I was

10    released from jail.

11         Q       What did you see him for?

12         A       Well, my ribs were hurting.

13         Q       Anything besides the ribs?

14         A       The hemachromatosis, he monitored that.

15    He's my regular doctor.

16         Q       Conditions that you held prior to the

17    time of being held in the jail --

18         A       Yeah.

19         Q       -- being detained?

20         A       He's an internal medicine specialist.

21    He looked after my liver.  These are all liver

22    diseases, you know.

23         Q       Besides that visit approximately ten

24    days after being released, did you see Dr. Carin

139

1      again prior to his death?

2              A     Oh, I saw him the day he died.

3              Q     What day was that?

4              A     May 15.

5              Q     Of what year?

6              A     2010.   He was fine that day, and then

7      6:00 that night he had an aneurysm and that was it.

8              Q     By my estimation, May 15, 2010 is ten

9      months after you were held at the Meigs County Jail.

10             A     I saw him the day he died, but I had

11     seen him just, you know, I saw him periodically,

12     including right after I was out of jail.  A week or

13     ten days after I was out of jail was the first time I

14     saw him after the raid, and I didn't tell him what

15     happened.  I just told him I fell down and hurt my

16     ribs.  I didn't tell him anything about the raid.  I

17     don't talk about this with anybody.

18             Q     Approximately how many times do you

19     believe you saw him between August of 2009 and his

20     death?

21             A     I saw him every six weeks, at least.

22     Because I have to go for phlebotomy.  I have been on

23     phlebotomy since '97, and I have to go periodically

24     for phlebitic treatments.  So I see the phlebotomist

140

1    and then I go see him.

2        Q    It's your testimony that or it's your

3    understanding that no records exist of any of those

4    visits between August of 2009 and May of 2010?

5        A    That's right.  That's what they said.

6    Paperwork was not his strong point.

7             MR. PETTEY:    We will be glad to sign

8    a release for those records.

9        A    If you can get them, that would be

10   great.  They say they don't exist.

11       Q    Who did you inquire of, inquire from

12   regarding those medical records?

13       A    His office stayed open for a couple

14   weeks after his death, and they sent out letters in

15   fact and said, you know, if you need anything, get

16   ahold of us before such and such a date.  So I got

17   ahold of them, and I said, "I'd like to have my

18   records," and they said, sorry.

19             Then I knew other patients of his too,

20   and we compared notes and they didn't get their

21   records either.  I wasn't singled out on that.  He

22   just was notoriously poor about doing paperwork.

23       Q    Was the treatment that you received

24   during those ten months all related to the liver

141

1    issues?

2         A    Pretty much.

3         Q    You said you were released on O.R.?

4         A    Uh-huh.

5         Q    You did not have to pay anything, any

6    money to be bonded out?

7         A    No.

8         Q    Did you have a criminal defense counsel

9    at the time?

10        A    Uh-huh.

11        Q    Who was that?

12        A    Carson Crow.

13        Q    Was Mr. Crow your attorney prior to this

14    incident?

15        A    Ever since I moved down here, since back

16    in the eighties.  He took care of all the deeds,

17    contracts and all that kind of stuff.

18        Q    So Mr. Crow helped you on a number of

19    civil matters?

20        A    Never any criminal.

21        Q    This was the only criminal matter --

22        A    Yeah.

23        Q    -- that he represented you in?

24        A    Uh-huh.

1          Q      What were you charged with?  What were

2      the criminal charges that were brought against you

3      related to this incident?

4          A      Untagged deer parts, untagged turkey

5      tail, and marijuana, but I can't remember what the

6      specific -- I can't remember if it was possession or,

7      you know.  I don't remember what, but something with

8      a marijuana charge.

9          Q      Something to do with the marijuana that

10     was in the packages?

11         A      Yeah.

12         Q      You say untagged deer?

13         A      Deer racks.

14         Q      Deer racks and turkey?

15         A      One untagged turkey tail.

16         Q      Is that the same thing as turkey

17     feathers?

18         A      Yeah.  The tail is feathers, yeah.

19         Q      I just want to make it clear for the

20     record.

21                Were all of those charges filed in the

22     same court?

23         A      Yeah, initially, uh-huh.

24         Q      What court was that?

1          A     Judge Story.  It was Judge Story,

2     whatever.

3          Q     It was the county court?

4          A     County court.

5          Q     Meigs County court?

6          A     I guess.

7          Q     Court of common pleas, does that

8     sound --

9          A     Judge Story was the judge.  It wasn't --

10    there's two courtrooms up there.  The little one and

11    the big one.  We started out in the little one.

12         Q     Was that the municipal court, do you

13    know?

14         A     You're asking me questions I just can't

15    answer.

16         Q     Fair enough.  I don't expect you to

17    answer something you don't know.

18                Was Judge Story the first judge that you

19    went before?

20         A     Yeah.

21         Q     Did Judge Story remain -- did he

22    continue to preside over the case until its

23    completion?

24         A     No, the charges were all dismissed.

144

1          Q      Did Judge Story dismiss those charges?

2          A      Yeah.

3          Q      Did you go to trial on any of the

4     charges?

5          A      No, no trial.

6          Q      How do you know that the charges were

7     dismissed?

8          A      It's online.

9          Q      Is that how you learned of it?

10         A      Yeah.  Well, of course, I talked to

11    Carson about it at the time.

12         Q      Did he inform you that the charges were

13    being dismissed?

14                MR. PETTEY:     I'm going to object as

15    to conversations between him and his attorney.

16         A      That's true.

17         Q      Fair enough.

18                During the course of -- while those

19    criminal charges were pending, was it your

20    understanding that the county was seeking to have

21    your guns forfeited?

22         A      Pardon me?

23         Q      During the course of those criminal

24    proceedings, did you learn that the county was trying

1    to have your guns forfeited?

2         A    No, no.  We were trying to get them

3    back.

4         Q    What was your understanding why they had

5    the guns?

6         A    I didn't understand it.

7         Q    What efforts did you make to have the

8    guns returned?

9         A    Well, Carson brought in Jeffery Finley.

10        Q    And who is that?

11        A    He was another attorney, and he started

12   filing stuff with the court trying to get the guns

13   back and everything else for that matter.  They had

14   my computers.  They took a lot of property, knives

15   and gun parts, military.  They probably emptied half

16   the stuff out of my house.

17        Q    Did you ever learn during the course of

18   those proceedings why the county didn't want to give

19   you those items back?

20        A    No, not really.  Of course there was an

21   indictment in May of the following year, and then the

22   judge said while I was under indictment, I couldn't

23   have them.

24        Q    Judge Story said that?

1      A      No, this is Judge Crow, Carson's

2   brother.

3      Q      Judge Crow said you couldn't --

4      A      Couldn't have any firearms.

5      Q      Because of the indictment?

6      A      Yeah.

7      Q      Now, if you know, why was Judge Crow

8   presiding over this case at this time rather than

9   Judge Story?

10      A      Well, apparently once you're indicted,

11   it goes to another court.

12      Q      Would that have been Meigs County Common

13   Pleas Court?

14      A      There's only two, and we were in the

15   other one.

16      Q      What was the indictment on?  What were

17   you indicted for?

18      A      Possession of marijuana, six untagged

19   deer racks, and one turkey tail.

20      Q      So the same three charges that were

21   initially brought against you?

22      A      Same ones they dropped.

23      Q      So initially -- when you testified that

24   the charges were dropped --

1        A        Dismissed.

2        Q        -- dismissed, was that before the

3    indictment came out?

4        A        Oh, yeah, a long time.  See, there was a

5    period of like six or seven months between the time

6    that the charges were dismissed and the indictment

7    came down, and during that time they still wouldn't

8    give my property back to me.  I don't know why.  I

9    can't tell you what Carson told me.

10       Q        Were you indicted by a grand jury?

11       A        I guess.  Is there another kind?

12       Q        I'm just asking what you understood to

13   have happened.

14       A        As far as I know, it was a grand jury.

15       Q        Was the possession of marijuana charge

16   or indictment, were you being charged with a felony

17   or a misdemeanor, if you know?

18       A        Felony.

19       Q        It was a felony marijuana possession

20   charge and the untagged deer parts and turkey

21   feathers?

22       A        Yeah.

23       Q        Was Carson Crow still your attorney at

24   this time?

1        A        Yes.

2        Q        Even though the judge presiding over the

3    case was his brother?

4        A        Well, let me -- the judge -- it was then

5    assigned to a visiting judge for that reason.

6        Q        Was that Judge Evans?

7        A        Yeah, Evans, right.

8        Q        And that was the reason you understood

9    Judge Crow recused himself because of the

10    relationship with your attorney?

11        A        As I recall, too, there was some illness

12    involved with the judge.  He was sick, not able to be

13    on the bench.

14        Q        Had you ever had dealings with Judge

15    Evans prior to him presiding over your case?

16        A        No.

17        Q        Did you know who he was?

18        A        No.

19        Q        Do you know what county he came from?

20        A        Gallia.

21        Q        Did you have to go before Judge Evans

22    and enter a plea to the charges that were filed

23    against you?

24        A        Oh, yeah.

1          Q       How did you plead to the three charges?

2          A       Not guilty.

3          Q       Not guilty?

4          A       Uh-huh.

5          Q       Was a trial date then set?

6          A       Oh, there was a lot of trial dates set.

7          Q       Was there?

8          A       I got a stack of continuances like this

9     (indicating).

10         Q       Your understanding the case was set for

11    trial?

12         A       I would show up and nobody was there.

13    Then there wasn't a jury and then the prosecutor was

14    gone.  It was a comedy, I'm telling you.

15         Q       Is that when you learned that Matt

16    Donahue was a prosecutor?

17         A       Yes.

18         Q       Was he a prosecutor on this case?

19         A       Yes.

20         Q       Did your attorneys or you through your

21    attorneys and the prosecution continue to have fights

22    about the return of the guns while those criminal

23    charges were pending?

24         A       (Witness nods affirmatively).

1          Q      Yes?

2          A      Yes.

3          Q      Did you through your attorneys ask Judge

4    Evans to have your guns returned?

5          A      Yes.

6          Q      Did you understand at that time that the

7    county was opposed to that?

8          A      Oh, yeah, obviously, or they would have

9    given them back.  Even after he ordered them

10   returned, they didn't.

11         Q      I want to talk about that in a second.

12   I will get to that.

13                Do you know what efforts your attorney

14   has made or you made through your attorneys to have

15   the guns returned while the charges were pending

16   before Judge Evans in the Meigs County Common Pleas

17   Court?

18                MR. PETTEY:     I'll object.  The record

19   will speak for itself on this.  To the extent you

20   know, you can go ahead and answer.

21         A      You know, I'm not sure I can give a

22   decent answer, you know, what arguments he made.

23   Other than they tried -- you know, one of the

24   arguments is, where are they?  For a long time we

1    didn't know where they were being held.

2         Q    Did you later learn where they were

3    being held?

4         A    I know where I picked them up.  I can't

5    honestly say I knew where they were during the whole

6    period of time.

7         Q    The time that you picked them up, where

8    did you pick them up from?

9         A    At the jail, property room above the

10   jail.

11        Q    Above the Meigs County Jail?

12        A    Uh-huh.

13        Q    Is the jail at the sheriff's office.

14        A    Yes.

15        Q    Was that the first time you learned the

16   guns were at the sheriff's office?

17        A    No, in the course of the court

18   proceedings when we were trying to get them returned,

19   Jeffery found out somehow that's where they were.

20        Q    At some point -- at any point did the

21   court order that the guns be returned to you?

22        A    Uh-huh.

23        Q    Yes?

24        A    Yes.

1          Q      And that was a written decision from the

2     court?

3          A      Yes, Judge Evans.

4                        - - -

5               Thereupon, Defendant's Exhibit F was

6               marked for purposes of identification.

7                        - - -

8     By Mr. Bernhart:

9          Q      I'm going to hand you Exhibit F.  You

10    don't need to read the whole decision, but I want to

11    ask if you have seen this document before?

12         A      Uh-huh.

13         Q      Is this Judge Evans' order that the guns

14    were to be returned that you just described?

15         A      I think this might have been the

16    first --

17               MR. PETTEY:    Again, I will object to

18    the plaintiff trying to characterize, you know, what

19    a legal pleading is.  The document speaks for itself.

20    It's asking for a legal conclusion from a nonlegal

21    expert.  But to the extent that you know or have an

22    understanding, you can testify as to what your

23    understanding is.

24         A      I think this was the first time that he

153

1    tried to get the stuff returned.

2         Q    When you say this is the first time he

3    ordered them returned, was there another time that he

4    ordered them be returned?

5         A    Yeah, the order that I'm thinking of had

6    a certain date on it, and it said that it will be

7    returned on -- it was April 11th.

8         Q    Okay.  So there is a second order that's

9    issued by Judge Evans stating that the property is to

10   be returned on April 11th; is that correct?

11        A    Yeah.  Well, there was a time frame

12   involved, and we had to talk to the sheriff when it

13   was convenient and so on and so forth.

14        Q    That was all discussed with the judge?

15        A    Oh, yeah.

16        Q    This is April 11th of what year?

17        A    2011.

18                   - - -

19             Thereupon, Defendant's Exhibit G was

20             marked for purposes of identification.

21                   - - -

22   By Mr. Bernhart:

23        Q    I would ask you if you have seen this

24   document before?

154

1          A      Yeah.  This was -- yeah, there it is.

2          Q      There what is, sir?

3          A      I told you it was April 11th he ordered

4     them returned on that date.  This is the one.  Jagers

5     was there, yeah.

6          Q      Who is Steve Jagers?

7          A      He's Ohio Valley Investigations.  He

8     retired from law enforcement.  He opened his own

9     business, and he's a professional.  You know, he

10    monitored the guns that were returned as they came

11    out.

12         Q      Did you ask judge Evans to appoint Steve

13    Jagers to oversee that?

14         A      I didn't have anything to do with it.

15    That was all -- that was all decided outside of my

16    doing.

17         Q      Did Carson Crystal represent you at the

18    time this order was issued?

19         A      Uh-huh.  It's Carson Crow.

20         Q      And Jeff Finley?

21         A      Yes.

22         Q      At the time this order was issued,

23    criminal charges were still pending, correct?

24         A      I can't remember now.  I don't believe

155

1    so.  I really can't remember.  Do you mind.  I will

2    be right back.

3         Q    We can take a few minute break.

4                        - - -

5                   Recess taken.

6                        - - -

7    By Mr. Bernhart:

8         Q    Mr. Six, I would like you to look at

9    Exhibit G for a moment.  Were you in court, were you

10   present in court when this judgment entry was issued?

11        A    I think it came later.

12        Q    If you'll look at the time stamp up in

13   the top right-hand side, it says that it was received

14   by the clerk of courts on April 8, 2011.

15        A    Oh, yeah.

16        Q    Do you see what I am referring to?

17        A    Okay.

18        Q    Were you in court on that day?

19        A    Apparently we were there on the 6th it

20   says here.  If you read the first line, "This matter

21   came on for hearing this 6th day of April."

22        Q    Okay.

23             MR. PETTEY:    Sorry to interrupt.  I

24   would like to say for the record that the exhibit

1     seems to also have another received stamp of April

2     11th on it that's fainter maybe than the April 8th

3     stamp.

4          A     You have April 11th and April 8th here.

5          Q     Okay.  Let me be more direct.  This

6     order required that the guns or property be return on

7     Monday, April 11th?

8          A     Yeah, that's when I got them.

9          Q     Between the date that this order was

10    issued and Monday, April 11th, did you meet with

11    Steve Jagers?

12         A     No, he was just there that morning.

13         Q     The morning of April 11th?

14         A     Uh-huh.

15         Q     So walk me through the morning of April

16    11th.  Did you go to the sheriff's office?

17         A     (Witness nods affirmatively).

18         Q     Yes?

19         A     Yes.

20         Q     Did you go by yourself?

21         A     Yes.

22         Q     You drove there?

23         A     I drove a U-Haul truck.

24         Q     Did you have to rent the U-Haul truck?

1        A      Yes.

2        Q      Why did you rent a U-Haul truck?

3        A      There was half a U-Haul truck of stuff

4     there, and I didn't own a truck.

5        Q      So in order to return -- or in order to

6     haul all of the items that you were going to get, you

7     needed a U-Haul truck?

8        A      Yes.

9        Q      Did you know Steve Jagers ahead of time?

10       A      No.

11       Q      So the morning of Monday, April 11th

12    when you arrive at the sheriff's office, that's the

13    first time you had met Steve --

14       A      He introduced himself.  That was the

15    first time.

16       Q      Did he explain he was there to oversee

17    the return of your guns?

18       A      I knew he was going to be there, but I

19    hadn't met him before.

20       Q      Where had you met him before at?

21       A      I hadn't met him before.  I knew him.  I

22    knew of him.  I knew he was going to be there because

23    they said, you know, in the discussion in the court

24    he was going to be there.  I met -- that morning was

158

1    the first time I had ever seen him.

2         Q    What did you and Mr. Jagers first

3    discuss when you met him?

4         A    How we were going to do it.  I said --

5    he said, "I will write the stuff down and you can

6    load it in the truck," and it was -- there was a

7    flight of stairs involved.  Adam was at the top, he

8    was making his list at the top, and then there was a

9    couple guys that helped carry them down, and then

10   Jagers was at the bottom making out his list and I

11   was loading them in the truck.

12        Q    Let's step back a second.  A long time

13   had passed between August of '09 until April of 2011

14   when the guns were returned?

15        A    A long time.

16        Q    When you were released from jail and

17   returned home, were there any guns at that time still

18   at your house?

19        A    They cleaned them out.

20        Q    So it's your testimony there wasn't a

21   single firearm at the residence when you were

22   released from jail in 2009?

23        A    That's right.

24        Q    Was there any ammunition left at the

159

1    house?

2         A    There was a birdseed can of antique ammo

3    sitting in my living room on -- the can was on

4    display and it had some antique rounds in it that

5    they left.

6         Q    Anything else?

7         A    No.

8              MR. PETTEY:    I'll object as to

9    vagueness.

10        Q    Were there any other firearms or

11   ammunition at your residence between the time that

12   you returned to your residence and when the guns were

13   returned?

14        A    No.

15        Q    Did you purchase any guns during this

16   period of time?

17        A    No, no.  It seemed kind of pointless to

18   do that.  Plus, you know, Judge Crow said that, you

19   know, no guns.

20        Q    Did you have to report to anybody, any

21   law enforcement agency such as the ATF that the guns

22   were no longer in your possession?

23        A    No, I didn't have to report it.

24        Q    Did you report it?

1         A      No, I didn't, because I wasn't sure

2    exactly how to handle that.  I had a receipt for the

3    guns.

4         Q      A receipt from the sheriff's office?

5         A      From the sheriff's office.  And had the

6    ATF inquired, all I could show them was the receipt.

7    Because they took all my logbooks and purchase and

8    sales orders and all my paperwork.  They took

9    everything.  I had nothing.

10        Q      When did you receive that receipt from

11   the sheriff's office?

12        A      They left one in the house.  It was

13   there when I got home.

14        Q      Have you given that receipt to your

15   attorney?

16        A      Yeah, he seen it.  You got it in

17   discovery.  I've seen it.

18             MR. BERNHART:    Sky, I don't believe I

19   have seen that.  I may have mistaken it was something

20   else.

21             MR. PETTEY:    I think it's probably

22   semantics.  He is calling it a receipt.  It might

23   have been the inventory from the search warrant.

24        A      That's it.  It's got a list of the guns

1    there and a signature.

2         Q    That was left at the house?

3         A    Yes.  I called that a receipt.

4         Q    Fair enough.

5              That was at the house when you returned

6    on April 6th, 2009 after you were released from jail?

7         A    Yes.  Now, should I -- I can tell you

8    how it went with the ATF if it's relevant.

9         Q    Before we get to that, let's talk about

10   the return of the guns in April of 2011.  You

11   indicated you met with Steve Jagers, and you

12   discussed how physically you would get the guns from

13   the office into the U-Haul?

14        A    Uh-huh.

15        Q    Tell me to the best of your recollection

16   how all that occurred.

17        A    How we actually got the guns, or the

18   discussion that led up to how we --

19        Q    Was it 10:00 in the morning --

20        A    Yeah.

21        Q    -- that you arrived at the sheriff's

22   office?

23        A    Uh-huh.

24        Q    Approximately how long were you there

1   that day?

2        A      Oh, gee.  It was, you know, past

3   lunchtime.

4        Q      A few hours?

5        A      Yeah.  It kept threatening rain.  We

6   were trying to hurry because we didn't want stuff to

7   get wet.

8        Q      How long after arriving at the sheriff's

9   office did guns start coming down the stairs?

10       A      Within just a few minutes.  They knew we

11  were coming.  Everybody was ready.

12       Q      You indicated Steve Jagers was there.

13  You pointed out Deputy Smith was there.  Is there

14  anyone else present?

15       A      There was a girl from the prosecutor's

16  office.  She was up with him.  He probably knows who

17  she was.

18       Q      Do you know?

19       A      No.

20       Q      How did you know she was from the

21  prosecutor's office?

22       A      Jagers said she was from the

23  prosecutor's office.

24       Q      Was there any --

1          A      And Jeffery Finley came by too.

2          Q      You said he came by.  Was that after

3     they returned the guns?

4          A      No, it was kind of at the beginning to

5     make sure that everything was as planned.

6          Q      Did he stay for the entire time?

7          A      No

8          Q      How long did Mr. Finley stay?

9          A      He wasn't there more than ten minutes or

10    so.

11         Q      Was Mr. Jagers there the whole time?

12         A      Yeah, he was there the whole time.

13         Q      Was the girl from the prosecutor's

14    office there the whole time?

15         A      I think she stayed.  She was up at the

16    top of the stairs with him.  I think she was there

17    the whole time.  They had the same the problem we

18    had, somebody had to hold them and somebody had to

19    write.  It takes a couple people to do that.

20         Q      Did you observe anyone else there?

21         A      Yeah, there were other deputies helping

22    carry the stuff down the steps.

23         Q      Did you recognize any of those deputies?

24         A      No.

1          Q      Have you since learned who those other

2     deputies were?

3          A      No.   I was just glad we had the help.

4          Q      So I understand, the evidence room is

5     upstairs at the sheriff's office.   Where are you

6     physically located when the guns were being returned?

7          A      At the back of the truck.   The stairs

8     came down and there was an alley right behind the

9     jail, and I backed the truck up the alley so that we

10    would come down the stairs and there's a parking lot.

11    We kind of laid them out, and they would bring them

12    down faster than Jagers could write them.   He would

13    say, "These are done.   Take these."   You know, I was

14    jumping in and out of the truck, trying to put them

15    where he could write without being damaged.

16         Q      At any point did you go up the stairs to

17    the evidence room?

18         A      Oh, I was helping carry down the steps

19    too, but I am not that good with steps with my back

20    being what it is, let alone carrying stuff.   It was

21    hard, but I did what I could.

22         Q      Did you go into the evidence room?

23         A      No, they didn't let anybody.   Not an

24    outsider.

1        Q     Did you observe Mr. Jagers go into

2     the --

3        A     No, he never went upstairs.  He stayed

4     down at the bottom of the steps writing.

5        Q     Had you brought with you the inventory

6     list or the receipt that was left at your house back

7     in August of '08 with you that day?

8        A     No.  I didn't -- that was the only thing

9     I had, and I really didn't think to bring it.

10       Q     Did you bring any documents with you

11    that day?

12       A     No.

13       Q     Had you reviewed that inventory list or

14    receipt prior to that day?

15       A     Oh, sure, I read it.

16       Q     So does anything else occur while you're

17    there?  Did you observe anyone else going up the

18    stairs, carrying the guns from the evidence room to

19    the U-Haul?

20       A     Well, just, you know, deputies came and

21    was helping and Sheriff Beegle came out.  In fact, he

22    came out and him and Jagers talked a little bit.  His

23    wife was with him.  They were talking about doing

24    some remodeling or something in his office.  They

166

1   obviously knew each other.

2        Q    Did you have any communications with

3   anyone there that day other than about the procedure

4   of bringing the guns down the stairs?

5        A    Well, I talked to Jeffery, you know, he

6   showed up -- no.  Actually, no, I didn't have any

7   other communications other than, you know, I think I

8   might have made a comment to Mrs. Beegle about the

9   office and I had been through it and it was -- it

10  needed fixing up.

11       Q    Did you observe anyone writing down

12  the -- writing down on a piece of paper the items

13  being returned to you?

14       A    Oh, yeah.

15       Q    Who did you observe writing that down?

16       A    Jagers was writing them down at the

17  bottom of the stairs, and the girl from the

18  prosecutor's office was writing them at the top of

19  the stairs.

20       Q    Were they --

21       A    There is an independent list, see.  Each

22  had their own.  She was like checking them out, and

23  then Jagers was checking them in.

24       Q    Did you obtain that list from Mr. Jagers

1    he was compiling?

2         A     No, I never saw it until this

3    proceeding.

4         Q     But you since have seen the list that

5    Mr. Jagers created?

6         A     Yeah.

7         Q     Do you possess that list?

8         A     I think so.

9         Q     Have you produced that to your attorney?

10        A     I think he gave it to me.  It came out

11   in discovery here.

12              MR. PETTEY:    It's a typewritten list.

13   It's been produced in discovery.

14        Q     Approximately how long did it take that

15   day while you were at the sheriff's office to load

16   all the guns?

17        A     It was past lunch.  It was probably

18   1:00, 2:00, something like that.  We were hurrying

19   because a little rain would come and go away and try

20   to rain a little more.

21        Q     So three or four hours?

22        A     Yeah, probably.

23        Q     Back in 2009 when you -- when all the

24   guns were seized from your house and the receipt is

168

1      left by the sheriff's office or whoever was there

2      indicating that the guns were all taken, why didn't

3      you report it to the ATF that your guns had been

4      seized?

5           A     I really expected to get them back.

6           Q     Have you ever spoken with ATF about this

7      issue?

8           A     Oh, yeah.

9                 MR. PETTEY:     I will note an objection

10     as to relevance about conversations with ATF.  You

11     can go ahead and answer.

12          Q     Have you spoken with ATF about this

13     issue?

14          A     I have their cards.  They are out in my

15     car.  Melissa.

16          Q     Melissa?

17          A     Melissa, what was her last name?  I

18     can't remember her last name now.  But I've spoken

19     with five.

20          Q     Five agents?

21          A     ATF agents.  That's face to face.

22          Q     I want to make sure we are on the same

23     page, Mr. Six.  I am asking about communication that

24     you had with the ATF between August of '09 when the

1   guns are seized and April 11th, 2011 when they were

2   returned.

3       A    Then, no, I didn't talk to them during

4   that time.

5       Q    Did you speak with anyone at that time

6   other than your wife and your attorneys about your

7   guns being held?

8       A    Nope, I didn't talk to anybody about it.

9       Q    So after a few hours, you have all he

10  guns returned.  Did you have to sign anything?

11      A    Oh, yeah.

12      Q    What did you sign?

13      A    The paper that said I was picking these

14  guns up.

15      Q    Was that the paper that was being

16  completed at the top of the stairs?

17      A    You got me there.  I might actually have

18  signed both -- no, I think Jagers and I signed the

19  same paper.  That would have been the one from the

20  top of the stairs because he wouldn't sign his own

21  paper.

22      Q    Did you sign the paper that Mr. Jagers

23  created?

24      A    I don't think so.  I don't think I

1    signed his.  I think I signed the one that the girl

2    from the prosecutor's office had.  I think that was

3    the one.

4         Q    Had Mr. Jagers seen -- had you provided

5    to Mr. Jagers a copy of the inventory list or receipt

6    that was left at your house --

7         A    Did I?  No.  No, I didn't.

8         Q    -- prior to going to the sheriff's

9    office?

10        A    No, I had never seen him before that

11   day.  I didn't have any contact with him.

12        Q    Other than the guns and ammunition, what

13   other types of items were being returned that day to

14   you?

15        A    Well, my computers, there was two

16   laptops and two PCs.  I do a little computer repair,

17   and one of them I fixed, and they took it along with

18   mine and my wife's.  We got those back.  They don't

19   work anymore, but we got them back.  My knife

20   collection.  They returned that, which surprised me

21   because it wasn't on the receipt, but they did give

22   it back.

23        Q    It was your knife collection?

24        A    Uh-huh.  A box collection of Bulldog

1    brand knives.  It wasn't on the list, but they

2    returned them.  So that was a good thing.

3         Q    Was there anything else returned to you

4    that day?

5         A    Well, all of my military, to the best of

6    my knowledge, everything -- if you look at the

7    receipt, it just says -- they call it -- they called

8    it neo-Nazi paraphernalia.  It wasn't neo-Nazi.  It

9    was the real thing.  It's World War II.  They

10   returned that.  To my knowledge I think it was all

11   there.

12              My holsters, my ammunition.  I think all

13   my ammunition was there, but it's pretty hard to say

14   when you're talking about, you know, a thousand

15   pounds of ammo, who knows how many rounds.  My

16   antique Budweiser box, they gave that back.  What

17   was -- what was noticeably missing was all my

18   paperwork.

19        Q    Okay.

20        A    That was a real problem.

21        Q    What paperwork are you talking about?

22        A    My logbooks, my purchase orders, sales

23   receipts.  All the stuff that related to the guns.

24        Q    Was there anything else -- when you say

1    noticeably missing, did you notice it at the time you

2    were still there --

3         A    Yeah.

4         Q    -- it was missing?

5         A    Yeah.  Because, you know, again, it was

6    the same thing with the ATF.  If I had got home and

7    had all the guns and they had showed up and said,

8    great, let's see the books, they didn't give me the

9    books back.

10        Q    Was all that paperwork stored in the

11   same place, in the same box?

12        A    Yeah, pretty much.  The record books, I

13   kept my record books together.  My sales receipts and

14   purchase orders and stuff, they were in the same room

15   in a cabinet in a different place.

16        Q    Before leaving that day, did you ask for

17   those items?

18        A    Not that day.  I waited until I saw

19   Jeffery.

20        Q    Were there any other items that were

21   noticeably missing while you were still there at the

22   sheriff's office?

23        A    I can't remember anything.

24        Q    Did you notice that these items were

1     missing before or after you had signed the inventory

2     list that was being compiled that day?

3          A     The record books?  I knew they didn't

4     give them back.  They weren't -- I didn't sign for

5     them.  They weren't listed.  I think that's what you

6     are asking.  I didn't sign --

7          Q     Did you notice they were missing before

8     you signed?

9          A     Yeah.

10         Q     You didn't inquire about them?

11         A     That was all they had in the property

12    room.

13         Q     Is that what they told you?

14         A     Yeah, yeah.  They said that was it.

15         Q     Do you have any reason to dispute that

16    was all they had in the property room?

17         A     No, no, because as it turned out, the

18    record books, the prosecutor had them in another

19    place.

20         Q     So you later got those books back from

21    the prosecutor's office?

22         A     I got two of them back.  This lady just

23    gave us copies of the books, and Jeffery went back

24    and complained to the judge again and finally he

174

1      produced them, or two of the books, he gave those

2      back.

3           Q      Did you notice there was some money

4      missing, a box of money missing before you left?

5           A      They gave me the money.

6           Q      That's something you brought to their

7      attention?

8           A      No, no.  Adams, he came trotting out.  I

9      forgot about the money.  He trotted it right out.

10          Q      That's something they found and brought

11     out to you before you left that day?

12          A      Yeah, they did.  It hadn't even crossed

13     my mind.  I was so happy to get the guns back that's

14     all I could think about.

15          Q      Did you sign some type of receipt

16     acknowledging that the money had been returned --

17          A      Yes.

18          Q      -- while you were there that day?

19          A      Yes.

20          Q      Was that separate from what you had

21     signed, the inventory list of returned guns?

22          A      I don't remember if it was separate or

23     not.  I can't remember that.  But I don't think the

24     money was in the property room.  I think he had to go

1    get that someplace else, but I got it back.

2         Q    It was all there?

3         A    Yeah.

4         Q    Before leaving the sheriff's office that

5    day, did you have any reason to believe or any

6    suspicion that some of your property wasn't returned

7    to you other than the paperwork that you've already

8    talked about?

9         A    Well, that particular day, again, I was

10   just so happy to get back what I got back that I

11   wasn't really thinking beyond that.  But after I got

12   home and started unloading it, you know, I started

13   thinking about, you know, where is the log notes,

14   where is my -- I started realizing there was some of

15   them that weren't there.

16        Q    Did you and Mr. Jagers have any further

17   discussion before he left that day or before you and

18   him departed?

19        A    Never saw him again.

20        Q    You never saw him again?

21        A    No.   That was the one and only meeting.

22        Q    How did you obtain the list from him?

23        A    Jeffery.

24        Q    What did you understand those lists to

176

1     be that Mr. Jagers created?

2          A     Those are what he wrote down that day.

3          Q     After all the guns that were returned

4     that day?

5          A     He had another list too, and he compared

6     the two lists and then he found some that were

7     missing between the two lists.  He made a list of

8     those guns.  There was like -- I think like 30, he

9     came up with 30 that were missing from the original

10    inventory.

11         Q     From the original inventory receipt or

12    inventory list that was left at your house the day of

13    the seizure?

14         A     I think that's what he meant.

15         Q     So later that day when you were

16    unloading the guns, that's the first time you

17    suspected not all your property had been returned to

18    you?

19         A     Yeah.  I mean, just one here and there

20    that was missing from my recollection and, of course,

21    it had been a year and a half since I had seen them.

22         Q     Since they were in your possession in

23    the first place?

24         A     Oh, you know, it was like the wheels

1    were turning.  There were a couple of them that were

2    very rare that I recognized that day weren't there,

3    but it's pretty hard without all the rest of my

4    record books, it's pretty hard to, you know.  I can

5    see the guns, but I don't memorize serial numbers.

6    You have to have your record books for that.

7          Q    So in your mind, I mean -- are you

8    referring to logbooks that the prosecutor's office

9    had?

10         A    Yes.

11         Q    So you hadn't received the logbooks

12   and --

13         A    It was July.

14         Q    -- paperwork from the prosecutor's

15   office right away?

16         A    Not until July or August.  I had the

17   guns since April.

18         Q    When you noticed all your property

19   wasn't returned to you, what was your next step, or

20   what did you do?

21         A    Tell Jeffery.  I got ahold of Jeffery

22   and said, "Man, I got to have my logbooks."  I said,

23   "The feds could come out any day now."  They should

24   never took my logbooks.

178

1          Q      So your initial concern was the logbooks

2     and paperwork?

3          A      (Witness nods affirmatively).

4          Q      When did you first contact anybody about

5     the other property, other than the paperwork and

6     logbooks, that you believed were missing?

7          A      When?  It would have been discussions,

8     you know, with my attorney after that, but I can't

9     put a date certain on that.

10         Q      With Mr. Finley?

11         A      Yeah, you know, what can we do?

12         Q      Did you contact the ATF --

13         A      No.

14         Q      -- and report the property missing?

15         A      I didn't want to stir up that hornet's

16     nest.

17         Q      Did you go back to Judge Evans and Meigs

18     County Common Pleas Court and notify them, notify the

19     judge that --

20         A      We didn't have the paperwork, yeah.

21         Q      -- not everything had been returned

22     pursuant to his order?

23         A      Right.  Yeah.  Actually we were in the

24     courtroom having that conversation and Matt Donahue

179

```
 1      left and came back with the paperwork.

 2            Q      With the logbooks?

 3            A      (Witness nods affirmatively).

 4            Q      I am not asking about the logbooks here.

 5      I am asking about guns, ammunition and other items

 6      that you now allege are missing?

 7            A      I never got it.

 8            Q      Did you notify Judge Evans or the common

 9      pleas court about that?

10            A      No, I would have just told Jeffery about

11      that.  I wouldn't have told the court about it.

12            Q      Did you file a police report with any

13      agency over the guns being missing?

14            A      No, no.

15            Q      Not just guns, but other ammunition,

16      other items that you now allege were taken and not

17      returned to you, did you file a police report --

18            A      No.

19            Q      -- indicating those were missing?

20            A      Well, I did.  I have subsequently done

21      that with the ATF, but I didn't do it at the time

22      because I was still hoping to get them back.  I

23      believed that they were going to find them or

24      something was going to happen.  Actually to this day
```

1    I still hope they produce them.

2         Q    So you don't notify the court, you don't

3    file a police report.  You subsequently notify ATF.

4    When was that?

5         A    Just the month before last when they

6    came out.

7         Q    Just recently?

8         A    Yeah.  To go down and tell Sheriff

9    Beegle that they didn't return all my guns didn't

10   sound like a healthy thing to do.

11        Q    There are other law enforcement agencies

12   besides Meigs County Sheriff's Office you could have

13   reported property being -- property missing, correct?

14        A    I don't know.  Is there?  Who would it

15   be?  I live in Meigs County.  You wouldn't report it

16   in Athens County.

17        Q    You have a local police department?

18        A    No, just the sheriff.

19        Q    Have you taken any other action besides

20   filing this lawsuit in an attempt to get that

21   property returned to you?

22        A    No.

23        Q    I'm going to go through a number of

24   documents I believe we've been talking about, but I

181

1    want to make the record clear and have you identify

2    those for the record.

3                    - - -

4         Thereupon, Defendant's Exhibit H was

5         marked for purposes of identification.

6                    - - -

7         A    I have seen this document.

8    By Mr. Bernhart:

9         Q    Is this what you you've referred to as

10   the receipt that was left at your house?

11        A    This is the one that was left at the

12   house, uh-huh.

13        Q    This is a document that's labeled on the

14   first page Columbus Division of Police Narcotics

15   Bureau Evidence Inventory?

16        A    Uh-huh.

17        Q    Your understanding is that this

18   identifies the property that was seized from your

19   house the day of the raid and seizure?

20        A    That's my understanding, yeah, uh-huh.

21        Q    During the course or in bringing this

22   lawsuit, you alleged that there are items on that

23   list that weren't returned to you, correct?

24        A    Correct.

1          Q     Is it your understanding Mr. Jagers has

2     compiled a list of guns that are on that list that he

3     believes are not on or that weren't returned to you?

4          A     That's correct.

5          Q     Part of your lawsuit is based on that

6     list that Mr. Jagers created?

7          A     Correct.

8                           - - -

9          Thereupon, Defendant's Exhibit I was

10         marked for purposes of identification.

11                          - - -

12         A     Yes, I have seen this list too.   I

13    wasn't really sure what this was.

14    By Mr. Bernhart:

15         Q     You have seen this document prior to

16    today?

17         A     Uh-huh.

18         Q     And this document identified as Exhibit

19    I is labeled Meigs County Sheriff's Office Ohio

20    Uniform Incident Report on the first page; is that

21    accurate?

22         A     Uh-huh.

23         Q     And this list contains a number of what

24    appears to be guns and other items along with serial

1    numbers?

2         A     Uh-huh.

3         Q     Exhibit H, the one you identified

4    previous to this, the Columbus Division of Police

5    Narcotics Bureau Evidence Inventory, also contains a

6    list of guns, ammunition, and other items that you

7    owned?

8         A     Uh-huh

9              MR. PETTEY:     Let the record reflect

10   that Attorney Ball has left the room.

11        Q     Mr. Six, Exhibit I that you've

12   identified, the Meigs County Sheriff's Office Ohio

13   Uniform Incident Report, you also allege in this

14   lawsuit that there are guns and property on that list

15   that were not returned to you, correct?

16        A     Well, without going down the list, I

17   think they basically are the same list.  So the guns

18   that weren't returned are probably on both lists.

19        Q     Are you saying that the guns overlap?

20        A     It's the same list.

21        Q     Okay.

22        A     It's the same guns, I think.  I haven't,

23   you know, I haven't gone through it.  They're not

24   even numbered.  In fact, some of them, you know, if

1    you look here, what does that -- what's that gun

2    there?  It's just blank.  So, you know, I don't know

3    if that was returned or not.  How could you know?

4         Q     There is an allegation in your complaint

5    there are guns on that list that were not returned to

6    you.

7         A     Uh-huh.

8         Q     Do you agree with that?

9         A     Yeah.  I'm looking through here real

10   quick.

11        Q     Sure.  This may help.  Let me ask my

12   next question:  Is it your understanding that Mr.

13   Jagers created a list of guns that are on that list

14   but were not returned to you?

15        A     Right.  Yeah.

16        Q     You attach to your complaint both of

17   these lists created by Mr. --

18        A     Those two lists, yeah, now I'm with you.

19   I'm up to speed now.

20        Q     One of those lists are guns he

21   identifies are on the Columbus Division of Police

22   Narcotics Inventory List that weren't returned to you

23   and another list is alleged to be guns that are on

24   the Meigs County Sheriff's Office Ohio Uniform

185

1    Incident Report that were not returned to you,

2    correct?

3           A      Yeah, his list.

4           Q      His list?

5           A      Uh-huh.

6           Q      And those are attached to your complaint

7    as property that's missing?

8           A      Well, with my notations because some of

9    them were returned.

10          Q      During the course of this litigation,

11   you've identified a number of guns on both of those

12   lists created by Mr. Jagers that were returned to

13   you, correct?

14          A      That were returned, yes.

15          Q      So Mr. Jagers' lists aren't entirely

16   accurate?

17          A      I think that's fair to say.  But it's a

18   big list.  There's mistakes on all these lists.

19   That's the point of having record books.

20                       - - -

21          Thereupon, Defendant's Exhibit J was

22          marked for purposes of identification.

23                       - - -

24

1    By Mr. Bernhart:

2         Q     I'll ask you to review this list,

3    specifically the final page of Exhibit J.

4         A     Uh-huh, I looked at the final page.

5         Q     Is that your signature?

6         A     That's my signature.

7         Q     Do you recognize this document?

8         A     Uh-huh.  I remember signing it that

9    glorious day.

10        Q     So Exhibit J is the document that you

11   signed at the sheriff's office.  It was created that

12   day when the property was being returned to you and

13   you signed prior to leaving that day?

14        A     Uh-huh.

15        Q     This signature under your signature, do

16   you recognize that signature right underneath yours?

17        A     That has to be Steve Jagers.  He and I

18   signed it.  Linda Taylor, she must have been the girl

19   there.  I see her name there.

20        Q     Underneath your and Steve Jagers'

21   signatures are names.  Read those names.

22        A     Ricky Smith, Adam Smith, Linda Taylor.

23        Q     Do you know Ricky Smith?

24        A     No.

1          Q       Do you believe these signatures were

2    obtained from the people that were there at the

3    sheriff's office that day returning the guns to you?

4          A       I have no reason, you know.

5          Q       Do you have any reason to dispute that

6    statement?

7          A       No.  It kind of looks like the same

8    person did all three signatures.  Maybe they just

9    have similar handwriting.  It looks like the same

10   person signed all three.

11         Q       I didn't mean to talk over you there.

12         A       The way "Smith" is written, you know,

13   that looks -- that's a minor point.  But it looks

14   like the same person that wrote "Smith" wrote "Smith"

15   there, doesn't it?

16         Q       You are not allowed to ask me questions.

17                 You have testified that there were a

18   number of law enforcement officers present when the

19   guns were returned to you.  One of those law

20   enforcement officers is in this room today.  You have

21   pointed him out as being Adam Smith, Deputy Adam

22   Smith.

23         A       Yeah.

24         Q       You testified that there was a female

188

1        from the prosecutor's office there.  Do you have any

2        reason to dispute Linda Taylor is that individual?

3            A       That's -- I'm assuming it was her.  She

4        didn't introduce herself that day.

5            Q       The first page of this document, very

6        top of the first page of Exhibit J states Robert Six.

7        It has your name there in a box.

8            A       Uh-huh.

9            Q       Without looking at every page of this,

10       does this identify the property that was returned to

11       you that day?

12           A       Yeah.  There were a couple ones like

13       "unknown pistol," stuff like that makes it a little

14       tough.

15           Q       But you recognize the --

16           A       Yeah.

17           Q       -- the guns and other items contained on

18       those pages?

19           A       Uh-huh.

20                            - - -

21              Thereupon, Defendant's Exhibit K was

22              marked for purposes of identification.

23                            - - -

24

1    By Mr. Bernhart:

2        Q    Have you had a moment to review Exhibit

3    K?

4        A    Yeah.  I was looking here.  I don't see

5    the money anywhere.

6        Q    That is the reason I asked you earlier

7    whether you signed a separate document for cash.

8    What is this document here that is identified as

9    Exhibit K?

10        A    It looks like a receipt for the money

11    that was returned.

12        Q    The money that we've talked about?

13        A    Uh-huh.  They didn't keep any money.

14        Q    In the middle of this receipt, correct

15    me if I'm wrong, but it states "Released to" and I

16    believe that's your signature --

17        A    Uh-huh.

18        Q    -- on 4-11-11?

19        A    Uh-huh.

20             MR. PETTEY:    Robert, try to give yes

21    or no.

22        A    I'm sorry.

23        Q    That was one of the instructions at the

24    beginning.  It's been a long day.

190

1          A     Yeah.  I'm wearing down a little.

2                I can't really read who that was, but I

3    think it was Adam that gave me the money back, if

4    memory serves.

5          Q     You don't dispute that the money was

6    given back to you?

7          A     No, no.  He reminded me of it, in fact.

8                            - - -

9          Thereupon, Defendant's Exhibit L was

10              marked for purposes of identification.

11                           - - -

12   By Mr. Bernhart:

13         Q     Mr. Six, have you seen this document

14   before?

15         A     Uh-huh.

16         Q     What is this document?

17         A     These are the guns missing from the

18   narcotics bureau list.

19         Q     From exhibit?

20         A     H.

21         Q     The Columbus Division of Police

22   Narcotics Evidence --

23         A     It says NB.

24         Q     Do you know who created this list?

1          A       Yeah, Jagers.

2          Q       Is that a list he created that day?

3          A       No, no.  It seems to me that it was

4    probably six or eight weeks later before, you know.

5    He said that day that it would be a while, but he

6    would send Jeffery the report and then Jeffery was

7    going to forward me a copy of it.

8          Q       Did you ask Mr. Jagers to compare the

9    inventory lists --

10         A       I didn't.

11         Q       -- and create this document?

12         A       No.  No, I didn't ask him anything.

13         Q       Did Mr. Jagers just volunteer to compare

14   the inventory lists and provide you with this list?

15         A       I don't know if "volunteer" is the right

16   word, but I think that was his job.  That's why he

17   was there.

18         Q       That was your understanding, he was to

19   oversee the operation?

20         A       Oversee it and report back to the judge.

21         Q       If there were any guns that he believed

22   were missing?

23         A       Uh-huh.

24         Q       And you've attached this document to

192

1      your complaint, correct, to this federal lawsuit?

2              MR. PETTEY:    Well, if you know.  You

3      can -- if you don't remember what's attached to the

4      complaint, you can tell him you don't remember.

5              THE WITNESS:    The list is attached

6      with my corrections.  I think you gave him a copy

7      today, didn't you?

8              MR. PETTEY:    They are talking about

9      the original complaint that was filed in the case

10     originally, way back when we first started the case.

11             THE WITNESS:    Oh, gosh, I don't know.

12     By Mr. Bernhart:

13         Q    Let me ask it a different way, Mr. Six.

14     In your complaint you make an allegation, several

15     allegations, one of which is that there are guns

16     contained on the Columbus Division of Police

17     Narcotics Bureau Evidence inventory list, which is

18     identified as Exhibit H, that are not -- that were

19     not returned to you, correct?

20         A    Correct.

21         Q    And this list identified as Exhibit L

22     are those guns, correct?

23         A    Yeah, uh-huh.

24                     - - -

1           Thereupon, Defendant's Exhibit M was

2           marked for purposes of identification.

3                   - - -

4     By Mr. Bernhart:

5           Q     Do you recognize Exhibit M?

6           A     Uh-huh.

7           Q     What is Exhibit M?

8           A     This is the other list that Jagers sent.

9     It's a list of guns that were missing.

10          Q     This states "Missing guns from Meigs

11    S.O. list."

12          A     Sheriff's office.

13          Q     Is the Meigs S.O. list, do you think

14    that to be Exhibit I?

15          A     That was the one that --

16          Q     Meigs County Sheriff's Office Ohio

17    Uniform Incident Report, this one, Exhibit I.

18          A     Uh-huh.

19          Q     Yes?

20          A     Yes.

21          Q     So is it your understanding that Mr.

22    Jagers went through Exhibits I -- I'm sorry, Exhibits

23    H and I, compared those to Exhibit J and created

24    these lists?

194

1          A       That would be my understanding, yes.

2          Q       In other words, he went through the

3     intake inventory list, compared that to the return

4     inventory list and created a list of guns that don't

5     match up?

6          A       Right.  The list of missing, what he saw

7     as not having been returned.

8          Q       I want you to keep exhibits L and M, the

9     two.  You got those in front of you?

10         A       Uh-huh.

11         Q       You have alluded to this already, but

12    during the course of this litigation, you were served

13    with what we refer to as interrogatories and request

14    for production of documents.  Do you recall working

15    with your attorney on completing that?

16         A       Uh-huh.

17         Q       In your response to, at least one

18    interrogatory, you acknowledge some of the guns that

19    are contained on Exhibits L and M were in fact

20    returned to you --

21         A       Yes.

22         Q       -- correct?

23         A       Correct.

24                            - - -

195

1              Thereupon, Defendant's Exhibit N was

2              marked for purposes of identification.

3                        - - -

4    By Mr. Bernhart:

5          Q    I'm going to hand you Exhibit N.  Mr.

6    Six, I will direct your attention to Interrogatory

7    No. 15.  I apologize.  The pages weren't numbered,

8    but it's about midway through the packet.

9          A    Okay.

10         Q    And in response to Interrogatory No. 15,

11   you identify a number of guns from Exhibit L and

12   Exhibit M, the Columbus Police Department Narcotics

13   Bureau Evidence list and the Meigs County Sheriff's

14   Office list, and acknowledge that certain guns were

15   returned to you --

16         A    Uh-huh.

17         Q    -- correct?

18         A    Yes.

19         Q    That's what we just talked about?

20         A    Uh-huh.

21         Q    For ease of reference now that you

22   acknowledge those guns were returned, I would like to

23   go through Exhibits L and M and cross off those guns

24   that you acknowledge have been returned.  So let's

196

1    start with Exhibit L Missing Guns from NB List.  You

2    indicated that an unknown handgun at the very top was

3    returned to you, correct?

4          A     Well, if you look at that, there's

5    something wrong.  The unknown handgun doesn't have a

6    serial number.  This serial number is for a

7    Remington.

8          Q     Okay.

9          A     What we're looking at here, it says Row

10   8, unknown handgun.  That's the serial number of the

11   Remington.  So there is something wrong here.

12         Q     If you look at your interrogatory

13   response right underneath there, you also acknowledge

14   that a Remington was returned to you, correct?

15         A     There was a Remington returned and two

16   that were not returned.  I don't have the serial

17   numbers.

18         Q     If we look at Exhibit L, you acknowledge

19   there is an unknown handgun from that list returned

20   to you, and that's the only unknown handgun on this

21   list?

22         A     It is.  But it could not have been

23   serial number 180559.  That would -- well, then, see,

24   then there's another mistake right below that.

197

1        Somebody has moved all the serial numbers one notch.

2        Check it out.  Look at the serial numbers here.

3        They've moved all the serial numbers down one notch.

4             Q        Okay.  So not looking at the serial

5        numbers, just looking at the names of the guns and

6        the row that they are contained in the initial

7        narcotics bureau inventory list, you have

8        acknowledged that the unknown handgun was returned,

9        the Remington .22 was returned, the Springfield 1884

10       was returned, the PW Arms 308 was returned, the HH

11       Pistol Bulwark was returned, and the Bauer pistol was

12       returned.

13            A        Uh-huh.

14            Q        Is that accurate?

15            A        That's accurate.

16            Q        So those guns have been returned to you?

17            A        See how easy it is to get records messed

18       up, something like that, the serial numbers.

19            Q        Mr. Six, I would like you to now turn

20       your attention, keeping Exhibit L in front of you,

21       pull out Exhibit J for ease of reference.  For this

22       exercise it may be best to start from the bottom of

23       this list.

24            A        The bottom would be an AG pistol.

1        Q     AG pistol serial number 1954?

2        A     Uh-huh.

3        Q     There is a row associated with it 82A?

4        A     Uh-huh.

5        Q     Exhibit J, and I apologize, on Exhibit J

6    some of the pages are out of order, but the pages are

7    marked at the bottom.  I would like you to turn to

8    Page 615.  It's the second page from the last.

9        A     Okay.

10       Q     Now, in the middle of this page, we can

11   track it on the left-hand side where it has item

12   number, the identity of the weapon and the serial

13   number.

14       A     Uh-huh.

15       Q     There is an AG pistol with serial 1954

16   on it, correct?

17       A     No.  Mine says -- sorry.  I had more

18   than one AG pistol.

19            MR. PETTEY:    If I might add something

20   to expedite things.  I apologize for interrupting.  I

21   noticed something that I believe to be an error in my

22   client's testimony earlier or perhaps an assumption

23   that he wasn't sure of.

24            MR. BERNHART:    I don't want you to

199

1   sit here and testify for your client.

2              MR. PETTEY:    I understand.  But I

3   think we're going -- we might be engaging in an

4   exercise here that's meaningless.  If I can go off

5   the record and talk to you about it if you would like

6   to do that.

7              MR. CONOMY:    I would prefer to do it

8   this way.

9              MR. BERNHART:    We can go off the

10  record.

11                    - - -

12                    Recess taken.

13                    - - -

14             MR. PETTEY:    We've had a break and

15  counsel have conferred.  Plaintiffs are willing to

16  stipulate that some of the weapons, the descriptions

17  of the weapons that appear on Exhibits L and M are

18  the same as the descriptions that appear on Exhibit

19  J.

20             MR. BERNHART:    Okay.  Thank you,

21  counsel.

22  By Mr. Bernhart:

23       Q    Mr. Six, in addition to the guns that

24  are included in Exhibits L and M, the two lists

1    created by Mr. Jagers --

2         A    Okay.

3         Q    -- in addition to the guns that are

4    identified on this list, you've also alleged that

5    there were additional guns that were seized from your

6    residence and that have not been returned to you,

7    correct?

8         A    Correct.

9         Q    And of those guns, you allege that they

10   were not on any inventory list created at the scene

11   or created at the sheriff's office, the inventory

12   lists that we've already talked about today, correct?

13        A    Correct.

14        Q    And those guns are not included on the

15   return inventory list identified as Exhibit J --

16        A    That's correct.

17        Q    -- correct?

18             During discovery in this lawsuit, I

19   asked you to provide evidence that you own these

20   guns.  Do you recall receiving that discovery

21   request?  Do you need clarification?

22             MR. PETTEY:    If you remember what

23   they say, you can testify.  If you don't remember

24   what the discovery request said, you can say you

1    don't remember.

2         A     You asked for a list of the guns that

3    were taken that weren't listed anyplace else?

4         Q     Let me ask it a different way, Mr. Six.

5    Through interrogatories and requests for documents, I

6    asked you to -- I asked you for evidence that you

7    owned these guns that you maintain had been taken

8    from your residence and that were not returned,

9    correct?

10        A     Correct, yeah.

11                    - - -

12           Thereupon, Defendant's Exhibit O was

13           marked for purposes of identification.

14                    - - -

15   By Mr. Bernhart:

16        Q     Before we get to the exhibit, let me ask

17   you another question.  During the course of this

18   litigation, you have compiled a list or did you

19   compile a list identifying all of the guns that you

20   believe were taken from your residence and not

21   returned?

22        A     Yes.

23        Q     Now look at Exhibit O, if you don't

24   mind.

202

```
1          A      Got it.

2          Q      Do you recognize this document?

3          A      Yes.

4          Q      What is this document?

5          A      This is a list of the guns that were --

6     that are missing from my collection.

7          Q      Are any of the guns that were identified

8     in the two lists created by Steve Jagers, Exhibits L

9     and M, are any of those guns included on this list,

10    Exhibit O?

11         A      No.

12         Q      So Exhibit O, is it your contention all

13    of these guns are guns that were seized at the

14    residence, your residence, and not placed onto an

15    inventory list and not returned to you?

16         A      Correct.

17         Q      Now, to get back to the question I had

18    about whether I asked you to produce evidence that

19    you owned these guns, do you recall receiving that

20    request?

21         A      Uh-huh.

22         Q      And do you recall responding to it?

23         A      Yes.

24         Q      You produced a number of documents in
```

1      this case to me, including purchase orders, receipts,

2      and other various documents that evidenced that you

3      had purchased the guns contained on this list; is

4      that accurate?

5              A      Uh-huh.

6              Q      Those evidence that at one time you

7      owned these guns, correct?

8              A      Uh-huh.

9              Q      Correct?

10             A      Correct.  Yes.

11             Q      Some of those guns are contained in

12     logbooks that you have produced in this lawsuit,

13     correct, that show you had purchased the guns at one

14     point?

15             A      Yes.

16             Q      Do you have any evidence that these guns

17     were at your residence at the time of the seizure,

18     the search and seizure by the officers on August 5,

19     2009?

20             A      Well, by their paperwork, they seized

21     300 weapons.  By their paperwork they returned 211.

22             Q      But it's my understanding that the guns

23     contained on Exhibit O were never included in their

24     paperwork?

1          A      Right.  Other than their count.  They

2     said in more than one place that they seized

3     approximately 300 weapons.

4          Q      Let me refer you back to Exhibit H.  Mr.

5     Six, we've discussed at length Exhibit H, and it's

6     your understanding this was the inventory list

7     created at your residence that day?

8          A      (Witness nods affirmatively).

9          Q      Is it your contention that guns that are

10    contained in Exhibit O are also contained in Exhibit

11    H?

12         A      No.

13         Q      It's your position that they're not

14    contained in Exhibit H?

15         A      Yes.

16         Q      It's your contention these guns in

17    Exhibit O are documented nowhere, correct?

18         A      Other than my records.

19         Q      Right.  Do you want to go back to my

20    question, initial question was:  Do you have any

21    evidence that these guns contained in Exhibit O were

22    physically at your residence on August 5, 2009?

23         A      Not other than their count.

24         Q      Whose count?

205

1          A      The sheriff's count, and Josh Shields

2    also in interrogatories, he said he participated in

3    taking the 300 firearms from my house.

4          Q      Have you found the firearms in Exhibit

5    H?  There's 221?

6          A      Yes.

7          Q      That's your contention?

8          A      Yes, or 211.  It's getting a little

9    foggy.  211 or 221.

10         Q      Where is this document that you

11   testified to that states that 300 weapons were taken?

12         A      It's on the indictment from Meigs

13   County, and it's in Josh Shields' interrogatories

14   that we requested.

15         Q      Isn't it true that the indictment states

16   there were approximately 300 guns?

17         A      Right.

18         Q      So it doesn't give a definitive number?

19         A      No, it doesn't.  In fact, 221 and, you

20   know, 75 and then the other 20 exceed 300.  So like

21   the judge said in one document, he said that he

22   couldn't tell if there was 275 or 325 based upon

23   their paperwork.

24         Q      Is the paperwork you're describing today

206

1          Exhibit H and Exhibit I, which are the two inventory

2          lists we discussed at length documenting the weapons

3          that were seized from your house?

4                    MR. PETTEY:    I don't know if that

5          calls for speculation.  I don't know if he knows what

6          the judge was referring to when the judge made that

7          statement.

8          Q      Okay.

9                    MR. CONOMY:    Let's have him testify

10         about that then.

11         Q      Mr. Six, you testified that there's some

12         documentation out there that 300 guns were seized

13         from your house, and I asked you where that

14         documentation is and you testified that --

15         A      It's on the indictment.

16         Q      Okay.

17         A      And it's in Josh Shields'

18         interrogatories.

19         Q      And that indictment said there were

20         approximately 300 guns taken from your residence,

21         correct?

22         A      Yes.

23         Q      Doesn't give a definitive number?

24         A      Does not.  But it was definitely more

1    than the 221 they returned.  They wouldn't miscount

2    it that much.

3         Q    That's your belief?

4         A    That is my belief.  They were still

5    loading stuff up when they took me away.

6         Q    Besides the documents that you've

7    referred to, the indictment and Josh Shields'

8    responses to interrogatories, do you have any other

9    evidence that the guns contained on Exhibit O were

10   physically at your residence on August 5, 2009?

11        A    My logbooks.  You know, I don't have a

12   photograph of them that day.  I'm not really sure

13   exactly what we count as evidence.

14        Q    The logbooks certainly do detail that at

15   one time you purchased some, if not all, of these

16   guns.

17        A    And the receipts.

18        Q    Okay.  Is there anything besides the

19   logbooks, the receipts, the purchase orders or any

20   other documents that you've provided to me that

21   evidence that -- would prove that these weapons were

22   physically at your residence and on your property on

23   August 5, 2009?

24        A    I couldn't think of what it would be.

1        Q      Mr. Six, take a look at Exhibit O,

2    please.   In addition to the description of the

3    weapon, the caliber of that weapon and the serial

4    number, there's a fourth column which has dollar

5    figures --

6        A      Uh-huh.

7        Q      -- associated with each items.  Do you

8    see that?

9        A      Yes.

10       Q      Did you create those, or did you

11   associate those dollar amounts with each weapon?

12       A      Yes.

13       Q      What is that based upon?

14       A      The Blue Book from 2009.  That's when

15   the guns were taken.  That was correct then.

16       Q      Is it just called the Blue Book?

17       A      Yeah, Blue Book of Gun Values, yeah.

18       Q      2009 edition?

19       A      Uh-huh.

20       Q      Does that Blue Book have a range of

21   value based upon the condition of the gun?

22       A      It does.

23       Q      How have you come up with these numbers?

24       A      Well, for the most part, as a collector,

1    I wanted to have the nicer guns and not the junk

2    ones.  So this would be the 90, 95 or 100 percent

3    categories, the upper end as far as condition goes.

4    Because I'm a collector, I would only had the nicer

5    guns.  There would be a few exceptions.

6         Q    Did you note those exceptions on here,

7    or are all of these values in the 90 percent to a

8    hundred percent range based on condition?

9         A    To the best of my memory, these would

10   all be the 90, 95, 100 percent condition.

11        Q    Take a look book at Exhibit L and M, the

12   two lists created by Steve Jagers.

13        A    Here we go.  Got it.

14        Q    During the course of this litigation,

15   you have offered values associated with each of these

16   weapons, correct?  I know they're not included on

17   Exhibits L and M, but I have seen a document that has

18   dollar figures next to each of these guns.  Is that

19   something you created, sir?

20        A    It would have been, but I'm not sure

21   that I did.  Did I put -- I'm not sure that I did

22   that.  We were talking about that yesterday.  In

23   fact --

24        Q    If you remember, you remember.

1          A     I don't remember.  It came to me

2     actually yesterday, it occurred to me that I hadn't

3     assigned a value to these guns.

4          Q     If you were to assign values to these

5     guns today, would you use the same method that you

6     assigned the values in Exhibit O?

7          A     For the most part I would.

8          Q     So you would go to the Blue Book of Gun

9     Values?

10          A     And look up the 90, 95, 100 percent

11     category and look up the value and assign it that

12     way.

13          Q     Do you have any evidence that all of

14     these guns, whether they be contained in Exhibit O,

15     Exhibit L or Exhibit M, other than your own belief

16     that they were -- should be valued in the 90 to a

17     hundred percent range, do you have any other evidence

18     that they are in fact worth that amount?

19          A     Other than what's in the Blue Book?

20          Q     I'm sorry.  Not worth that amount, but

21     that they were in the condition that would place them

22     in that 90 to 100 percent value?

23          A     Just -- well, just it was my collection

24     and in my opinion they were in -- okay.  Maybe I can

1    help.  In front of the Blue Book it tells you how to

2    grade a weapon.  It tells you what the points off

3    are.  And going by what's in the front of the Blue

4    Book is how I arrived at the condition grading.

5            Q    If you received a gun that had a serial

6    number altered on it, visibly altered, would that

7    decrease the value of the gun?

8            A    You have to turn those over to the feds,

9    yes.

10           Q    Did you possess any guns that have

11    serial numbers that appeared altered on their face?

12           A    I had what they called some overstamps,

13    but that's not the same as an altered serial number.

14           Q    What does that mean?

15           A    An overstamp generally means it would

16    have been reissued in the military and the military

17    would assign a different number to it than it did the

18    first time, an overstamp.  In that case, usually you

19    can read both serial numbers and you just go ahead

20    and record both serial numbers.

21           Q    The one serial number would be on top of

22    the other?

23           A    Or right next to it and maybe one will

24    have a line through it.  There's different ways to do

1    it, but some guns will be reserialized.

2         Q    Is the entire serial number changed, or

3    is it just one number?

4         A    Sometimes it will be one number, and

5    sometimes it will be the whole number.  There's

6    really no one size fits all.  A lot of my guns were

7    European.

8              Europeans don't have a one-size-fits-all

9    policy when they go from country to country.

10   Germans were notorious for adding serial numbers.

11   For example, between World War I and II, they

12   reissued World War I guns in World War II and

13   assigned them new numbers.

14        Q    Mr. Six, I'm going to hand you a

15   document that I received today from your attorney and

16   ask that it be P.

17                        - - -

18             Thereupon, Defendant's Exhibit P was

19             marked for purposes of identification.

20                        - - -

21   By Mr. Bernhart:

22        Q    I handed you a document that's been

23   marked Exhibit P, as in Paul.  Mr. Six, have you seen

24   this document?

1          A      I wrote it.

2          Q      When did you write this document?

3          A      Yesterday.

4          Q      Does this document reiterate, if we look

5     back at Exhibits L and M, the lists created by

6     Jagers, are you simply including the guns that he

7     alleged were missing?

8          A      No.   Actually what I failed to do was to

9     list the guns on these lists that were returned.   All

10    I listed here were the ones that are still missing

11    off of these two lists (indicating).

12         Q      The guns that are on Exhibit P, those

13    guns are also contained on Exhibits L and M, correct?

14         A      Right.   But there are more on L and M

15    than mine because I got some of these back.

16         Q      You have reduced the number of -- based

17    upon -- we have gone through the interrogatories.

18    Response to Interrogatory No. 15 where you have

19    acknowledged some of the guns on Exhibits L and M

20    were returned --

21         A      Uh-huh.

22         Q      -- does Exhibit P simply reflect that?

23         A      Reflects that, yes.

24         Q      Got it.

1              Is Exhibit P an extension of Exhibit O?

2        A    Yes, it is.  O is a list of guns that

3   were missing that aren't listed anywhere, and P is a

4   list of guns that are missing that are listed on

5   Jagers' lists.

6        Q    I will note for the record Exhibit O

7   contains values of guns, Exhibit P does not.

8        A    Does not, yeah.  I can look those up and

9   assign values.

10       Q    If I were to go to the Blue Book of --

11       A    Gun Values.

12       Q    -- of Gun Values 2009 version and assign

13  each of these guns a value in the range of 90 to 100

14  percent, is that what you would do?

15       A    Yeah, I think so.  Let me see if I can

16  jog my memory here real quick and see if there's any

17  here that would be less.

18            Yeah, I would say that based upon the

19  best of my recollection from looking at them four

20  years ago.

21       Q    Do you have pictures of each of the guns

22  contained on Exhibits O and P?

23       A    No.

24       Q    Do you have pictures of some of those

1    guns?

2         A      Just what was in discovery.

3         Q      You provided me a handful perhaps, less

4    than five pictures of guns.

5         A      That's it.  They took them.  I never

6    photographed my guns.

7         Q      It's your contention that those pictures

8    were taken by somebody other than yourself?

9         A      Yeah.  Yeah, they took them.  Adam, I

10   think, is in a couple where they were holding them

11   back up in my room the day they were taking them.

12   All you can see in the picture is the gun.  You can't

13   see serial numbers or nothing.

14        Q      So there would be no way of associating

15   the gun that's in the pictures with these guns on

16   Exhibits O and P?

17        A      There might be.  It depends on what the

18   picture was.  I mean, if it was -- a lot of my guns

19   were like I have a collection of Enfields.  There's

20   model 3, model 4.  I had several of each model.

21   Okay.  If they're standing there holding up a model

22   4, which one is it?  If I owned four model 4's, you

23   really couldn't say.

24        Q      Without looking at the serial number?

1          A       Without looking at the serial number.

2          Q       I understand.

3                  Had you ever had a, quote, unquote,

4    expert on gun valuation come in and value your gun

5    collection?

6          A       I used to do that myself.  Not an

7    outside expert.  I took them to shows and got other

8    opinions, but not to my house.  I didn't really want

9    people to know I had them.

10          Q       Those opinions given at gun shows were

11    verbal opinions?

12          A       Oh, yeah.  I never had a written

13    appraisal gone.  I used to do estate appraisals

14    myself.

15          Q       When was that?

16          A       Back in the seventies.

17          Q       Were you paid to do that?

18          A       Yeah.

19          Q       And you appraised weaponry?

20          A       Estate collections.  Generally somebody

21    dies and relatives have me come in and do an

22    appraisal, arrange an auction.

23          Q       Have you done that since the seventies?

24          A       Maybe just as a favor but not

217

1    professionally.  I have done it a couple times.

2         Q    Have you ever testified in court or any

3    other proceeding as an expert witness on gun

4    valuation?

5         A    No.  Maybe to an insurance agent.  I

6    think I did talk -- it wasn't in court, though.

7         Q    Part of an appraisal process?

8         A    Yeah.

9         Q    In addition to the guns that are

10   contained on Exhibits O and P, you've also identified

11   an antique deer foot knife Austrian in origin.

12        A    Yes.

13        Q    Is it your contention that knife was

14   seized from the residence, not inventoried and not

15   returned to you?

16        A    That's correct.

17        Q    Do you have any evidence that the deer

18   foot knife was physically present at your house on

19   September 5, 2009?

20        A    That one was an antique, and I had a

21   brand new one on my shelf that was on display and the

22   new one is still there.

23        Q    Other than your testimony, is there

24   anything that would corroborate --

1          A       My wife could say.  She could say, yes,

2     he had that knife.  It was a pretty big deal to us.

3     It wasn't worth a lot of money, but they're rare.

4          Q       What do you estimate the value of that

5     knife to be?

6          A       $200.

7          Q       What do you base that on?

8          A       Replacing it.  I priced them at a couple

9     knife shows I have been to, and that's about the best

10    price I can find on one.  That's been a while.  It

11    would be tough to find one now at any price.

12         Q       You allege that a number of items that

13    were taken from your residence were damaged, items

14    that were taken at the residence and had been

15    returned to you were damaged while they were in

16    possession of the Meigs County Sheriff's Office.

17    What in particular do you believe was damaged?

18         A       A lot of gunstocks were damaged because

19    the evidence tag that they used was a sticky back

20    tag, and they would wrap it around the stock and

21    write the description on there, and then it sat that

22    way for a year and a half.  So when it came back, it

23    was nearly impossible to get those tags off without

24    taking the finish off the wood, which caused me to

1      have to have the wood on most of them refinished.

2              Q      What was the cost of having that done?

3              A      I did it myself.  I do restoration, but

4      it was a lot of time.  I had to buy some supplies and

5      so forth.

6              Q      Would the cost of those supplies be

7      under a hundred dollars?

8              A      Yes, I would say under a hundred

9      dollars.  To have somebody do it for me, probably

10     would have charged about a hundred per gun.

11             Q      Were the evidence tags on the items when

12     they were returned to you?

13             A      Yes.

14             Q      What did you do with those evidence

15     tags?

16             A      Just threw them in the trash, most of

17     them.  Might be one or two left.  I just wanted, you

18     know, out of sight, out of mind.

19             Q      Did you ever compare those evidence tags

20     with any of the inventory lists?

21             A      No, I can't say that I did.  They had

22     the serial number on the tag, and we looked at that

23     with the gun, you know.  As far as taking these lists

24     out, when I came home the next day from -- I brought

220

1       the guns home on the 11th.  The only paperwork I had

2       was the receipt they left at the house.  So, you

3       know, I didn't do a comparison there.  These other

4       lists here didn't have any copies, not Jagers' lists

5       or the sheriff's or anybody.

6               Q       But it's your testimony that you did not

7       compare the evidence tags on the items with Exhibit

8       H, which is the evidence list that you have testified

9       to having in your possession?

10              A       Not until I went through the guns, wrote

11      all the numbers down myself and then looked.

12              Q       So you created a document where you

13      physically wrote down gun numbers, serial numbers?

14              A       (Witness nods affirmatively).

15              Q       Do you still have that document?

16              A       Possibly.

17              Q       I'll ask you to look for that document

18      and provide it to your counsel if you have not

19      already.

20              A       It's just a note pad, you know.  It's

21      nothing -- mostly notes to myself, I would imagine.

22      The serial numbers would be there.

23              Q       In either event, I would like to see

24      that document if it still exists.

1          A      That would pretty much be the same as

2     the list that you just printed out there.

3          Q      A list from the federal firearms logbook

4     that you maintain?

5          A      Yeah.

6          Q      During discovery you produce a federal

7     firearms logbook, correct?

8          A      (Witness nods affirmatively).

9          Q      Yes?

10         A      Yes.

11         Q      That logbook contains at the very least

12    guns that were returned to you from the sheriff's

13    office, correct?

14         A      Correct.

15         Q      Did you go through the physical guns

16    themselves and look at their serial numbers in

17    creating that list?

18         A      Yes, that's what I am talking about.

19    Wrote them in a notebook and then wrote them into the

20    logbook.

21         Q      So there is no dispute that on the list

22    that you provided in discovery are guns that you had

23    in your possession after April 11, 2011?

24         A      Yes.

222

```
 1                        - - -

 2                Discussion held off the record.

 3                        - - -

 4                Thereupon, Defendant's Exhibit Q was

 5                marked for purposes of identification.

 6                        - - -

 7      By Mr. Bernhart:

 8           Q     Mr. Six, I am handing you a document

 9      that's been marked as Exhibit Q.  Do you recognize

10      that document?

11           A     Yes.

12           Q     Is that one of the federal firearms logs

13      that you have produced in discovery in this case?

14           A     Yes.

15           Q     Is that one of the federal firearms logs

16      that you described as containing all of the guns --

17      containing guns that were in your possession after

18      April 11, 2011?

19           A     Yes.

20           Q     And the second page of that logbook

21      contains a receipt.  Is that intended to be part of

22      the logbook?

23           A     Ultimately these are guns I did have to

24      log off.
```

223

1          Q      Does that logbook contain guns that

2      you've acquired since April 11, 2011?

3          A      Yes.   Yes.   The ones that I got from the

4      sheriff's office say MCSO, Meigs County Sheriff's

5      Office, then all these dittos.

6          Q      Okay.

7          A      And then if I acquired them somewhere

8      else --

9          Q      It would be so identified on there?

10         A      Yeah, it would be identified they came

11     from someplace else.

12         Q      When did you create that list?

13         A      Right after -- probably the day after I

14     got them home I wrote them in my note pad.

15         Q      Let me ask you another question.

16         A      Okay.

17         Q      Those firearms logbooks require you to

18     note when guns are out of your possession, correct?

19         A      Yeah, when I sell one.

20         Q      You created that logbook because those

21     came back into your possession?

22         A      Correct.

23         Q      I think you testified already today that

24     you never noted in any logbooks when the guns were

224

1      seized --

2             A      Oh, yeah.

3             Q      -- and were out of your possession?

4             A      No.   The old logbooks, I just noted in

5      the front, you know, and told -- and told the ATF

6      that when the sheriff came and took all my guns, that

7      as of that day, they were all logged off to him.

8             Q      That was just done recently, correct?

9             A      Yeah.

10            Q      At the time back in 2009, you didn't

11     create any notation in your logbooks that the guns

12     were out of your possession?

13            A      I didn't have any logbooks until -- they

14     didn't give them back to me until August, July or

15     August of 2010.

16            Q      Was it noted in any other logbooks?

17            A      I didn't have any other logbooks.

18            Q      Could you have gone and got a new

19     logbook?

20            A      I could have got a new logbook, but I

21     didn't have any to write in there.

22            Q      What about when you received the

23     logbooks back from Matt Donahue, the prosecutor's

24     office, which I believe you testified was?

1        A      July, August 2010.

2        Q      Right.  At that time did you note in the

3    logbooks that the guns were out of your possession?

4        A      No.

5        Q      Is there a reason that you've noted in a

6    logbook that the guns have come back in your

7    possession as opposed to noting it anywhere they were

8    out of your possession?

9        A      Well, yeah.  When I received them, you

10   have to log in who you receive the guns from.  So I

11   received all these guns from the sheriff's office.

12   They left me a receipt for them.  In essence, that

13   closed out my books because they took everything.

14   When I got the guns back, I started a new book and

15   logged them back in from the sheriff's department.

16   That satisfied the ATF.

17       Q      In hindsight, should you also not logged

18   those in other logbooks that they were out of your

19   possession?

20       A      You know, over a year later when I

21   finally got them back.

22       Q      Sure.

23       A      The ATF could have shown up any time.

24       Q      And if the ATF would have shown up at

226

1    your house during that time they were out of your

2    possession, how would you explain it?

3          A     I would refer them to -- Carson Crow and

4    I discussed it at length.  He was expecting that he

5    might hear from the ATF.

6          Q     Did the ATF ever go to your residence

7    during that time frame the guns were out of your

8    possession?

9          A     No.  It was a miracle.

10         Q     I understand the ATF recently paid you a

11   visit?

12         A     Uh-huh.

13         Q     When was that?

14         A     February 15th, think.

15         Q     Of 2013?

16         A     Yeah.

17         Q     Just this past year?

18         A     Uh-huh.  Now, they had -- they came also

19   the year before in November.  They came in 2011.

20         Q     So November of 2011 the guns had already

21   been returned to you?

22         A     Yeah, the logbooks, everything was cool.

23   They were happy.  They wrote me a clean bill of

24   health.

1        Q      How about in February of this year?

2        A      Not so clean.

3        Q      Tell me what happened.

4        A      Well, they have a copy of my letter that

5    I recounted the events.

6        Q      We will get to that in a moment.  Tell

7    me what happened.

8        A      Basically they came up.  A little girl

9    knocked on the door and said she was here for a

10   compliance inspection, and I said, okay, come on in.

11   So then she motioned, and the other guys came in

12   there.  There were five of them.

13       Q      Five ATF officers?

14       A      Yes.

15       Q      Did you recognize any of them?

16       A      No.

17       Q      They weren't the same officers there in

18   November of 2011?

19       A      No.

20       Q      Did you have an audit done in 2012?

21       A      No, they missed '12.  They got '11 and

22   '13.  Missed '12.

23       Q      What did you observe them doing while

24   they were at your residence?

228

1          A       They pulled out all the guns and

2     compared them to the record books.

3          Q       Were there any problems found?

4          A       The only problem was some of the guns

5     that I had sold or traded off, whichever the case

6     was, usually I deal pretty much with the same people,

7     the same collectors, but I didn't fill out the

8     address and so on of where each of them lived, you

9     know.

10         Q       Are those guns that were sold or traded

11    off since November of 2011?

12         A       Yeah.

13         Q       So that's why there were no problems

14    found in the first audit in November of 2011, but

15    since it's become a problem?

16         A       I've been to a couple gun shows and I

17    did some trading around, and I hadn't brought my

18    books up to date.  Normally they call and say, we're

19    going to be out on -- we'll be out Thursday, you

20    know, and then you hurry up, you know, and catch up

21    all the paperwork.  I don't take a book to a gun

22    show.  The book stays home.  You take a notebook to

23    the gun show and write down the information, so on

24    and so forth.  Then when I get home, I transfer this

1    information into my logbook, and I hadn't done that

2    yet.

3         Q    What is the consequence of not noting

4    that in your logbook, those transactions, if you

5    know?

6         A    They said, you know, get it done.

7         Q    That's it?

8         A    Yeah.

9         Q    Slap on the wrist?

10        A    Well, I mean, you know, you don't want

11   that to happen.  That's the first time it ever

12   happened.

13        Q    Do you anticipate a fine coming?

14        A    No.

15        Q    Or any --

16        A    There is nothing like that.

17        Q    No criminal charges coming from

18   something like that?

19        A    No, it was just incomplete logs.  I went

20   through my book and I wrote down the names.

21        Q    Is your license in jeopardy because of

22   their findings?

23        A    No, nothing like that.  No.  If it was a

24   reoccurring problem, it's likely that would happen.

230

1          Q      The issues that they discovered there

2     with the transactions not being noted in the logbook,

3     that has nothing to do with the underlying -- the

4     guns being seized back in August of '09 and returned

5     in 2011?

6          A      No.

7          Q      Nothing to do with this lawsuit?

8          A      Correct.

9          Q      Were any guns seized by the reps?

10         A      They took my Thompson, 1978 Thompson.

11         Q      Why?

12         A      Because I didn't have a registration

13    form.  With an NFA weapon, you get a form from the

14    ATF, you can compare it to a car title, so they know

15    you have it and you know you have it.  And when they

16    initially -- of course, they gave me all the guns

17    back and no paperwork.  It was a long time later

18    before they returned my paperwork, and one piece of

19    paperwork that they didn't return or one of them was

20    that registration form.

21                So when the feds came out, for some

22    reason they already knew a lot of this stuff.

23    Somebody had told them that, you know, what I'm

24    telling you.  They already knew this stuff when they

231

1    got to the house.

2         Q      How do you know that?

3         A      Well, they said, "Do you still have the

4    Thompson?"  I said, yeah.  They said, "We would like

5    to see it."  So I went and got it and brought it out.

6         Q      Did she ask you for a registration?

7         A      Sure.

8         Q      And you didn't have it at the time?

9         A      Didn't have it at the time.

10        Q      It's your contention that registration

11   was seized from your residence in August of 2009 and

12   never returned to you?

13        A      Correct.

14        Q      Is that registration documented

15   anywhere?

16        A      That's the problem.  See, their records,

17   they couldn't find it in their records either.  I can

18   tell you how that works, but that's not -- that was

19   registered back in the early seventies.

20        Q      Sitting here today, you can't tell me of

21   any evidence that exists that that registration form,

22   that you actually had that registration form in

23   August of 2009?

24               Let me ask it a different way.  In

1    August of 2009 did you have the proper registration

2    form?

3             A      Yes, I had the registration form.

4             Q      What evidence do you have besides your

5    own testimony that you possessed that registration

6    form?

7             A      I don't have any.

8             Q      There would be no document that exists

9    anywhere?

10            A      No.   They didn't have it either.   I

11   filed -- there is paperwork that I had to file to get

12   a new registration issued and $200.  I posted the

13   $200 transfer tax, but whether they will issue it to

14   me or not remains to be seen.  It usually takes 60 to

15   90 days.  It may take longer.  I think they may wait

16   until this proceeding concludes.

17            Q      Did you explain to the ATF that the

18   registration form had been seized and not returned to

19   you?

20            A      Yes.

21            Q      Was that the position you took on this

22   new application?

23            A      Yes.

24            Q      That's the explanation you have given

233

1      them?

2              A      That's it.

3              Q      Now it's wait and see?

4              A      Wait and see.

5              Q      What was the value of that gun?

6              A      They valued it at $22,000.

7              Q      And is it the ATF that issues the

8      registration, new registration?

9              A      It is.

10             Q      If the ATF does not issue the new

11     registration, you won't get that gun?

12             A      They keep the gun.

13             Q      Are there any other types of

14     administrative proceedings that you're aware of that

15     you can pursue to get that gun back?

16             A      There was -- I had two choices, you can

17     go to court or file, what do they call that?  I

18     forget what they call it now.

19             Q      Let me ask you a question I may have

20     already asked you.  If I have done so, I apologize.

21     When you noticed or when did you notice the

22     registration form had not been returned to you for

23     this weapon?

24             A      The day I got the gun, it wasn't in the

234

1    box.

2        Q    Did you report to the ATF that day --

3        A    No.

4        Q    -- or shortly thereafter the

5    registration form was no longer in your possession?

6        A    No, because I didn't get any paperwork

7    that day.  I didn't want to tell them I had a whole

8    bunch of guns I couldn't prove anything about.

9        Q    How about when you did receive the

10   paperwork back from the prosecutor, did you discover

11   then the registration form was not included with the

12   information?

13       A    Yes.

14       Q    Did you report to the ATF then that you

15   still did not have the registration?

16       A    No, no.  I was still hoping that they

17   would find the rest of my property.

18       Q    So the ATF would have viewed it as you

19   held that weapon or you possessed that weapon

20   improperly for that entire period of time?

21            MR. PETTEY:    Object as to what the

22   ATF might have believed.  It calls for a legal

23   conclusion and speculation as to what somebody else

24   might be thinking.  You can answer, if you know.

1          A      Well, based on what they said that day,

2     I didn't have -- I probably should have handled it a

3     different way, but they understood what I was saying.

4          Q      Were any other weapons seized from your

5     residence that day?

6          A      No, that was it.

7          Q      Mr. Six, today I was provided by your

8     attorney some documents related to that ATF search

9     and seizure and audit of your books.  One of those

10    documents appears to be the forfeiture form, another

11    document appears to be your appeal --

12         A      Yes.

13         Q      -- for lack of a better word, and a

14    third is titled Acknowledgment of Firearms

15    Regulations.

16         A      That was as a result of the compliance

17    inspection.

18         Q      Is that document indicating your

19    awareness of the regulations?

20         A      Yes.

21         Q      You were aware that you were required to

22    maintain the registration for the weapon at issue?

23         A      (Witness nods affirmatively).

24         Q      Yes?

1          A     Yes.

2          Q     When do you expect to receive a decision

3     from ATF?

4          A     Like I said, normally it takes 60 to 90

5     days.  I won't be surprised if they wait until this

6     proceeding is over.

7          Q     Did they indicate they may do that?

8          A     I asked them if they would, and they

9     didn't indicate.

10         Q     What was the disposition of your

11    criminal case?  Is that case still pending?

12         A     No, that's all a done deal.

13         Q     You testified earlier that you were

14    indicted on three charges?

15         A     Uh-huh.

16         Q     The three charges were drug possession,

17    having untagged deer racks, and turkey feathers?

18         A     Right.

19         Q     Did you go to trial on those charges?

20         A     No.

21         Q     What happened?

22         A     Basically they put me on two years of

23    community control with the understanding that if

24    nothing happened in that two years, the whole

237

1    business would be tossed or sealed or whatever the

2    legal term was.

3              MR. PETTEY:    I'll note an objection

4    to the question that it calls for a legal conclusion.

5    It asks him for an opinion about things that are

6    already in the record that can be determined from the

7    documents themselves.  You can give your

8    understanding of what happened, and I'm assuming

9    that's what you are testifying to now.

10         Q    So noted.

11              As part of entering into this probation

12    or community control that you've described, did you

13    have to enter a plea on any of the three charges?

14         A    Well, pretty much, if I recall

15    correctly, the animal charges were dismissed, and the

16    only thing that I had to address was the marijuana

17    charge.

18         Q    Did that stem from -- was it your

19    understanding that stems from the packages that were

20    received containing large amounts of marijuana?

21         A    Yeah.

22         Q    So the charge was drug possession.  How

23    did you plead to that charge?

24         A    I offered to plead guilty, but they

238

1    didn't accept the plea.  They put me on this

2    community control instead, held the plea in abeyance

3    depending on the outcome of the two years, and then

4    dismissed or dropped or whatever you would call that.

5         Q    So you did not plead guilty to drug

6    possession.  Did you have to enter any type of plea

7    to a lesser charge?

8              MR. PETTEY:    Again, I will note a

9    continuing objection.

10        Q    If you understand what that means.

11             MR. PETTEY:    You know, you're asking

12   him what is already in the record in this case.  You

13   can go ahead and answer to your understanding.

14        A    It's my understanding if I had screwed

15   up in the two years, I would had to face those

16   charges.

17        Q    Sure.

18                   - - -

19        Thereupon, Defendant's Exhibit R was

20        marked for purposes of identification.

21                   - - -

22   By Mr. Bernhart:

23        Q    Mr. Six, do you recognize this document?

24        A    Uh-huh, I think -- just a minute now.

239

1    Let me see.

2         Q     Take your time.

3         A     Tendered a plea of guilty.  Yes, I

4    offered a guilty plea.

5         Q     Does this document help refresh your

6    recollection as to whether you had entered a plea --

7         A     Yes.

8         Q     -- to a charge?

9         A     That's why I said I had to offer a plea

10   of guilty, but he didn't really accept it.  They held

11   it in abeyance.

12        Q     Look at the third paragraph.  This

13   indicates you offered a plea of guilty to attempted

14   possession of drugs, correct?

15        A     Yes.

16        Q     That was different than the underlying

17   charge?

18        A     Yes.

19        Q     But still a felony of the fourth degree?

20        A     Yes.

21        Q     Is that your understanding?

22        A     Yes.

23        Q     Second page of Exhibit R contains ten

24   numbers with statements next to them.  Does this

240

1    indicate the conditions of the agreement?

2         A    The ten things here, let me read it real

3    quick.

4              I'm not sure I have seen this.

5              MR. PETTEY:    Objection.  The document

6    speaks for itself.  To the extent you can answer the

7    question or have an understanding, you can testify to

8    that, Robert.  Do you understand the conditions of

9    the agreement?

10        A    Yes.

11        Q    No. 7, "Defendant is permitted to have

12   firearms."

13        A    Right.

14        Q    What is your understanding as to what a

15   finding of guilty or being found guilty of a felony

16   would have on your ability to maintain firearms?

17        A    It would end it, yeah.

18        Q    Is it your understanding that if you

19   don't complete this community control, that that

20   guilty plea that was held in abeyance, the court

21   would actually find you guilty of the charge?

22        A    Yeah, that was my understanding.

23        Q    Have you been subjected to drug and

24   alcohol testing since entering this agreement?

241

1                MR. PETTEY:    Objection, relevance,

2      but you can go ahead and answer.

3           A     You know, this is over.  The two years

4      has passed.  I've already been released.

5           Q     Well, can you turn to the third page of

6      this agreement.  Mr. Crow and Mr. Finley were your

7      attorneys, correct?

8           A     Yes.

9           Q     What is the date?

10          A     The fourth page was 12-1 2011.

11          Q     And the page before that also has that

12     same date; is that correct?

13          A     The page before that doesn't have a date

14     on my copy.

15          Q     Why don't you look at the first page of

16     Exhibit R, and there is a time stamp to the

17     right-hand corner.

18          A     Uh-huh.

19          Q     What is the date there?

20          A     December 8, 2011.

21          Q     The very first sentence of this states

22     that the matter came for hearing on the 14th day of

23     September 2011.

24          A     Uh-huh.

242

```
 1            Q      It's your understanding that you're
 2     subject to two years of community control --
 3            A      Well, I was, but they reduced that to a
 4     year.  They threw it in after one year.
 5            Q      When did that occur?
 6            A      Actually I have it out in the car if you
 7     would like to see it.
 8            Q      I'd ask you to provide it to your
 9     attorney and we receive a copy of that.
10                   So it's your testimony that the two-year
11     community control was reduced to one year, and that
12     it expired a year after this agreement?
13            A      Yes.
14            Q      During the course of this agreement,
15     which appears to have begun in December of 2011 and
16     according to you terminated in December of 2012, were
17     you asked or ordered to take a drug test?
18                   MR. PETTEY:    Again, I'll objection to
19     that question based on relevance, but you can answer,
20     if you recall.
21            A      No.
22            Q      Did you fail any drug test during that
23     period of time?
24            A      No.
```

1               MR. PETTEY:    Objection, but you can

2     answer.

3          A     No, I didn't fail any drug test.

4          Q     One last question.  I know it's kind of

5     out of order, but one of your allegations is that a

6     federal firearms logbook was taken from your

7     residence and not returned to you, correct?

8          A     Yes.

9          Q     It would be correct Exhibits O and P are

10    the list of guns that you've alleged have been taken

11    from you and not returned.  Are any guns that are

12    contained on Exhibits O and P listed in that logbook?

13         A     The missing book?

14         Q     Correct.

15         A     I don't think so.

16         Q     So all of the guns on Exhibits O and P

17    should be in the logbook that was returned to you and

18    that you've produced to us during this lawsuit?

19         A     I think so.

20         Q     Okay.

21         A     There may be some in the third book, but

22    I haven't really -- I don't have a third book.  I

23    think these were all in the two books I got back.

24         Q     My question is:  If there is a third

1    logbook that you don't have, my question is:   How

2    would you come up with the list of guns you owned?

3         A    Good point.  If there was any missing

4    out of Logbook 3, the only way I would be able to

5    establish those would be if I still had a purchase or

6    sales order.

7         Q    Did you compose these lists, Exhibits O

8    and P, by referring to your logbook?

9         A    Yes.

10        Q    That was the primary way that you

11   identified these guns?

12        A    Yes.

13                    - - -

14             Discussion held off the record.

15                    - - -

16             MR. BERNHART:    Mr. Six, I have no

17   further questions of you today.  I would ask that

18   Exhibits A through R be admitted into the record.   I

19   understand that some of the other attorneys may have

20   some questions for you, and I'll pass it over to

21   them.   Thanks for your time.

22                    - - -

23

24

1                          - - -

2                    CROSS-EXAMINATION

3    By Mr. Conomy:

4         Q    I know we've gone through a lot of

5    paperwork, but can I get Exhibit Q out of that pile

6    there from you?  I think they've been placed in

7    order.  Exhibit Q is the Dealer Transaction Record

8    Book, correct?

9         A    Correct.

10        Q    And if I understand and am clear on

11   this, this, at least the first page, shows guns that

12   were returned to you --

13        A    Yes.

14        Q    -- correct?

15        A    Yes.

16        Q    So I would like you to tell me what is

17   the second gun listed there that --

18        A    That is an Ithaca 1911-A1 World War II

19   U.S. Military Issue 45, serial number 100374.

20        Q    If I understood it, that was one of the

21   guns then that made it on the U-Haul and made it back

22   to your house?

23        A    Yes.

24        Q    And this morning, I guess, we got a list

1    that is Exhibit P, and the guns on that list you

2    claim are guns that have not been returned to you,

3    correct?

4         A    Correct.

5         Q    Can you tell me what is the fourth one

6    from the bottom?

7         A    Yes.  That would be another Ithaca 1911,

8    No. 1374 serial number.  See, 1911's were the first

9    war, early issue.  A1's were later ones.

10        Q    Let me see Exhibit Q, if I may.  It's

11   got the same 374 as the last three digits in the

12   serial number as the one in Exhibit Q, and you're

13   saying that there was another Ithaca 1911 with the

14   last three numbers 374 that is missing?

15        A    Yes.

16        Q    Okay.  And Exhibit J, would you return

17   to Exhibit J, please.

18        A    Okay.  That's the handwritten one.

19   Okay.

20        Q    And if you could turn to the fifth page

21   in, it says 000611 at the bottom.

22        A    Okay.

23        Q    Five up from the bottom it says No. 70A,

24   Ithiza, with a Z, 1911.  Would you agree that should

247

1    be Ithaca?

2         A    Yes.

3         Q    Serial number 101374?

4         A    Yeah.  That would be a third, a

5    different third serial number.

6         Q    So you're claiming there are three

7    Ithaca 1911 guns each with serial numbers ending in

8    374?

9         A    Yeah.  I didn't realize that.

10        Q    And you did sign this document?

11        A    This is 101374.  Yeah, that's an A1,

12   right.  There is a difference between a 1911-A1 and a

13   1911.

14        Q    They both have the same last three

15   digits in the serial number?

16        A    Those three digits would come up

17   periodically.  They made thousands and thousands, so

18   it would come up.

19        Q    You happened to have three of them that

20   ended up with the same last three digits?

21        A    Didn't realize it until you pointed it

22   out.

23        Q    That's kind of like winning the lottery.

24        A    Yeah.  I have a pair of 1903 rifles at

1    home that are consecutive numbers.  That's the only

2    consecutively numbered pair that anybody has ever

3    turned up.  They were made during World War II.  A

4    rarity like that intrigues collectors.  I appreciate

5    you pointing that out.  I wish I had all three

6    pistols now.

7         Q    And you signed Exhibit J at some point,

8    correct?  It's your signature on the last page?

9         A    Yeah.  I think I looked at this one

10   before and noted that -- yeah, that's mine.  I

11   remember signing this.

12        Q    And are you saying that your signature

13   doesn't mean that you are acknowledging receiving

14   these guns?

15        A    Realizing in hindsight that might have

16   been a mistake, but the only way I could have checked

17   his list that he made at the top of the steps would

18   be to unload the truck again and go through all the

19   guns and make sure they were listed here.

20        Q    Okay.

21        A    It was already starting to rain.

22   Everybody wanted to leave, me included.

23        Q    So there is an Ithaca 1911 gun out there

24   somewhere with serial number 1374, according to

249

1    Exhibit P, that should have been returned to you,

2    this one fourth from the bottom?

3         A    Yeah.

4         Q    The complete serial number is 1374?

5         A    Apparently, yeah.  I guess I would have

6    copied that out of my logbook.

7         Q    And even though you signed Exhibit J,

8    you're saying that doesn't mean that you actually

9    agree that they returned to you an Ithaca 1911 with

10   serial number 101374 on Exhibit J?

11        A    Yeah.  Well, yeah, is that missing too?

12   You are getting me confused here now.

13        Q    Exhibit J is the gun that --

14        A    J, okay.

15        Q    -- you're saying they produced at the

16   top of the stairs.

17        A    All right.  Okay.

18        Q    On the fifth page in, the fifth number

19   from the bottom, fifth item from the bottom.

20        A    Was that a 611?  I am on the wrong page.

21   10374.

22        Q    But you didn't -- but you are saying

23   your signature doesn't acknowledge having received

24   that gun?

1        A       Well, I may have received that gun, but

2    I didn't check it out, you know.  The list, they

3    brought the list down and said, sign this list, and I

4    signed it.

5        Q       And --

6        A       Did I have that one listed?  Am I

7    missing it?

8        Q       That's what I'm trying to ask is whether

9    No. 23 on Exhibit P, the Ithaca 1911 with the last

10   four digits of a four digit serial number 1374, is

11   the same as the Ithaca 1911 on Exhibit J with a six

12   digit serial number, the last four digits of which

13   are 1374, are you saying there are two different guns

14   or would those be the same gun?

15       A       Actually, I think there's three

16   different guns here.

17       Q       All of which end in the number 374?

18       A       That is amazing, but it can happen.

19   They sequentially issue serial numbers as they build

20   guns.  1374 would have been in the run, and it's a

21   1911.  Then I do -- I have that listed missing twice,

22   but it's the same -- I have 1374 written in here, and

23   it's also on this list.  I see now.  I have it

24   written in -- I have it on two lists, the same gun.

1      But that's not -- that's not the same gun as 101374.

2      But I did have it listed twice as missing.  I'm

3      looking at O, Page 2, bottom gun.

4              Q       Yes, I do see that.  Thank you.

5              A       And on P it's No. 23.  It's also on this

6      list as missing.  So I have it recorded as missing on

7      both lists.

8              Q       And you have a document Exhibit J with

9      your signature with a 101374.

10             A       Yeah.  According to what they have

11     recorded here, I did receive it.

12             Q       But you're saying those are two

13     different guns?

14             A       Correct.

15             Q       And that you owned them both?

16             A       That's correct.

17             Q       And that you also have an Ithaca 1911-A

18     with the last three digits 374?

19             A       A-1, yes.

20             Q       So are you missing the 101374, or are

21     you missing the 1374?

22             A       Well, apparently 1374.

23             Q       And how do you know you are missing

24     that?

252

1          A      I don't have it.

2          Q      How do we know you ever did?

3          A      Let's see.  It will be in my record book

4     and who I bought it from, and I may or may not have

5     the purchase order.  I don't know.  I haven't looked

6     for it specifically.

7          Q      And do you have three purchase orders

8     for 1911 models of Ithaca guns all ending with the

9     serial last three digits 374?

10         A      It's possible.  I know it's hard to

11    believe.  I take it you're thinking do all three

12    numbers refer to the same gun.

13         Q      I'm asking you the questions.  All

14    right.  Let me move on to another subject then.

15                Who helped you unload the U-Haul?

16         A      Nobody.  I was home by myself.  Took me

17    all day.

18         Q      What measures do you take to keep your

19    firearms and ammunition secure so that nobody can

20    walk in and take them?

21         A      The room that I keep them in locks.

22         Q      And what kind of door does it have?

23         A      It's a wooden door.  It has a key lock.

24         Q      Is it a solid wooden door?

1        A       No, it's like this one.

2        Q       A hollow wooden door?

3        A       I think so, yeah.

4        Q       What kind of lock does it have?

5        A       It's a key lock.  I couldn't tell you

6    the manufacturer.

7        Q       So you don't have a safe that all these

8    guns are kept in?

9        A       No, no.  I consider the room to be

10   pretty much a safe.

11       Q       Does it have a window?

12       A       Yeah, but it's too small to get in and

13   out of.

14       Q       How many guns did you have in your house

15   when the shipment of marijuana arrived?

16       A       Well, my guess would be probably close

17   to 400.

18       Q       How would you arrive at that guess?

19       A       I remember having -- when we went to

20   court the first time, the indictment said 300.  They

21   asked me, he says, "300, is that correct?"  I said,

22   "I would have guessed it closer to 400."

23       Q       So that's a guess?

24       A       It's a guess.  I never totaled them up,

254

1      you know, never counted them.  I'm a collector.

2      Quantifying or even putting values on was not what my

3      interest was in the guns.  I'm more into the history.

4           Q     So you never really counted how many you

5      had?

6           A     No.

7           Q     How many guns came back to your house in

8      that U-Haul?

9           A     I believe it was 211.

10          Q     Did you count?

11          A     Yeah.

12          Q     When was the last time that you had an

13     audit from the ATF before the shipment of marijuana

14     arrived?

15          A     I don't remember.  Generally they come

16     around once a year.

17          Q     What were you wearing at the time that

18     the shipment of marijuana arrived?

19          A     Well, I had on my jeans and my T-shirt.

20     I usually wear jeans and a T-shirt and moccasins

21     around the house.  I think I still had it on when he

22     got there.  I had been out mowing the grass and doing

23     yard work and stuff, and I was pretty hot.

24                I think he arrived and I got those

1    packages, and when I saw those Styrofoam peanuts

2    start flying, I didn't want to deal with it.  So I

3    was taking my clothes off getting ready to go take a

4    shower when the rest of the crew arrived.

5         Q    Did you have the air conditioning on?

6         A    Oh, yeah.

7         Q    What was it set at?

8         A    73.

9         Q    So it was a lot cooler inside than

10   outside?

11        A    Oh, yeah.

12        Q    When you were brought into the jail and

13   they did the medical intake form, did you tell them

14   that you had passed out?

15        A    I don't remember if I did or not really.

16        Q    Well, if you could scare up Exhibit D

17   there for a moment.

18        A    Okay.

19        Q    All right.  And in the second section,

20   No. 8, at least what the document indicates is that

21   you responded "no" about fainting.

22        A    Yeah.  I took that like to be right

23   above there epilepsy, diabetes, you know, are you

24   afflicted with these problems, and fainting being a

256

1    problem that I am not afflicted with.

2         Q    And nowhere on this form, you will agree

3    with me, does it say -- does it at least remark that

4    you had told somebody that you passed out?

5         A    No, it doesn't.  I have no memory of

6    telling anybody that except the other inmates, you

7    know, I discussed it with them.  I was in a lot of

8    pain.  I wasn't that concerned about passing out at

9    that point.  It was my ribs that were hurting.

10        Q    I think you said there were three

11   individuals that escorted you out of the house and

12   into the cruiser?

13        A    I think it was three.

14        Q    Do you remember, I think you said they

15   were wearing uniforms; is that correct?

16        A    Uh-huh.

17        Q    Do you know which agency uniforms they

18   were wearing?

19        A    No.

20        Q    You couldn't tell me if they were

21   sheriff's office, state --

22        A    No.

23        Q    -- people?

24        A    I really can't.  I don't remember.  I

257

1     couldn't tell you who it was.  I was -- I thought I

2     was going to wake up any moment then.

3          Q     What kind of dogs do you have in the

4     kennel there?

5          A     Pit bull dogs, registered.

6          Q     About how many?

7          A     I had six when they came.  They took

8     them.

9          Q     A few times you have mentioned a receipt

10    that they left at the house.

11         A     Uh-huh.

12         Q     I was just hoping if you could tell me

13    which exhibit letter, I think we looked at that, but

14    I just want to make sure I know what you have said is

15    the receipt through this depo.

16         A     This one (indicating).

17         Q     You were referring to, what's the

18    exhibit sticker on that say?

19         A     H.

20         Q     I'm sorry?

21         A     H.

22         Q     That's all I've got.  Thank you.

23               MS. CHANCELLOR:     I don't have any

24    questions.

1                          - - -

2                     DIRECT EXAMINATION

3    By Mr. Pettey:

4         Q    I have a couple of follow-ups.  It will

5    take me a minute to get back to them.  Okay.

6              Mr. Six, we talked about on the day that

7    the weapons, some of the weapons were returned to

8    you, that there were two lists made.  And you gave

9    testimony somewhat to the effect, I don't remember

10   the exact words, that you believe that Mr. Jagers

11   compiled his list of missing guns by looking at

12   Exhibit J and comparing that to some other documents.

13   Do you know how Mr. Jagers reached or arrived at his

14   list of missing guns?

15        A    No.  Actually, no.  Never talked to him

16   after that day.

17        Q    When you said that, you were

18   speculating?

19        A    Well, to tell you the truth, at the time

20   I was taking that this was the list he wrote at the

21   bottom (indicating).

22        Q    So you misunderstood?

23        A    Yes, it was my mistake.  I thought I was

24   looking -- because I would imagine that he made his

259

1    list out and did his work off his list.

2         Q    And he never gave you a copy of that

3    list?

4         A    No, I never had a copy.  I never saw

5    either list until this proceeding.

6         Q    Now, with regard to the Thompson that

7    was seized, had there been any prior legal

8    proceedings about that gun?

9         A    Well, not really legal proceedings per

10   se, but when I lived down on Sharts Road, I took it

11   outside and shot it, and they called the sheriff and

12   the sheriff came out and investigated at the time.

13        Q    And so there was some documentation

14   relating to that?

15        A    Yes.

16        Q    And you referred to that in your appeal?

17        A    Yeah.

18        Q    Do you believe that's additional

19   evidence of your ownership?

20        A    Of that, uh-huh.

21             MR. PETTEY:    That's all I have.

22             We have the right to read this

23   deposition before it becomes official or waive the

24   reading of the transcript of this deposition.  That's

1    up to you, if you would like to read it or not to

2    read it.  I don't have any concern, and I'm satisfied

3    without reading it if you are okay with that.

4              THE WITNESS:    If you are okay with

5    it, I am okay with it.

6              MR. PETTEY:    We'll waive.

7                   - - -

8              Signature waived.

9                   - - -

10             Thereupon, at 5:30 p.m.,
               Thursday, April 11, 2013,
11             the deposition was concluded.

12                  - - -

13

14

15

16

17

18

19

20

21

22

23

24

# C E R T I F I C A T E

STATE OF OHIO      )
                    )    SS:
COUNTY OF MADISON   )

        I, Denise L. Shoemaker, a Notary Public in and for the State of Ohio, do hereby certify that before the taking of his deposition, the said Robert Six, was first duly sworn by me to tell the truth, the whole truth, and nothing but the truth;

        That said deposition was taken in all respects pursuant to the stipulations of counsel heretofore set forth and given at the said time and place by the said Robert Six;

        That I am not an attorney for or relative of either party and have no interest whatsoever in the event of this litigation; and I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

        IN WITNESS WHEREOF, I have hereunto set my hand and official seal of office at London, Ohio, this 6th day of May, 2013.

*Denise L. Shoemaker*
Denise L. Shoemaker, Notary
Public in and for the State of Ohio.

My Commission Expires:  January 27, 2014.

- - -