1          IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF OHIO

3                 EASTERN DIVISION

4                     -  -  -

5   Robert Six, et al.,        :
                               :
6            Plaintiffs,        :
                               :
7        vs.                    :
                               :   Case No.
8   Robert Beegle, et al.,     :   2:11-cv-0698
                               :
9            Defendants.        :   Judge Graham
                               :
10

11                    -  -  -

12          DEPOSITION OF **SCOTT FITCH**

13                    -  -  -

14       Taken at Lavelle and Associates,
              449 East State Street,
15            Athens, Ohio  45701

16           Tuesday, May 21, 2013
                 11:42 a.m.

17                    -  -  -

18

19

20

21

22     Donna J. Karoscik, RMR, CRR, CCP, CLR
     Realtime Advantage Court Reporting Services, Inc.
23                P.O. Box 279
             Lancaster, Ohio  43130-0279
24                614-323-4455

APPEARANCES

On behalf of the Plaintiffs:

        Sky Pettey, Esq.
        Lavelle & Associates
        449 East State Street
        Athens, Ohio  45701

On behalf of the Defendants Jonathan Jenkins and
Scott Fitch:

        Christopher P. Conomy, Esq.
        Assistant Attorney General
        150 East Gay Street, 18th Floor
        Columbus, Ohio  43215

On behalf of the Defendants Jerry Peters, Joshua
Staats, Scott Parks, and Christine Roberts:

        Alexis K. Chancellor, Esq.
        Assistant Attorney General
        P.O. Box 968
        Grove City, Ohio  43123

On behalf of the Defendants William Gilkey, Adam
Smith, Rick Smith, Scott Trussell, Robert
Beegle, and Brian Rhodes:

        Paul M. Bernhart, Esq.
        Fishel, Hass, Kim, Albrecht, LLP
        400 South Fifth Street, Suite 200
        Columbus, Ohio 43215

Also Present:

        Robert Six
        Jonathan Jenkins

        - - -

1              Tuesday Morning Session

2              May 21, 2013

3              11:42 a.m.

4                   - - -

5              STIPULATIONS

6                   - - -

7          It is stipulated by and between

8    counsel for the respective parties herein that

9    this deposition of SCOTT FITCH, a Defendant

10   herein, called by the Plaintiffs for examination

11   under the statute, may be taken at this time by

12   agreement of counsel and without other legal

13   formality; that said testimony may be reduced to

14   writing in stenotypy by the notary, whose notes

15   may thereafter be transcribed out of the

16   presence of the witness; and that proof of the

17   official character and qualifications of the

18   notary is waived.

19                   - - -

20

21

22

23

24

1                              INDEX

2

3    Examination of SCOTT FITCH                    Page

4      Examination by Mr. Pettey                     5

5                        - - -

6
                        DEPOSITION EXHIBITS
7
      Number      Description                       Page
8
      1           8/4/2009 BCI&I Investigative      17
9                 Report, Case Opening

10    2           8/4/2009 BCI&I Investigative      19
                  Report, Executed Search
11                Warrant at the Robert Six
                  Residence
12
      3           Narcotics Bureau Evidence         28
13                Inventory

14    4           Search Warrant                    51

15

16

17
     (Original exhibits were attached to the original
18                deposition transcript.)

19                        - - -

20

21

22

23

24

- - -

P R O C E E D I N G S

- - -

SCOTT FITCH,

being by me first duly sworn, as hereinafter

certified, testifies and says as follows:

- - -

EXAMINATION

- - -

BY MR. PETTEY:

Q.        Okay.  Could you state your full name

for the record, please?

A.        Donald Scott Fitch.

Q.        And have you ever had your deposition

taken before?

A.        Yes, sir.

Q.        Okay.  And in what type of case was it

that you had your deposition taken?

A.        It was a civil -- oh, as a witness in

a civil suit when I was at Washington County

Sheriff's Office, maybe around 1997, give or

take.  '96, '98, somewhere in that area.

Q.        And you were not a defendant in the

case?

1     A.          No, sir.

2     Q.          I'll give you the kind of the same

3     ground rules that I talked about with

4     Mr. Jenkins.  And let me ask you, you were

5     present for Mr. Jenkins' deposition; is that

6     correct?

7     A.          Yes, sir.

8     Q.          If you do want to take a break, please

9     feel free to ask, but I'll ask that you complete

10    the question that you're answering.

11    A.          Okay.

12    Q.          Please answer with yeses or nos if

13    it's a yes-or-no question, and please do give

14    verbal answers.  Is that okay?

15    A.          Yes, sir.

16    Q.          And if you don't understand a

17    question, please feel free to ask me to rephrase

18    it or repeat it.  But if you do answer, I'll

19    assume that you understood the question.  Is

20    that fair?

21    A.          Yes, sir.

22    Q.          Are you currently under the influence

23    of any drugs, prescription or otherwise, or

24    alcohol that would affect your ability to

1    testify truthfully and accurately here today?

2    A.          No.

3    Q.          Okay.  Let me ask you about your

4    educational background.  Where did you attend

5    high school?

6    A.          Eastern High School.

7    Q.          And when did you graduate?

8    A.          1990.

9    Q.          And, of course, that's in Meigs

10   County?

11   A.          Yes, sir.

12   Q.          Okay.  And then have you had any

13   education after that?

14   A.          Yes.  Hocking College, an Associate's

15   degree, from '90 to '92 in police science.  And

16   then from '93 to '94, I was at Ohio University,

17   criminal justice.  And then University of Rio

18   Grande -- I'm not sure of the year -- a degree

19   in public administration.

20   Q.          Okay.

21   A.          Oh, I'm sorry.  And Rockville

22   University after that with a Master's in

23   public -- or, I'm sorry -- criminal justice

24   administration.  And I believe that was in 2009,

1  is when I completed.

2  Q.          That's Rockville University?

3  A.          Yes, sir.

4  Q.          Okay.  And where is that?

5  A.          Virginia.

6  Q.          Virginia.

7  A.          It was an online course.

8  Q.          Okay.  And that resulted in a

9  Master's?

10  A.          Yes, in criminal justice

11  administration.

12  Q.          Did your time at O.U. result in any

13  degree?

14  A.          No, no.

15  Q.          Okay.  And did your time at Rio Grande

16  result in a degree?

17  A.          Yes.  A Bachelor's in public

18  administration.  Bachelor's of Science.

19  Q.          Okay.  About when did you graduate Rio

20  Grande?

21  A.          Maybe 2004.  I'm not -- give or take.

22  Q.          2004.

23  A.          It was all during work.  Yeah.

24  Q.          Okay.  All right.  And did you attend

a police academy?

A.          Yes, sir.  Through Ohio Peace Officer
Training Academy through Hocking College in
19- -- the summer of 1992.

Q.          Okay.  And tell me your first law
enforcement job.

A.          As a patrolman with the City of Belpre
Police from August of 1993 to August of 1995.
Do you want me to continue?

Q.          Yeah, please.

A.          I left there because I got employment
with the Washington County Sheriff's Office in
Marietta, Ohio, from August of 1995 until March
of 2001.  While there, I was hired as a
uniformed road patrol officer until mid-1997,
and then I was promoted to detective and worked
in the detective bureau until March of 2001.

Q.          Okay.

A.          In March of 2001, I was hired at the
Ohio Bureau of Criminal Investigation, BCI, as a
special agent.  I worked as a special agent
until December of 2011 when I was promoted to
special agent supervisor, and that's what my
current title is now.

1    Q.          Okay.  Okay.  And as a special agent

2    supervisor, what do your duties include?

3    A.          Supervising the -- what we call the

4    southeast and central Ohio -- and I believe

5    there's 23 counties, in the major crimes.  That

6    involved crime scene agents and special

7    investigation units, SIU agents, and crime scene

8    agents.

9    Q.          Okay.  And have you ever had -- have

10   you ever been a defendant in a lawsuit?

11   A.          No, sir.

12   Q.          Have you ever had any citizen

13   complaints of any kind filed against you when

14   you were acting as a law enforcement officer?

15   A.          No, sir.

16   Q.          Have you ever been the subject of any

17   internal affairs investigations while a law

18   enforcement officer?

19   A.          No, sir.

20   Q.          Okay.  Let's turn to the events that

21   are at issue in this lawsuit.  How was it that

22   you first got involved in this case?

23   A.          I received a call from Columbus Police

24   Department, also a member of the Ohio Task

1   Force, Jerry Peters.  Jerry advised me, because

2   I was from this area and worked this area, that

3   they had done a package interdiction.  And I

4   remember the number.  Approximately 40 pounds of

5   marijuana was located, and he wanted to know --

6   he gave me an address on Rutherford Road in

7   Meigs County, if I could -- myself could drive

8   by and obtain a description for a possible

9   search warrant, and asked me if -- the following

10  day -- I don't know if he asked me initially.  I

11  think he just asked me that initially.  And I

12  told him, yeah, that's not a problem.

13          Agent Jon Jenkins and myself -- I

14  think that was on August 3rd, 2009.  We were

15  traveling to Gallia County from Marietta to do a

16  narcotics operation.  En route to there, we

17  drove by Mr. -- what we later found out to be

18  Mr. Six's residence on Rutherford Road and

19  obtained a description.  I believe Agent Jenkins

20  took several photographs of the residence as we

21  drove by.

22  Q.          Okay.  Do you know what has happened

23  with those photos?  Do you know whether those

24  photos have been produced in discovery in this

1  case?

2  A.          I do not know.

3          MR. PETTEY:  If they haven't been, we

4  would request that they be provided.

5  BY MR. PETTEY:

6  Q.          Do you still maintain copies of those

7  photos in your file in this case?

8  A.          I personally am not a case agent or

9  have any of the files, but not to my knowledge.

10  I mean, I don't know.

11  Q.          Okay.  That would be -- Mr. Jenkins on

12  this case would be your file agent?

13  A.          For BCI.  But, again, it was an

14  assisting role.  He would have -- I assume he

15  would have forwarded those, if they do -- if he

16  did retain them, to either Meigs County

17  Sheriff's Office or the HIDTA Task Force in

18  Columbus.

19          MR. CONOMY:  Just to let you know, as

20  far as we know, you've got everything we've got.

21  We can go back and check to see if there are

22  pictures or anything else, but to the best of my

23  knowledge you've got everything that's still in

24  existence on that matter.

1          THE WITNESS:  And I believe that they

2     weren't really necessarily for any significance

3     other than to recall a description from the

4     photograph.  Because, again, we was driving by

5     and it was in a rural area.

6     BY MR. PETTEY:

7     Q.          Okay.  After you did that drive-by,

8     what was the next involvement you had with this

9     case?

10    A.          I think the following day I contacted

11    Jerry Peters, gave him the physical description

12    that agent Jenkins and myself obtained from

13    Mr. Six's residence as far as a description.  He

14    asked me -- he said that they had had, you know,

15    the 40 pounds of suspected marijuana, asked me

16    if I could contact Sheriff Robert Beegle, at the

17    time the sheriff of Meigs County, to see if they

18    would be interested in doing a controlled

19    delivery of the package to Mr. Six's residence.

20          I told him I would.  I contacted

21    Sheriff Beegle.  I told the sheriff what

22    Mr. Peters had told me.  He called me back

23    within an hour.  He said he was going to talk to

24    one of the prosecutors, and said that he wanted

1    to make the controlled delivery.

2    Q.          Okay.

3    A.          I remember supplying him with

4    Mr. Peters' number.

5    Q.          And why was it that you were giving

6    him Mr. Peters' number?

7    A.          Well, because presumably they was

8    going to obtain a search warrant, and I really

9    didn't have any initial involvement other than

10   doing a drive-by of the residence to obtain a

11   description.

12          So once we had passed that along, I

13   was going to let basically the HIDTA Task Force

14   and the Sheriff's Office, whomever, whichever

15   officer might be assigned to that, you know,

16   work out the detailed description, is what they

17   was going to do, of the operational plan.

18   Q.          Okay.  After that communication with

19   then-Sheriff Beegle, what was your next

20   involvement with the case?

21   A.          Jerry Peters called me.  It was later

22   that -- late afternoon or that evening, I

23   believe, and asked me if we -- if the task force

24   that I was assigned to, the Major Crimes Task

Force out of Washington and Marietta -- or, I'm

sorry -- Washington County and Morgan County,

could provide an entry team; that they was going

to obtain a search warrant and needed some

assistance because Meigs County Sheriff's Office

didn't have their own entry team and they knew

that we did a lot of entries, if we could put

together an entry team to assist the Sheriff's

Office.

And I told him we could. And I

believe it was at that time they set up a

meeting -- a pre-execution of the search warrant

meeting at the O.U. -- Ohio University airport.

Q.        Okay. Anything else you remember

discussing with Jerry Peters at that time?

A.        No, not at that time.

Q.        Okay. And then what was your next

involvement with the case after that

conversation?

A.        We met at the Ohio University airport.

We went over the search warrant. It was advised

that the search warrant had been signed. I

believe Meigs County Deputy Adam Smith was the

affiant on the case and the search warrant, and

1   they reviewed the search warrant and essentially

2   gave out, like -- I guess you would say basic

3   assignments.

4   Q.          Okay.  And what were some of those

5   basic assignments?

6   A.          Basically, the guys that was doing

7   entry would have been myself and Jon Jenkins,

8   Josh Staats from Washington County, Greg Nohe,

9   Scott Parks, Brian Rhodes, and Meigs County

10  deputies Adam and Ricky Smith was going to be

11  doing the entry.

12          It was my understanding that they was

13  going to make the controlled delivery in a U.S.

14  Postal Service vehicle to Mr. Six's residence,

15  and it was alarmed with an electronic device.

16  And when the package was opened, it would be

17  triggered.  At that time, they would contact me

18  via radio, and I would -- at that point we was

19  to make entry; that that was the trigger, if you

20  will, on the search warrant to be activated.

21  Q.          Let's use that same Jenkins Exhibit 1

22  as Exhibit 1 in this deposition as well.

23  There's Exhibit 1.  And I'll give you a minute

24  to review that.

1          MR. CONOMY:  Go ahead and take your

2    time.  Read the whole thing if you need to.

3          THE WITNESS:  Okay.  I'm good.

4                    - - -

5          (Deposition Exhibit No. 1

6     was marked for purposes of identification.)

7                    - - -

8    BY MR. PETTEY:

9    Q.        Do you recognize that exhibit?

10   A.        Yes.

11   Q.        And what is that?

12   A.        It's a -- on BCI letterhead, an

13   investigative report that is authored by Agent

14   Jon Jenkins.

15   Q.        Okay.  And this is -- it also says

16   toward the top, "August 4th, 2009, case

17   opening."  Have you had a chance to read over

18   that document?

19   A.        Yes, sir.

20   Q.        And do you have any reason to believe

21   that anything in that document is not accurate?

22   A.        No, sir.

23   Q.        Now, is it your understanding that the

24   HIDTA -- was it your understanding that the

1   HIDTA officers there were Columbus P.D.

2   officers?

3   A.         U.S. Postal Service inspectors,

4   Columbus Police Department officers, Franklin

5   County Sheriff's Office officers.  Those three

6   agencies.

7   Q.         Okay.  Now, are you sure that Franklin

8   County Sheriff's Office employees were involved?

9   A.         Yes.

10   Q.         Okay.  And do you recall who they

11   might have been?

12   A.         Lisa Brown.

13   Q.         Okay.  Any others?

14   A.         Last name's slipping me right now, but

15   Clyde.  He's a sergeant with the Sheriff's

16   Office.

17   Q.         Okay.  Anyone else?

18   A.         Not that I recall.

19   Q.         Okay.  And then do you recall at the

20   O.U. airport whether it was discussed what would

21   be seized from the house?

22   A.         I know the search warrant was read to

23   the participating officers, and in that would

24   have been items to be searched for.  I don't

1    recall specifics.

2    Q.        Okay.  And what was your assignment,

3    as you remember it, after the discussions that

4    occurred at the O.U. airport?

5    A.        To be part of the entry team, which

6    consists of when and if we was given the

7    go-ahead, if you will, if the package was opened

8    and the surveillance -- or the monitoring device

9    was activated, to make entry into the residence,

10   secure the residence and any people inside

11   the -- inside or on the residence.

12   Q.        Okay.  And we'll use Jenkins Exhibit 2

13   as Exhibit 2 in this deposition as well.

14   A.        Okay.

15                          - - -

16             (Deposition Exhibit No. 2

17      was marked for purposes of identification.)

18                          - - -

19             MR. CONOMY:  Once again, take your

20   time to read the whole thing if you need to.

21             THE WITNESS:  Okay.  Okay.

22   BY MR. PETTEY:

23   Q.        All right.  The very last word of the

24   report on the first page and then going on to

1  page 2, it says there, "Upon completing the

2  delivery, Major Crimes Task Force agents Josh

3  Staats, Brian Rhodes, Greg Nohe, Scott Parks,

4  Scott Fitch, and Jon Jenkins were responsible

5  for entering and securing the residence.

6  Deputies Adam Smith and Ricky Smith were also

7  assigned to entering and securing the

8  residence."

9          To your recollection, is that the

10  group that actually did enter and secure the

11  residence?

12  A.          Yes.

13  Q.          And it would have been one or more of

14  those officers who secured Mr. Six?

15  A.          Correct.

16  Q.          Let's go back to the O.U. airport.

17  Once you're done there, what did you do next?

18  A.          Got into a vehicle, I believe driven

19  by Josh Staats, and drove to an area just below

20  Mr. Six's residence along the roadway, within

21  probably 100 feet.

22  Q.          Okay.  And do you recall any

23  conversations that occurred in the vehicle on

24  the way there or once you're there waiting near

1  the Sixes' residence?

2  A.          No, sir.  Once we would have been

3  there, we would have been just waiting on the

4  radio.  We remember getting radio updates where

5  the officer driving the U.S. Postal Service

6  truck or vehicle -- I don't recall what type --

7  was in the driveway, leaving the driveway.  We

8  could see that from our vantage point as well.

9  And then after that point we exited the vehicle

10 and waited for the go-ahead, if you will.

11 Q.          Okay.  And once you did receive the

12 go-ahead, what happened then?

13 A.          The door -- the officers on the -- we

14 was kind of -- some of us was on the porch.

15 Some of us was standing down the steps.

16 Mr. Six's -- the door he knocked on to the

17 residence, nobody answered.  I remember the door

18 being breached.  And the officers we just

19 discussed, including myself, entered the

20 residence, secured Mr. Six, and searched the

21 residence for any additional occupants, which

22 there was none located.

23 Q.          And that was breached with a ram?

24 A.          Yes.

1    Q.         Can you describe the ram and how it's

2    used?

3    A.         Yeah.  It's very heavy, metal.

4    It's -- I don't know -- probably maybe five

5    inches in diameter, maybe three and a half feet

6    long, and it has handles on it.  And essentially

7    it is, with force, used to hit right around the

8    doorknob because it's the weakest part of the

9    door, and break the locking mechanism, if

10   necessary, to gain entry.

11   Q.         All right.  And is it your

12   recollection it was Jon Jenkins who used the

13   ram?

14   A.         That is correct.

15   Q.         Once the door was opened, what did you

16   do?

17   A.         Once the door was opened, I entered

18   the residence, which you kind of entered into

19   the -- I guess the dining room area slash living

20   room.  It's kind of an open area.  As I was

21   coming in, I heard somebody say something to the

22   effect of a gun, which is obviously a very big

23   concern.

24              At that time, I'd seen Mr. Six

1    face-down on the living room floor.  I seen a

2    gun on the coffee table, a handgun.  I then went

3    and knelt down beside -- in between him and the

4    gun, and he was handcuffed at that time, while

5    other officers was searching, clearing the

6    residence for any additional occupants.

7    Q.          All right.  And did you do the

8    handcuffing?

9    A.          No, sir.

10   Q.          Who did that?

11   A.          I do not who the officers was.

12   Q.          It would have been one of those

13   officers that we had looked at on Exhibit 2 who

14   were part of the entry team?

15   A.          Correct, correct.

16   Q.          Okay.  And did Mr. Six resist officers

17   when they were taking him into custody?

18   A.          I don't -- no.  He did not have an

19   opportunity to.

20   Q.          Okay.  So you were between the table

21   and Mr. Six.  He's on the floor.  Tell me how he

22   was handcuffed and what happened with him after

23   that.

24   A.          He was handcuffed -- he was basically

1    laid out on the floor, face-down, on his

2    stomach.  When I was there, I was -- I would

3    have been on his left side.  His hands were

4    placed behind him and handcuffed with standard

5    handcuffs.

6              At that time he was assisted to stand

7    up.  And then I personally walked him out on the

8    front porch.  And I don't know if there was

9    another officer on the other side of him or not,

10   and there was Sheriff Robert Beegle.  And

11   Mr. Beegle took control of Mr. Six.

12   Q.        And that was just on the porch?

13   A.        Yes, sir.

14   Q.        Okay.

15   A.        Yeah.  Just two feet outside the

16   doorway.

17   Q.        Okay.  And so once you handed Mr. Six

18   off to Mr. Beegle, what did you do then?

19   A.        Took him -- basically, walked out to

20   the vehicle, took my ballistic and entry

21   equipment off, and then -- because it's -- we

22   knew we was going to be searching -- you know,

23   assisting with the search of the residence, and

24   it's very cumbersome, the equipment is, and

heavy.  So we would have -- or I took it off at
that time and left it in the vehicle and then
returned to the residence.

Q.        Did you see what happened with Mr. Six
after you handed him off to Mr. Beegle?

A.        No, sir.

Q.        Did you see him in a patrol car at any
time?

A.        No, sir.

Q.        And you're not saying that he wasn't
in a patrol car?  It's just that you didn't see
that?

A.        Correct.  I did not physically.  No, I
did not.

Q.        Okay.  Okay.  And so after you had
your entry gear off and so forth, what did you
do then?

A.        Returned to the residence, and that's
when myself and everybody started searching
Mr. Six's residence.

Q.        Okay.  All right.  And what parts of
Mr. Six's residence did you search?

A.        When I got back in there, it's kind
of -- it's a small residence, and there was a

1    number of officers there.  So it was kind of

2    just a little bit of everywhere.  Typically

3    officers kind of just go to an area, and then

4    they search that area particularly.  So I was

5    assisting wherever there wasn't an officer.

6          Ultimately, I think myself and most of

7    us was at one time or another in the back

8    bedroom where a lot of the weapons were found.

9    I think I had looked throughout the living room

10   as well.  I know at one point I walked

11   downstairs.  I don't know if I really actually

12   searched, but I walked downstairs into what I

13   guess what would be the basement area.

14   Q.          What do you recall seeing in the

15   basement area?

16   A.          I just remember it being very

17   cluttered and dusty and dark.

18   Q.          Do you remember there being any animal

19   parts down there in the basement?  Like turkey

20   or deer parts?

21   A.          I remember later on in the search

22   warrant there was wildlife officers there, and I

23   asked what in the world they were doing there.

24   Because it's not typical that wildlife officers

1    will just show up to a narcotic search warrant.

2              And I don't remember who, but somebody

3    had told me that there was a bunch of deer

4    antlers located in the basement, and there was

5    something located in the freezer.  I don't

6    remember what it was.  I want to say some kind

7    of snake.  But I don't know if my memory's

8    correct on that or not.

9    Q.       But you didn't actually see any of

10   these animal parts in the basement when you were

11   there?

12   A.       I remember seeing the wildlife -- I

13   think when, like, they seized them, if I

14   remember, because -- quite honestly, I thought

15   it was comical that they were concerned with

16   deer antlers when we were worried about 40

17   pounds of marijuana.  That's what I remember.

18   Q.       Okay.  And then so when you

19   initially -- well, strike that.

20             Let's look at what was marked as

21   Exhibit 3 in Mr. Jenkins' deposition, and we'll

22   make that Exhibit 3 in this deposition as well.

23   A.       Okay.

24                        - - -

1            (Deposition Exhibit No. 3

2        was marked for purposes of identification.)

3                          - - -

4    BY MR. PETTEY:

5    Q.          Now, looking at this -- I'll give you

6    a chance to look at this list first.

7    A.          Okay.

8    Q.          Does looking at that list refresh your

9    memory about where you might have been in the

10   house?  You have already indicated you were

11   perhaps in one of the bedrooms, the living room,

12   and at one point in the basement area but didn't

13   really search down there.

14   A.          Not particularly, to be honest.

15   Q.          Okay.  What items do you remember

16   seizing yourself?

17   A.          I don't know if I actually seized any

18   particular item.  I remember that a lot of times

19   since I didn't really have a specific area that

20   I kind of gravitated towards, I would -- you

21   know, like, somebody would bring -- like, say --

22   just an example, I don't recall this.  An

23   officer would hand me a gun and say, hey, I

24   found this in the master bedroom.  And I might

walk it out to the inventory officer and hand it

to them and maybe assist by reading a serial

number off of it or a gun description, a firearm

description, something to that effect.

I also recall -- I see this is labeled

a red chest. I don't remember if it was a red

chest or some type of box with numerous handguns

inside of it. I kind of just in the doorway,

kind of half in the residence, half out of the

residence, sat there along with another officer,

and we was going through -- I believe Officer

Nohe had found the box and I had -- was going

through those looking at those, inventorying

those particular guns individually as opposed to

just saying, you know, here's a box with a bunch

of guns.

Q.          And so as you inventoried those ones

that were in the box, what was done with the

firearm after you had, you know, gotten the

information from it, inventoried it?

A.          Like all the items, taken to the

inventory officer and left with them with a

description, including the serial number.

Q.          Okay. Did you see what was being done

1  with firearms once the inventory officer had

2  logged it in?

3  A.          Prior to being loaded for exiting the

4  residence?

5  Q.          Yes.

6  A.          I know that at least -- I don't know

7  if all, but a majority of them was kept right

8  there at the -- I guess it would be the kitchen

9  table where the inventory officer was sitting,

10  completing this inventory report.  Was being

11  kept there, kind of like stacked up, laid on --

12  I don't know exactly their method, but right

13  there with them.

14  Q.          Now, do you know whether weapons were

15  stacked up there at the kitchen table area and

16  just -- where all they all stacked before they

17  were taken out, or were some being taken out and

18  some being left there on the table?

19  A.          I don't recall any of them being

20  removed prior to the end of the search warrant.

21  Q.          Okay.  So you think --

22  A.          They would have been, but not to my

23  knowledge.  I didn't transport any weapons out

24  of there prior to the search warrant being -- or

1    the search being concluded.

2    Q.        Okay.  And so you're thinking -- your

3    recollection is that they are taken out to the

4    vehicles only once the entire search of the

5    inside of the house is done?

6    A.        Correct.

7    Q.        And so we're talking about

8    somewhere -- well, how many weapons would you

9    estimate were seized?

10   A.        I mean, I don't know a particular --

11   to put a numerical figure to it.  A lot.  A lot

12   of weapons.

13   Q.        And so if they're all being maintained

14   in that kitchen table area, there would be a

15   sizable stack or conglomeration of firearms

16   there; would that be fair to say?

17   A.        Correct.  And, again, a lot of them

18   might -- was put back into, I think, like a

19   chest or a box as I referred to it.  I don't

20   remember what it was, but, you know, there was a

21   lot of weapons around there.  Yes, sir.

22   Q.        Now, do you remember items other than

23   firearms that were seized that day?

24   A.        I remember drug paraphernalia, what I

1  define as Neo-Nazi or White Supremacist

2  paraphernalia, and then potentially -- in just

3  reading over this lawsuit apparently there was

4  some antlers and some things that apparently was

5  seized that I wasn't familiar with necessarily.

6  Q.       Okay.  Now, in terms of what you're

7  phrasing Neo-Nazi or White Supremacist items, do

8  you have any knowledge of whether the items were

9  actually World War II historical items or not?

10  A.       I don't think the Confederate flag

11  necessarily has any World War II historical

12  significance.  And the derogatory bobblehead of

13  the black male probably, in my opinion, doesn't

14  have a lot of World War II significance.  And

15  there was some other paraphernalia similar to

16  that that I think it would be quite a stretch to

17  associate it with World War II historical

18  significance.

19  Q.       It would also be a stretch to

20  associate it with Nazis; wouldn't that be fair

21  to say?  A Confederate flag and a bobblehead?

22  A.       Not in my experience in dealing with

23  them.

24  Q.       Okay.  So apart from the bobblehead

1  and the Confederate flag, are there any other

2  items that you associate as White Supremacist

3  items?

4  A.          Yeah.  There was some paperwork and

5  some other little figurines and stuff that he

6  had that held no evidentiary value, but

7  certainly at the very least indicated that

8  somebody had some very serious racial views, in

9  my opinion.

10 Q.          Okay.  What kind of paperwork are you

11 talking about?

12 A.          Oh, he had -- I don't remember exactly

13 what it was necessarily, but it was things

14 associated with, you know, the Confederacy not

15 on a historical level, but it was more of just

16 the Confederate flags, things of that nature.

17 There was also some Adolf Hitler things that was

18 there.  I don't remember specifics.

19 Q.          Okay.  What are the Adolf Hitler

20 things that you're --

21 A.          Again, there was like some

22 documentation, some, you know, like, little

23 medals, if you will, things of that nature.

24 Q.          And do you know whether those items

1  were historical World War II items or not?

2  A.        I have no idea.

3  Q.        And with the other Nazi items, you're

4  not aware with those either, whether they're

5  historical World War II items or not; is that

6  fair to say?

7  A.        No, that would -- didn't hold a lot of

8  relevance to me in my being there.

9  Q.        Okay.  Do you recall any knives being

10 seized?

11 A.        I do not.  I do remember an additional

12 item that you -- now that I'm thinking, there

13 was some documentation or possibly even a badge

14 where Mr. Six had been a police officer, and

15 then they found some accompanying documentation

16 to where he had been fired due to some kind of

17 drug offense.  I do remember that.

18        But, again, I don't -- to my

19 knowledge, I don't think that was seized.  I

20 don't remember.  I just remember somebody saying

21 that.  I want to say it was like in Ohio, but

22 like Oakland P.D. or Oakland Township P.D.

23 Something along those lines.

24 Q.        And that's something you're saying you

1   became aware of that day?

2   A.          Correct.

3   Q.          Okay.

4   A.          Yeah.  I think somebody had located a

5   badge or something like that, or an I.D.

6   Q.          Okay.  And the bobblehead you're

7   referring to --

8   A.          Uh-huh.

9   Q.          -- can you describe that?

10  A.          I don't know.  Four or five inches

11  tall.

12  Q.          Okay.  And why was it that you felt it

13  was somehow derogatory?

14  A.          Well, Clyde was with me, and Clyde's a

15  black male.  And he found it highly offensive.

16  It had some little slogan on it that was

17  disparaging to African Americans.  I don't

18  recall it to quote it.  It depicted African

19  Americans in a negative light.  I do remember

20  that.  Again, I didn't focus on the bobblehead.

21  I just recall it.  Because I wasn't there to

22  seize bobbleheads.

23  Q.          Okay.  When you -- once the

24  inventorying of the firearms was done, what did

1    you do from there?

2    A.          Jerry Peters had a truck with a topper

3    on the back.  I remember him backing it up

4    closer to the porch, and the majority if not all

5    the officers involved, including myself, carried

6    the firearms out in the back of his truck.  And

7    they was placed inside, in the back.

8    Q.          Okay.  And your recollection is that's

9    done all at once at the end after the search in

10   the house is done?

11   A.          Yeah.  Again, if there was any

12   before -- I know we took a lot of weapons, guns,

13   firearms outside of the residence at that time.

14   If there was any prior to that, I was not aware

15   of it.  You see, my understanding, it was all

16   done at once.

17   Q.          Okay.  Now, would it be fair to say

18   that the only people who had an opportunity to

19   make away with any of these firearms or other

20   items of personal property were the officers who

21   were there executing the search warrant?

22              MR. CONOMY:  Objection.

23              Go ahead.

24              THE WITNESS:  I'm not sure how

somebody that wasn't there could have made away

with a firearm from the residence, so I guess

common sense would say, yes, you had to have

been there to theoretically take a weapon.  Does

that answer your question?

BY MR. PETTEY:

Q.          Yes, sir.

A.          Okay.

Q.          Now, you were not involved in the

transportation of the weapons from the Sixes'

residence to the Meigs County Sheriff's Office?

A.          No, sir.

Q.          And is that your understanding of

where the weapons were going to be taken?

A.          Yes.  Because I remember there was

discussion that Jerry was going to follow the

sheriff and Meigs County officers to the

Sheriff's Office, and they was going to be

unloaded there and held at the Meigs County

Sheriff's Office, was my understanding.  I got

back into the vehicle that was there and was

driven, I believe, again, by Josh Staats, back

to the O.U. airport where several of us had

parked our vehicles, and then from there headed

1    home.

2    Q.          Now, at the time that the firearms are

3    being taken away and you're leaving, did you see

4    whether Mr. Six was still present?

5    A.          No, I did not.  After Mr. Beegle took

6    control of Mr. Six and was walking him off the

7    porch, I hadn't seen Mr. Six until this morning

8    at the deposition.

9    Q.          Did you testify in any of the criminal

10   proceedings against Mr. Six?

11   A.          No, I did not.  I think I was

12   subpoenaed to potentially a grand jury.  Again,

13   due to the time, I'm not particularly sure.  I

14   think I was subpoenaed to testify before a grand

15   jury.  But either the grand jury didn't go that

16   day or else my testimony was not needed.  But I

17   do not recall actually testifying.

18   Q.          And you did not participate when the

19   firearms were returned to Mr. Six?

20   A.          No, sir.

21   Q.          Have you heard anything about any

22   firearms or other items of personal property

23   that were seized from the Sixes' residence not

24   being returned?

1   A.          The paperwork once the lawsuit was

2   filed was the first that I was made aware of it.

3   Q.          Okay.  And you haven't seen any of

4   these items since they were seized that day?

5   A.          No, sir.

6   Q.          You never had any call to check any of

7   these items out of the evidence room for any

8   reason at the Meigs County Sheriff's Office?

9   A.          No, sir.

10  Q.          You've heard Mr. Jenkins testify he

11  thought it was cool that day.  We've had other

12  officers testify they thought it was hot that

13  day.  What's your recollection about what the

14  weather was that day?

15  A.          Me, along with some other officers --

16  the way I remember it, it was unseasonably cool.

17  It was a perfect day, beautiful day, is the way

18  I remember the weather.  Because I remember it

19  was -- you know, we do a lot of search warrants

20  and August typically is hot, and this was

21  actually a very comfortable day.  It was

22  daylight, no rain, cloudy.

23  Q.          You had no -- you don't know the

24  conditions under which Mr. Six was detained

1    during the search; is that fair to say?

2    A.        Correct.

3    Q.        Were you aware that he was in the back

4    of a Meigs County Sheriff's Office cruiser.

5    A.        I assumed that he was going to be

6    transported to the Meigs County Jail or to

7    wherever they might hold Mr. Six, because

8    sometimes their prisoners -- I don't know about

9    their jail, housing prisoners not always at

10   Meigs County, but he was going to be transported

11   to a jail facility.  So I knew that he would

12   have to be in the back of a cruiser to get there

13   that was equipped to transport a prisoner.  I

14   mean, he wasn't -- does that answer your

15   question?

16   Q.        Well, I guess what I'm asking is

17   whether you had personal knowledge that he was

18   in the back of the Meigs County --

19   A.        No.

20   Q.        -- Sheriff's Office cruiser?

21   A.        No.

22   Q.        Okay.

23             MR. PETTEY:  Let's take a quick break.

24   I think we're pretty close to the end here.

1           MR. CONOMY:  All right.

2                    -  -  -

3                (Recess taken.)

4                    -  -  -

5    BY MR. PETTEY:

6    Q.          Okay.  We're ready to go back on the

7    record.

8                All right.  This Confederate flag,

9    where do you recall that being?

10   A.          The flag itself, in the back bedroom.

11   Q.          Okay.  And where in the back bedroom?

12   A.          I don't remember specifically.

13   Q.          Was it displayed on a wall or stored

14   in a box or --

15   A.          No.  Really, I don't recall anything

16   really being that organized.

17   Q.          And was it just the one, or were there

18   multiple?

19   A.          There was smaller not actual flags but

20   things that happened with the Confederacy.  And

21   then, like I said, there was several other bits

22   of paperwork and figurines that was not really

23   associated with the Confederacy but it was

24   disparaging to blacks.

1    Q.         Okay.  And smaller things representing
2    the Confederacy, what do you mean by that?
3    A.         There was, I mean, several things with
4    the confederate things on them symbolized, just
5    not a flag itself.  Not the material of a flag.
6    I don't remember -- again, we wasn't there to
7    document Confederacy memorabilia, Neo-Nazi,
8    White Supremacist, historical stuff.  We were
9    there for drugs and guns, not bobbleheads or
10   flags or things of that nature.
11   Q.         Right, right.
12              You didn't feel you had probable cause
13   to seize those other kind of items; would that
14   be fair to say?
15   A.         The items we're referring to?
16   Q.         Yeah.  The Nazi memorabilia, the
17   Confederate flag, the bobblehead?
18   A.         Yeah.  Well, to my knowledge, they
19   weren't listed on the search warrant and I don't
20   know what crime there is to possess a -- I don't
21   know -- racist bobblehead.
22   Q.         So you would agree there wasn't
23   probable cause to seize those items?
24   A.         Well, no.  To my knowledge, it's not a

1    crime.

2              MR. CONOMY:  Can you be particular as

3    to which items that are on this list?

4              MR. PETTEY:  Well, we were discussing

5    the Nazi items, the Confederate flag and

6    Confederate items, and the bobblehead.

7              MR. BERNHART:  I'm going to place an

8    objection on the record.

9              MR. CONOMY:  Yeah.  Unless we're going

10   to go one by one through each item, I think

11   we're not going to be able to -- I don't think

12   that question's going to be able to stand.

13             MR. PETTEY:  Okay.  Are you

14   instructing your client not to answer that

15   question?

16             MR. CONOMY:  I'm asking that you

17   clarify.  I mean, items is a -- there's weaponry

18   and there's non-weapon items, some of which may

19   have fallen within your question, some of which

20   would not.  So I'm just asking that you clarify

21   it.

22             MR. PETTEY:  Okay.

23             MR. BERNHART:  And I'm going to place

24   an objection on the record that the entire line

1  of questioning regarding probable cause and the

2  seizure of items calls for a legal conclusion.

3  BY MR. PETTEY:

4  Q.          All right.  In terms of the

5  bobblehead, you didn't feel like you had

6  probable cause to seize that; would that be fair

7  to say?

8  A.          Correct.

9  Q.          And in terms of the items with

10 Confederate flag symbols on them or the

11 Confederate flag itself, you didn't feel like

12 you had probable cause to see that; would that

13 be fair to say?

14 A.          Yeah.  It was -- that was not what we

15 was looking for.

16 Q.          And in terms of items that were

17 non-weapons but had Nazi symbols on them, you

18 didn't feel like you had probable cause to seize

19 those; would that be fair to say?

20         MR. BERNHART:  I'm going to, again,

21 object to the entire line of questioning.  That

22 will be a continuing objection.

23         MR. PETTEY:  Okay.  And I'll note for

24 the record I'm asking him his opinion about

1    that, whether he felt he had probable cause.

2    But your objection is noted.

3            THE WITNESS:  I don't know if it

4    was -- if any of these items were seized or not.

5    I know I didn't seize any of them.  To my

6    knowledge, that wasn't what I was focused on.

7    There was so many weapons, firearms that we were

8    seizing.  I wasn't concerned with and I don't

9    believe many people was too concerned, but --

10   BY MR. PETTEY:

11   Q.        The question was whether the

12   non-weapon Nazi paraphernalia was something you

13   felt like you had probable cause to seize.

14   A.        I never made a determination one way

15   or another.  It didn't have any evidentiary

16   value, to my understanding, to what we was doing

17   there.  I was never -- I never posed the

18   question if we had probable cause to take it or

19   not.

20   Q.        I understand you didn't ask anybody

21   that.  I'm asking whether you felt you had

22   probable cause to seize that kind of thing based

23   on the warrant you had.

24   A.        I never thought about it.  There was

1    probably ketchup in the refrigerator I didn't

2    seize either, but I didn't give that that much

3    thought either.  Does that make sense?

4    Q.        Yeah.  And if I asked you did you have

5    probable cause to seize the ketchup, would your

6    answer be yes or no?

7    A.        I never gave it any consideration that

8    day because ketchup was about as relevant to me

9    as bobbleheads.

10   Q.        And so you're saying that you can't

11   answer that you did not have probable cause to

12   seize ketchup?

13             MR. CONOMY:  I'll object to the form.

14             THE WITNESS:  I was there seizing guns

15   and drugs.  Okay?  I never thought about at the

16   time during that day if I had probable cause to

17   seize bobbleheads or a bottle of ketchup.  They

18   both were irrelevant to me.

19   BY MR. PETTEY:

20   Q.        And you're saying the same is true of

21   Nazi paraphernalia that were non-weapons?

22   A.        That wasn't my decision, to seize it

23   or not.  I was asked to seize -- help assist

24   with seizing the weapons.  Okay?  This was not

1    my case.  I was not making those legal

2    decisions.

3    Q.          Okay.  And who asked you to assist

4    with seizing the weapons?

5    A.          Sheriff Robert Beegle.

6    Q.          And when did he ask you that?

7    A.          Prior to the airport, at the airport,

8    during the briefing.

9    Q.          Okay.  So during the briefing, it was

10   discussed that weapons would be seized?

11   A.          I believe that's when it was.  Again,

12   what I testified earlier, that we read over the

13   search warrant.  I don't recall what firearms

14   was listed on the search warrant or not.  But at

15   some point they said it was just -- that's

16   pretty standard procedure.  Where there's drugs

17   and guns, they all get collected.  Whether or

18   not it was listed on the search warrant or not,

19   I'm not sure.  I don't recall.  It was nearly

20   four years ago.  I do remember seizing firearms

21   and I do remember seizing drugs.

22   Q.          You did not seize any Nazi items,

23   though?

24   A.          I personally did not, no.

1    Q.          Okay.  You saw Nazi items there --

2    A.          Correct.

3    Q.          -- fair to say?

4               And why was it that you did not seize

5    those items?

6    A.          Because I was seizing guns.

7    Q.          Okay.  There was certainly the

8    opportunity for you to seize those.  Why didn't

9    you take the opportunity and seize the Nazi

10   items that were non-weapons?

11   A.          Because the case officers and case

12   agents did not instruct me to do so.

13   Q.          And you obviously did not feel as if

14   you were independently authorized to do that

15   either; would that be fair to say?

16               MR. CONOMY:  Objection.

17               Go ahead and answer.

18               THE WITNESS:  I wasn't going to

19   independently collect anything because it wasn't

20   my case.

21   BY MR. PETTEY:

22   Q.          And so you're saying you were going to

23   seize only those items that you had been told to

24   seize?  Is that what you're saying?

1    A.          That's what we do when we assist other

2    officers.  We do what they ask us to do.

3    Q.          And so you were exercising no -- none

4    of your own thought about what would be seized,

5    apart from following the instructions you were

6    given?

7    A.          Other than firearms and drugs,

8    correct.

9    Q.          And you believe that those were the

10   instructions that were given to all of the

11   officers at the same time at that O.U. airport

12   meeting; would that be fair to say?

13   A.          Correct.

14   Q.          And so an officer who was seizing Nazi

15   paraphernalia that was not a weapon would be

16   acting outside the instructions he was given;

17   would that be fair to say?

18   A.          I can't say what other instructions

19   that officer may or may not have had.  I'm just

20   saying I personally was not instructed to seize

21   Nazi paraphernalia or whatever -- however else

22   you define it.  I don't know what the other

23   officers was -- if they was instructed anything

24   beyond that or not.

1    Q.        But you didn't ever hear any

2    instructions that were given to the whole group,

3    for instance, saying we're going to take Nazi

4    paraphernalia that are non-weapons?

5    A.        I did not.  No, sir.

6    Q.        And your understanding of what you

7    were going to seize was arrived at at the O.U.

8    airport; is that fair to say?

9    A.        I believe so, yes.

10   Q.        And so it was not something that was

11   done after you were back at the Sixes' -- I said

12   back at the Sixes' residence -- after you were

13   at the Sixes' residence?

14   A.        I don't -- like I said earlier, the

15   search warrant was gone over.  It lists on there

16   items to be seized and searched for.  Where

17   there's guns or -- or drugs and guns, you seize

18   all that.  That was my focus.  I don't recall

19   any -- there was no discussion that I ever

20   recall of any Nazi paraphernalia at the airport,

21   because obviously no one at the airport would

22   have known that that would have been inside the

23   residence until we was at the Six residence.

24   Q.        And what you were seizing was not

1   based on your understanding of the search

2   warrant; it was based on the instructions that

3   were given to you?

4   A.          The instructions was given to me based

5   off the search warrant.  Again, on the search

6   warrant, it says items to be seized and searched

7   for.  There's a whole list of items.  Part of

8   that is drugs and firearms, to my knowledge.

9   That was my instructions.  Part of the

10  instructions was read directly from the search

11  warrant.

12          MR. PETTEY:  All right.  Let's take a

13  quick break here.  I'm going to go ahead and get

14  a copy of that search warrant since we're having

15  a discussion about it.

16          MR. CONOMY:  Okay.

17                    -  -  -

18              (Recess taken.)

19                    -  -  -

20          MR. PETTEY:  Okay.  Let's mark this as

21  Exhibit 4.

22          (Fitch Deposition Exhibit No. 4

23      was marked for purposes of identification.)

24                    -  -  -

1          MR. CONOMY:  As usual, please take

2     your time and read the whole thing if you need

3     to.

4          MR. PETTEY:  Excuse me.  I'll be right

5     back.

6                         - - -

7               (Pause in proceedings.)

8                         - - -

9     BY MR. PETTEY:

10    Q.          Okay.  Have you had an opportunity to

11    review that?

12    A.          Yes, sir.

13    Q.          And what is that?

14    A.          It's a search warrant signed by Meigs

15    County Juvenile Probate Judge, Judge Powell, for

16    Meigs County, on Mr. Six.  The search warrant

17    we've been referring to in this deposition.

18    Q.          Nowhere in that search warrant does it

19    specifically mention firearms; would that be

20    fair to say?

21    A.          Correct.

22          MR. BERNHART:  Objection.

23          MR. CONOMY:  I'll object as well.

24          THE WITNESS:  No, it doesn't

1   specifically say firearms, no.

2   BY MR. PETTEY:

3   Q.          Okay.  But it was discussed at the

4   O.U. airport that firearms would be seized, as

5   we've just already -- as you already testified,

6   correct?

7   A.          Well, I believe that it was discussed.

8   I mean, obviously this was read.  This was what

9   I remember being read, which was basically

10  standard language with any narcotic search

11  warrant.  And with any narcotic search warrants,

12  it's standard that if you have 40 pounds of

13  marijuana and weapons laying all around that

14  everything goes.  I mean, that's just -- that is

15  as basic of narcotic search warrants as you can

16  get.

17          So, I mean, it would be my

18  understanding, if I just read this, that this --

19  you know, because it talks about -- and I think

20  the language they always talk about is the

21  proceeds.  And, you know, oftentimes whenever

22  there's weaponry or drugs, a large amount of

23  drugs, any proceeds possibly from the benefit or

24  whatever, not necessarily -- it could mean cash.

It could mean firearms.

I mean, typically, just no different than cash. If we had found a large sum of cash beside the large amount of drugs, we would have seized that. That's standard as well. But in this scenario, we're referring to firearms.

Q.      And you're referring to them as proceeds?

A.      No. I'm referring to them as part of the crime with the drugs. I don't think I've ever been on a narcotic search warrant where they're right beside the drugs with firearms that we've never seized it.

Q.      Now, Nazi paraphernalia is not listed in this search warrant either; is it?

MR. CONOMY: Objection.

THE WITNESS: Correct.

BY MR. PETTEY:

Q.      Have you had a chance to review the Meigs County Common Pleas Court's decision ordering the return of the firearms to Mr. Six?

A.      No, sir. I'm aware that there was one, but I've not reviewed it, no.

Q.      Do you recall whose instructions you

1  were acting on when you were seizing the

2  firearms?  You said that you were acting on the

3  instructions of those who were organizing this.

4  A.          I don't specifically know who led the

5  briefing, if you will, prior to the search

6  warrant.

7  Q.          Who was the law enforcement agency

8  that was in charge of this operation?

9  A.          Meigs County Sheriff's Office.  They

10  were the investigating agency.

11  Q.          Were you aware of any photos that were

12  taken of these Confederate flag -- of the

13  Confederate flag or any items bearing a

14  Confederate flag?

15  A.          I did not take any photographs.  I'm

16  not sure if anyone else did.

17  Q.          Okay.  Let's take a look at Exhibit 3

18  again.  And I'll direct you to the page that at

19  the bottom right-hand corner is marked 572.

20  A.          Okay.  Just a moment.

21  Q.          572.

22  A.          Okay.

23  Q.          Items 100 and 100-A, the second and

24  third items listed there.

1   A.          Okay.

2   Q.          Item 100-A is listed as miscellaneous

3   documents found in the living room.  Is that --

4   A.          Correct, correct.

5   Q.          What documents were those?

6   A.          I have no idea.  I was not -- I didn't

7   seize those.

8   Q.          And this exhibit doesn't allow you to

9   determine what those documents were; does it?

10  A.          That's correct.

11  Q.          Exhibit 101-A, miscellaneous Nazi

12  paraphernalia found in the master bedroom.  Is

13  that correct?

14  A.          Correct.

15  Q.          What Nazi paraphernalia is being

16  referred to there?

17  A.          Again, I can't say.  It wasn't I that

18  collected it.

19  Q.          You were in the master bedroom for

20  some of the time?

21  A.          At some point during the search

22  warrant, yes, but I'm not sure what they're

23  listing as item 101-A.

24  Q.          And this property description in this

1    document does not allow you to determine what

2    items those were; does it?

3    A.          Correct.

4    Q.          Okay.  Those are all the questions I

5    have.  Thank you.

6    A.          Thank you.

7              MR. CONOMY:  Agent Fitch, as with

8    Agent Jenkins, you have the right to review a

9    transcript for errors if it is prepared, and I

10   recommend you reserve that right.

11             THE WITNESS:  Okay.

12                    - - -

13             (Signature not waived.)

14                    - - -

15             (Thereupon, the deposition was

16                concluded at 1:04 p.m.)

17                    - - -

18

19

20

21

22

23

24

# AFFIDAVIT

State of Ohio      :
                SS:
County of _____:

       I, SCOTT FITCH, do hereby certify that I have read the foregoing transcript of my deposition given on May 21, 2013; that together with the correction page attached hereto noting changes in form or substance, if any, it is true and correct.


                                         _____
                                       SCOTT FITCH


       I do hereby certify that the foregoing transcript of the deposition of SCOTT FITCH was submitted to the witness for reading and signing; that after SCOTT FITCH had stated to the undersigned Notary Public that the transcript had been read and examined, said transcript was signed in my presence on the

_____ day of _____, 2013.

                                         _____
                                       Notary Public

My commission expires:
_____

**ERRATA SHEET**

| | **From:** | **To:** | |
| Page/Line | Quote text you wish to change | Change you wish to make | Comments |

1

2

3

4 _____/_____ _____ _____ _____

5 _____/_____ _____ _____ _____

6 _____/_____ _____ _____ _____

7 _____/_____ _____ _____ _____

8 _____/_____ _____ _____ _____

9 _____/_____ _____ _____ _____

10 _____/_____ _____ _____ _____

11 _____/_____ _____ _____ _____

12 _____/_____ _____ _____ _____

13 _____/_____ _____ _____ _____

14 _____/_____ _____ _____ _____

15 _____/_____ _____ _____ _____

16 _____/_____ _____ _____ _____

17 _____/_____ _____ _____ _____

18 _____/_____ _____ _____ _____

19 _____/_____ _____ _____ _____

20 _____/_____ _____ _____ _____

21 _____/_____ _____ _____ _____

22 _____/_____ _____ _____ _____

23 _____/_____ _____ _____ _____

24 _____/_____ _____ _____ _____

**Realtime Advantage Court Reporting Services, Inc.**
P.O. Box 279
Lancaster, Ohio  43130
614-323-4455
realtimeadvantage@msn.com

July 5, 2013

Christopher P. Conomy, Esq.
Senior Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio  43215

     Re:  Six, et al. vs. Beegle, et al.
        Case No. 2:11-CV-0698

Dear Mr. Conomy:

    Enclosed please find your original of the deposition transcript of SCOTT FITCH, taken on Tuesday, May 21, 2013, for examination pursuant to Rule 30(E) of the Ohio Rules of Civil Procedure.

    As you will recall, signature was not waived.  Please have the witness read and sign the deposition transcript in the twenty-eight days allotted by the Rules.  After completing the above, please incorporate the original signed Affidavit and Errata sheet into your original transcript, and provide copies to me at the above address.

    Thank you for your assistance in this matter.

               Sincerely,

               Donna J. Karoscik,
               RPR-RMR-CRR-CCP-CLR

Enclosures
cc:  Paul Bernhart, Esq.
     Alexis Chancellor, Esq.
     Sky Pettey, Esq.

# CERTIFICATE

State of Ohio:
County of Fairfield:  SS:

I, Donna J. Karoscik, Notary Public in and for the State of Ohio, duly commissioned and qualified, certify that the within named SCOTT FITCH was by me duly sworn to testify as to the truth in the cause aforesaid; that the testimony was taken down by me in stenotypy in the presence of said witness and transcribed upon a computer; that the foregoing is a true and correct transcript of the testimony given by said witness taken at the time and place in the foregoing caption specified.

I certify that I am not a relative, employee, or attorney of any of the parties hereto; that I am not a relative or employee of any attorney or counsel employed by the parties hereto; that I am not financially interested in the action; and further, that I am not, nor is the court reporting firm with which I am affiliated, under contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I have set my hand and affixed my seal of office in Fairfield County, Ohio, on this 5th day of July, 2013.

_____
DONNA J. KAROSCIK,
Notary Public in and for the
State of Ohio
Registered Professional Reporter
Registered Merit Reporter
Certified Realtime Reporter
Certified CART Provider
Certified LiveNote Reporter

My commission expires
January 30, 2017.