# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OHIO

| ROBERT SIX, et al., | : | Case No. 2:11-cv-00698 |
| --- | --- | --- |
|    PLAINTIFF, | | JUDGE GRAHAM |
| v. | : | MAGISTRATE JUDGE ABEL |
| ROBERT BEEGLE et al., | | |
|    DEFENDANTS | : | MOTION FOR SUMMARY JUDGMENT OF DEFENDANT JOSH SHIELDS |

Now comes Defendant, Josh Shields, and hereby moves the Court to enter summary judgment in its favor on all counts of Plaintiffs' Amended Complaint (Dkt. No. 58), pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth in the attached Memorandum in Support, there are no genuine issues of material fact, and Defendant Shields is entitled to judgment as a matter of law.

          Respectfully Submitted,

          MICHAEL DEWINE.
          ATTORNEY GENERAL OF OHIO

          <u>/s/Daniel J. Martin</u>
          Daniel J. Martin 0065249
          Brian A. Ball (0078285)
          Assistant Attorneys General
          Environmental Enforcement Section
          ODNR Unit
          2045 Morse Rd.
          Building C-2
          Columbus, Ohio 43229
          Office: (614) 265-6879

Facsimile: (614) 268-8871
Daniel.Martin@ohioattorneygeneral.gov
Brian.Ball@ohioattorneygeneral.gov
Attorneys for Defendant Shields

**MEMORANDUM IN SUPPORT**

## I.    INTRODUCTION

The Complaint of Robert and Bobbi Six alleges multiple law enforcement officers from an array of law enforcement agencies either individually, or in a common conspiracy, sought to deprive them of their federally protected rights. Discovery has concluded, and a review of the results demonstrates that Plaintiffs cannot support their allegations, and that there is no need to go to trial. Summary judgment in favor of Defendant Joshua Shields is clearly appropriate.

## II.    STATEMENT OF FACTS

Officer Shields responded to a call for assistance from dispatch for the Meigs County Sheriff's office for a search warrant being executed at 26225 Rutherford Rd., in Albany Ohio (Affidavit of Joshua Shields, ¶3, attached hereto and fully incorporated herein as Exhibit A). The search was conducted in conjunction with a controlled delivery of marijuana that had been intercepted at the Columbus, Ohio post office. Officer Shields was advised that various untagged animal parts were found at the residence (Shields Affidavit, ¶3, Shields Depo. p. 12, lines 17-23). As an Ohio Division of Natural Resources ('ODNR") Division of Wildlife officer, Officer Shields was assigned to enforce Ohio's wildlife laws (Shields Affidavit, ¶¶1,2). Officer Shields arrived at the Six residence late in the afternoon on August 5, 2009 (Shields Affidavit, ¶4). It took him about 40 minutes to get to the scene from another law enforcement contact (Shields Depo., p. 13 lines 2-12). He was accompanied by Officer Eric Bear, also of the Division of Wildlife, and he also contacted ODNR Wildlife Investigator Keith Wood to assist (Shields Affidavit, ¶4).

The ODNR officers were not present at the initial entry and execution of the warrant (Shields Affidavit, ¶5). Mr. Robert Six was already confined in a Meigs County Sheriff's cruiser when the ODNR officers arrived (Six Depo. p. 98 lines 2-14). Officer Shields proceeded to enter the residence and was directed to the basement or lower level of the Six property (Shields Affidavit, ¶6, Shields Depo, p.18). Upon viewing the basement, Officer Shields observed several sets of deer antler racks as well as turkey feathers (Shields Affidavit, ¶¶ 6,10). He examined the animal parts in the basement for tags required to be affixed to the animal parts pursuant to Ohio Revised Code ¶1531.02, and the Ohio Administrative Code ¶1501:31-15-11(23) (for deer) and ¶1501:31-15-10(12) (for turkey). (Shields Affidavit, ¶ 7, 9, 10, 11, 12, and Attachment 2, Shields Depo p. 20). Officer Shields identified six deer skulls with antlers and one turkey fan that were not properly tagged under Ohio law (Shields Affidavit, ¶¶ 9, 11, 12, 13). Officer Shields proceeded to mark the animal parts with evidence tags and photographed them (Shields Affidavit, ¶ 10, Attachment 1, Shields Depo. p.36 lines 11-22). Officer Shields assisted the other law enforcement officers on the scene with moving some of the many firearms into an area of the house that was being used to conduct an inventory (Shields Affidavit, ¶18, Shields Depo. p. 37-38).

Officer Shields took six deer antlers and one fan of turkey feathers from the property, and transported the animal parts in his state vehicle to the Meigs County Sheriff's office, which accepted the evidence for storage (Shields Affidavit, ¶14, 16). While there, Officer Shields assisted the other law enforcement officers with handing firearms from a vehicle to the Meigs County evidence room (Shields Affidavit, ¶15, 18, Shields Depo. pp.45-46).

Officer Shields prepared the citations and summons for violations of Ohio wildlife laws (Shields Affidavit, ¶¶ 11, 12, 13, Exhibit A, Attachment 2). The misdemeanor charges were subsequently filed in the Meigs County Municipal Court. Mr. Six subsequently produced some loose hunting tags, but could not identify with certainty which tags should have been affixed to specific animal parts (Shields Affidavit, ¶21, Shields Depo, p.23, lines 19-24, p. 24-25). The Meigs County Prosecutor voluntarily dismissed the wildlife charges without prejudice on June 29, 2011 (Shields Affidavit ¶ 20). Mr. Six pled guilty to a felony drug possession charge in Meigs County Common Pleas Court. Officer Shields petitioned the County Court for disposition of the six deer antlers and turkey fan taken as evidence in the wildlife cases. On July 7, 2011 the County Court issued an order allowing for disposal of those animal parts (Shields Affidavit, ¶22, Exhibit A, Attachment 3). No appeal of that disposition order was taken.

## III. ARGUMENT

### A. Standard of Review for Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. This question is decided by examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," submitted in the matter pursuant to Fed. R. Civ. P. 56(c). *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The moving party has the initial burden of informing a court that, based on the pleadings, affidavits and other authorized material, the moving party is entitled to summary judgment. *Boretti v. Wiscomb*, 930 F2d 1150, 1156 (6th Cir.1991); *Gutierrez v. Lynch*, 826 F2d 1534, 1536 (6th Cir. 1987).

Once the moving party meets this obligation, the burden shifts to the nonmoving party to show that genuine issues for trial exist. *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 250 (1986). "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff. *Michigan Protection and Advocacy Serv., Inc. v. Babin.* 18 F.3d 337,341 (6th Cir. 1994). "..the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**B.      Plaintiffs lack factual support to prevail upon their U.S.C. §1983 Act and Constitutional claims.**

To prevail on a Section 1983 claim, plaintiffs must allege (1) conduct by a person (2) who acted under color of state law, (3) which caused a deprivation of a federally protected right. *West v. Atkins*, 487 U.S. 42, 48 (1988). In *Gilmore v. Corrections Corporation of America,* 92 Fed. App'x 188 (6th Cir., 2004), the plaintiff named twenty-two defendants in the caption of the Complaint but in the body of the complaint the plaintiff failed to indicate how each of the individual defendants violated his constitutional rights. The Sixth Circuit, in affirming the dismissal of the complaint stated: "Merely listing names in the caption of the complaint and alleging constitutional violations in the body of the complaint is not enough to sustain recovery under § 1983." *See Flagg Bros. v. Brooks,* 436 U.S. 149, 155-57, 56 L. Ed. 2d 185, 98 S. Ct. 1729 (1978). *Gilmore* at 190.

While *Gilmore* involved a review of a Motion to Dismiss, the point is that allegations must identify how a named individual engaged in the constitutional violations. Mr. Six's

Complaint casts a wide net, alleging multiple officers from multiple law enforcement agencies engaged in the alleged unreasonable conduct. To establish personal liability against an individual government officer in a §1983 action, the plaintiff must show that the official "acting under color of state law caused the deprivation of a federal right." *Hafer v. Melo*, 502 U.S. 21, at 25 (1991). An individual defendant cannot be held liable when a plaintiff fails to show that the official was directly involved or caused the events at issue. *Petty v. County of Franklin, Ohio,* 478 F.3d 341, 349 (6th Cir. 2007). In this matter, the facts do not demonstrate that Officer Shields engaged in specific conduct that amounts to a deprivation of a federally protected right.

In order to evaluate whether a violation of a constitutional right has occurred, it is important to evaluate the specific conduct that a complaining party alleges to be unconstitutional. The general test is whether the officer's actions were "reasonable" *United States v.* Lambert, 771 F.2d 83, 93 (6th Cir. 1985). "The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant." *United States v. Ramirez*, 523 U.S. 65, 71, 118 S.Ct. 992 (1998).

Here, there is no factual support for the allegation that Officer Shields acted unreasonably. He was called to the scene to respond to untagged animal parts located in the Six's home. Upon arriving, he examined the animal parts and indeed observed multiple deer antlers and a fan of turkey feathers that were not tagged as required by the Ohio Administrative Code, a violation of Ohio's wildlife law. Officer Shields placed evidence tags on the parts and photographed the evidence. Officer Shields then prepared and issued summons and complaints based on those violations. The record does not contain support for any allegation that he was

responsible for Mr. Six's confinement in the cruiser, or that he removed hunting tags or otherwise unlawfully took the Plaintiffs' property.

**1. No evidence supports the claims that ODNR officers removed wildlife tags**

The Plaintiffs do not raise a challenge to the sufficiency of the warrant, but make claims that the officers engaged in unlawful or fraudulent conduct. Absolutely no facts have been ascertained in discovery to support even the remote plausibility of such conduct. Plaintiffs first contend that Officer Shields deliberately removed existing hunting tags from the animal parts, and then wrongfully sought to charge Mr. Six with violations for untagged animal parts (Amended Complaint ¶¶136-143). Officer Shields denies removing any attached hunting tags (Shields Affidavit, ¶8). Officer Shields photographed and documented the untagged animal parts (Shields Affidavit ¶10, Attachment 1). Plaintiffs have had the opportunity to depose multiple law enforcement officers who were on the site during the search, and no testimony was ever developed that suggests any officer removed wildlife tags or saw another removing tags, or ever had personal knowledge of any such conduct occurring.

In fact, when presented with several deer tags at his deposition by Plaintiffs' counsel, Officer Shields noted that based upon his knowledge and experience, those tags could not have been associated with the deer parts at issue based on their condition (Shields Depo, pp. 57-59. The loose tags were either already closed or in a secured intact state so as to be unable to have been affixed to an antlered deer and removed, (Shields Depo. p. 57-58) while other loose tags appeared to not have been secured or attached in the first place (Shields Depo. p. 59).

8

Plaintiffs even fail to provide a plausible motive or rationale for why the ODNR officers would or could benefit by essentially "framing" Mr. Six by removing the tags and then falsely accusing him of failing to have the parts tagged. The course of discovery revealed no malice or bias or ill-will between the ODNR officers and Mr. Six.

**2. No evidence supports the claims that animal parts were improperly taken**

With respect to the untagged animal parts, these items were the subject of a valid disposition order issued by the Meigs County Court (Shields Affidavit, Attachment 3). The parts taken by ODNR consisted of six deer antlers and a fan of turkey feathers, and were included in the inventory records (Shields Depo. p. 51 lines 3-5). Based on Officer Shields' experience, physical examination of the parts in question, and consultation with fellow officers and the assistant prosecutor, he did not act unreasonably in taking what amounted to contraband wildlife parts. The ODNR officers did not wrongfully take or dispose of the property, but followed the legal process provided by Ohio law to request disposition of the property at the end of the case. Because the animal parts did not have the required tags affixed, they could not be lawfully possessed under Ohio law. A legal process was provided to handle the disposition of the untagged animal parts, and Officer Shields followed that process. There is no indication in the factual record that Plaintiffs objected to, or appealed the disposition order of the Meigs County Court.

**3. No evidence supports the claim that Defendant Shields improperly took firearms or conspired with others to do so.**

Plaintiffs also allege that Officer Shields could have taken some of their firearms collection, or was part of a conspiracy to take their property (Amended Complaint, ¶¶127-130).

Officer Shields has affirmed he did not take or remove firearms or other property from the Six residence for his personal use or benefit (Shields Affidavit, ¶ 17). Nor did he remove firearms from the scene except when assisting in loading and unloading them from vehicles (Shields Affidavit, ¶18). Officer Shields was called to the scene after other agencies had entered the residence and responded to the untagged animal parts located in the basement. Officer Shields does acknowledge assisting the other law enforcement officers with handling some firearms during the inventory process and later assisting with passing them from a vehicle to other officers who were placing the firearms into the property room at the Meigs County sheriff's office. Officer Shields did take the untagged animal parts and also transported this evidence to the Meigs County Sheriff's property room.

Plaintiffs cannot point to specific facts developed in discovery that support a claim that officer Shields stole firearms or other property. Plaintiffs have alleged that certain weapons were not included in an inventory or otherwise not returned to the Plaintiffs. But Plaintiffs can point to no facts or circumstances that establish any plausible linkage between Mr. Shields' limited handling of the weapons, and the alleged taking of any of the alleged missing property. Plaintiffs attempt to capture all the participating officers in a wide net by claiming there was a conspiracy among the officers to take Mr. Six's property. Again, that claim has no basis for support.

Likewise, no facts have been developed that connect Officer Shields or the other ODNR officers with the alleged conspiracy plead by Plaintiffs . As discussed previously, Officer Shields was asked to come to the scene upon being contacted by the Meigs County Sheriff's office after the search had commenced. There's no indication Officer Shields was involved in any plan or conspiracy to take property. There has been not one scintilla of factual support

developed through discovery that lends any plausibility to the claims that the officers jointly sought to steal or wrongfully take any of Plaintiffs' firearms or other property. Officer Shields affirms he has no knowledge of such a plot (Shields Affidavit, ¶19). A detailed inventory was compiled, including reference to the untagged animal parts. Officer Shields' only handled some of the weapons along with other officers by assisting in compiling an inventory and assisting with the unloading of firearms at the Meigs County Sheriff's office.

After multiple depositions and exchanges of paper discovery, including additional time for completion of discovery, Plaintiffs have had ample opportunity to develop facts that support their claim, but no credible support can be found in the record that the law enforcement officers, including the ODNR officers, engaged in a plan to take the Plaintiffs' property or to deprive them of their rights.

**4. There are no facts to support the claims that ODNR Officers were responsible for injury or illness to Mr. Six while placed in the cruiser**

Additional claims made by Plaintiffs must also be rejected because the facts do not support an argument that Officer Shields or other ODNR officers were even remotely involved in certain aspects of the events that occurred on the day in question. First, no facts support that Officer Shields was present when Mr. Six was removed from the residence and placed in a Meigs County Sheriff's cruiser (Robert Six Deposition, p. 93 lines 7-24). There is no factual support to any allegation that the ODNR officers were even on the scene at the time Mr. Six was put in the cruiser, or that Officer Shields or other ODNR officers were responsible for Mr. Six's care while in custody. Mr. Six himself acknowledges in his deposition that he was already in the cruiser when he saw ODNR officers arrived on site (Robert Six Deposition p.93, lines 23-24). Thus, the claims related to injuries or medical conditions resulting from the placement of Mr. Six

in a cruiser cannot be attributed to Officer Shields. Plaintiffs have proved no set of facts indicating Officer Shields physically touched Mr. Six at any point, or had decision-making authority for his care or treatment during or after placement in the cruiser. There has been no testimony from witnesses indicating officer Shields was made responsible for Mr. Six's care, had any supervisory authority over officers in charge of the custody of Mr. Six, or that Mr. Six was placed in Officer Shields' vehicle.

### C. Plaintiffs lack factual support to prevail on their Malicious Prosecution Claim

Further, there is no factual support for the allegation that Officer Shields or any other ODNR officers maliciously caused Mr. Six to be prosecuted. The elements for a claim for malicious prosecution are: (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused. See *Harris v. U.S.*, 422 F.3d 322, 2005 FED App. 0376P (6th Cir. 2005); *Logsdon v.* Harris, 492 F.3d 334 (6th Cir. 2007); *Rainey v.* Patton, 873 F.Supp.2d 908 (S.D. Ohio 2012). Malicious prosecution is an intentional tort requiring a showing of malice. *Price v. Austintown Local School Dist. Bd. Of Edn.,* 178 Ohio App.3d 256, 897 N.E.2d 700 (7th Dist. Mahoning County 2008). Officer Shields testified that when provided some loose wildlife tags by Mr. Six, he was not able to match the tags with the particular animal parts he seized (Shields Affidavit, ¶21, Shields Depo, p.23, lines 19-24, p. 24-25). He affirms that such tags would have been required to be affixed to the animal parts (Shields Affidavit, ¶13). He also testified that in writing the summons and complaints, he was simply following through on his experience and familiarity with Ohio's hunting laws, which clearly provide that failure to keep the tags affixed to the taken wild animal or parts thereof is a misdemeanor offense (Shields Affidavit, ¶11,12,and 13). He also consulted with the on-scene

assistant prosecutor (Shields Affidavit, ¶12).  Officer Shields found a violation of Ohio law, and issued the appropriate citations.

It is well-settled Ohio law, that wild animals are held in trust by the State through the Division of Wildlife.  The Chief of Wildlife is also authorized to make rules pursuant to R.C. 1531.08. The statute states in pertinent part, "…the chief of the division of wildlife has authority and control in all matters pertaining to the protection, preservation, propagation, possession, and management of wild animals and may adopt rules under section 1531.10 of the Revised Code for the management of wild animals." R.C. 1531.08.  Ohio Revised Code 1531.08  further provides the chief "..may adopt, amend, rescind, and enforce rules throughout the state or in any part or waters thereof as provided by sections 1531.08 to 1531.12 of the Revised Code.  Revised Code 1531.08 further specifies that the chief may regulate "Taking and possessing wild animals, at any time and place or in any number, quantity, or length, and in any manner, and with such devices as he prescribes."  This includes requirements for documenting the lawful taking of an animal by tagging it pursuant to Ohio Admin. Code 1501:31-15-11 (for deer) and Ohio Admin. Code 1501:31-15-10 (for turkey).

Here, upon witnessing the untagged animal parts, Officer Shields had good cause to prepare and issue citations.  The writing of the citations, when a clear violation was readily visible, does not amount to malice.  The depositions and other discovery taken in this case have developed no facts that support the allegation that Officer Shields acted prejudicially against Mr. or Mrs. Six.  Nor have any facts come too light that might plausibly lead one to conclude the ODNR officers had any pre-disposition to be biased or malicious against Mr. Six, such that they would have some motive or rationale for falsely accusing him of a crime.

**D. Defendant Shields would be entitled to qualified immunity based on the facts of his participation.**

In addition to a 42 U. S. C. Section 1983 defendant being entitled to summary judgment when no constitutional rights were violated, such a defendant is entitled to summary judgment when, at the time of his actions, it was not clearly established that such actions violated a clearly established constitutional right of which a reasonable defendant would have known. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

To assess whether a public official is entitled to qualified immunity, the Supreme Court has developed a two-part test. In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) the Supreme Court recognized the resolution of qualified immunity involves a two-pronged inquiry. First, a court must decide whether a constitutional right would have been violated on the facts alleged. Second, assuming the violation of a right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated the right. "[T]o deny summary judgment any time a material issue of fact remains could undermine the goal of qualified immunity to avoid excessive disruption of government and permit resolution of many insubstantial claims on summary judgment. If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. In *Pearson v.* Callahan, 555 U.S. 223 (2009), the Supreme Court did revise the *Saucier* analysis, holding that the first prong was not mandatory and that courts could reach resolution of immunity by going directly to a review of the second prong of the two-part analysis. "Even if the plaintiff's complaint adequately alleges

14

the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue of material fact as to whether the defendant in fact committed those acts." *Mitchell v. Forsyth,* 472 U.S. 511, at 526, 105 S.Ct. 2806 (1985).

"To determine whether a right is 'clearly established,' a court may rely on decisions of the United States Supreme Court, the courts of its own circuit, the highest state court in which it sits, and under very limited circumstances, the courts from other federal circuits*." Caldwell v. Woodford Cty. Chief Jailer,* 968 F. 2d 595, 599 (6th Cir. 1992). The "clearly established law" must be defined with particularity and not in the abstract *Anderson* 483 U.S. at 639-40. The Court must seek to determine if an officer could have reasonably believed that his actions were lawful in light of the facts and law as generally understood at the time of her action. *Id* at p. 641. The inquiry into whether a right at issue was clearly established is tied to the specific facts of the case *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. Qualified immunity is a balance between competing values which recognizes "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow, supra*, at 807, citing *Butz v. Economou,* 438 U.S. 478, (1978).

As discussed above, the facts do not demonstrate that Officer Shields engaged in unreasonable conduct, nor did he assist others in carrying out objectively unreasonable conduct. Even if it is assumed that Officer Shields is not entitled to summary judgment as to the alleged involvement in the claimed conduct, he may still be entitled to qualified immunity if the rights alleged to be violated were not clearly established at the time. Qualified immunity is appropriate unless either a precedent "squarely governs" the outcome of the case or the case is so "obvious" that "general tests….clearly establish the answer, even without a body of relevant case law."

*Brosseau v. Haugen*, 543 U.S. 194, 199-201, 125 S.Ct. 596 (2004). The case law must "dictate, that is, truly compel, the conclusion for every like-situated, reasonable government agent that the conduct violates federal law in the circumstances" *Saylor v. Bd. Of Educ. Of Harlan County,* 118 F.3d 507,515 (6th Cir. 1997).

Here, Officer Shields was called to the scene to handle the wildlife violations associated with the untagged animal parts. He rendered limited assistance in the form of helping to move weapons that were being seized and taken to the Meigs County Sheriff's office. Extensive discovery has not revealed any facts that support plaintiffs' claims against Officer Shields individually. Assuming for the sake of argument, Plaintiffs were to demonstrate an officer or officers involved in the search acted unreasonably, and violated Plaintiffs' rights, imputing such conduct to all other officers who were on the scene of the search that day would essentially create an environment of strict liability under USC §1983 for any officer in the search. The gist of an action under USC §1983 involves the recognition that an officer acting under color of law, acted outside of the law to deprive someone of their constitutional rights.

The mere presence of an officer at the scene of a "bad" search, without evidence that the individual officer engaged in unreasonable conduct, should not impute a violation of USC §1983 to that individual officer on the theory that the officer's presence "furthered" a deprivation of rights. This would run counter to the reasoning in *Petty,* that the wrongful acts must be committed by the officer alleged to be acting unreasonably. *Petty v. County of Franklin Ohio,* 478 F.3d 341, 349 (6th Cir. 2007). If the standard advanced by Plaintiffs were to be applied, Officer Shields should be afforded immunity for his participation. The record after discovery does not adduce facts that show the officer knew of any unreasonable conduct or facilitated or

furthered the unreasonable conduct of others. No facts have been produced that Officer Shields acted in bad faith. He acted in good faith in the performance of his duties in responding to the call to handle the untagged animal parts, and rendering some limited assistance to other law enforcement agencies at the scene.

**E.     Plaintiffs' claims regarding damaged or lost property are not properly before this Court.**

Plaintiffs allege that besides firearms being missing, that returned property was damaged. To the extent Plaintiffs have failed to support their claims for USC 1983 violations or intentional torts but support a claim for negligence, any such claims against Officer Shields must be brought before the Ohio Court of Claims. While as an initial factual matter, Plaintiffs do not demonstrate under whose custody their property was allegedly lost or damaged, any claims for money damages for negligence against an Ohio officer fail as a claim under USC §1983. Without establishing the deprivation of as federally protected right "§1983 provides no redress even if the plaintiff's common law rights have been violated and even if the remedies available under state law are inadequate." *Lewellen v. Metropolitan Gov't*, 34 F.3d 345, 347 (6th Cir. 1994). A plaintiff may not simply rest upon a level of culpability that amounts only to negligence. *Estelle v. Gamble,* 429 U.S. 97, 105-106 (1976). Further, an "injury caused by negligence does not constitute a 'deprivation' of any constitutionally protected interest." *Lewellen v. Metropolitan Gov't*, at 348 (*citing Collins v. City of Harker Heights*, 503 U.S. 115, 127-128 (1992).

Here, absent factual support that Officer Shields sought to deliberately deprive Plaintiffs of their property or damage their property, Plaintiffs cannot stand upon a theory of mistake or negligence under USC §1983. The proper forum to raise a damage claim would be before the

Ohio Court of Claims, or arguably, before the Meigs County courts that issued the original orders regarding disposition of the property. Ohio Revised Code §2743.03(A)(1)-(2) established the Ohio Court of Claims with exclusive original jurisdiction of civil actions against the state. Further, under Ohio Revised Code §2743.02(F), that court holds exclusive original jurisdiction to determine whether an officer or employee of the state was acting within the scope of their employment, and has personal immunity under Ohio Revised Code §9.86. Lacking factual support for the deprivation of a federally protected right, any surviving claim for money damages for property against state employees should be adjudicated in state court.

## IV.	CONCLUSION

For the reasons set forth above, Defendant should be granted Summary Judgment on all Counts of Plaintiffs' Amended Complaint. Reasonable minds can only conclude that Plaintiffs' case is not supported by the facts, and Defendant is entitled to judgment as a matter of law.

Respectfully Submitted,

MICHAEL DEWINE.
ATTORNEY GENERAL OF OHIO

/s/Daniel J. Martin \_\_\_\_\_
Daniel J. Martin 0065249
Brian A. Ball (0078285)
Assistant Attorneys General
Environmental Enforcement Section
ODNR Unit
2045 Morse Rd.
Building C-2
Columbus, Ohio 43229
Office:  (614) 265-6879
Facsimile: (614) 268-8871
Daniel.Martin@ohioattorneygeneral.gov
Brian.Ball@ohioattorneygeneral.gov
Attorneys for Defendant Shield

## CERTIFICATE OF SERVICE

I certify that that foregoing Motion For Summary Judgment and Memorandum in Support was served upon counsel of record by operation of the Court's CM/ECF system this 12th day of June, 2013.

s/Daniel J. Martin<br>
Counsel for Defendants Josh Shields