**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **Robert B. Six, et al.,** | **Case No.: 2:11-cv-698** |
| **Plaintiffs** | **Judge Graham** |
| **v.** | **Magistrate Judge Abel** |
| **Robert Beegle, et al.,** | |
| **Defendants.** | |

**<u>OPINION AND ORDER</u>**

This matter is before the court on motions for summary judgment filed by: Defendants Robert Beegle, William Gilkey, Brian Rhodes, Adam Smith, Rick Smith, Scott Trussell[1] (doc. 102); Plaintiffs Bobbi G. Six, Robert B. Six (doc. 116); Defendants Greg Nohe, Scott Parks, Jerry Peters, C. Roberts, John Staats (doc. 117); Defendant Josh Shields (doc. 118); and Defendant Keith Woods (doc. 122), on July 12, 2013. In addition, Defendants Scott Fitch and Jonathan Jenkins filed a Motion to Dismiss all claims relating to personal property and a Motion for Summary Judgment (doc. 126). For the reasons that follow, the Court will DENY the Plaintiffs' Motion for Summary Judgment (doc. 116); GRANT IN PART AND DENY IN PART Defendants Beegle's, Gilkey's, Rhodes's, Adam Smith's, Rick Smith's and Scott Trussell's Motion for Summary Judgment (doc. 102); GRANT IN PART AND DENY IN PART Defendants Nohe's, Parks's, Peters's, Robert's, and Staats's Motion for Summary Judgment (doc. 117); GRANT Defendant Shields' Motion for Summary Judgment (doc. 118); GRANT

---

[1] The Plaintiffs voluntarily agreed to dismiss Defendant Trussell from this case. <u>See</u> Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J. 34, doc. 134.

Defendant Woods' Motion for Summary Judgment (doc. 122); and GRANT Defendants Fitch's and Jenkins's Motion for Summary Judgment and DENY AS MOOT Defendants Fitch's and Jenkins's Motion to Dismiss (doc. 126).

## I.    Factual Background

In August 2009, the United States Postal Service (USPS) Inspector Donnie Simmons informed the Columbus Police Department (CPD) of a suspicious package being delivered to the Plaintiffs' address in Albany, Ohio. Simmons Aff., doc. 102-1 at 2. With the aid of a K-9 unit, law enforcement officers determined that the package contained narcotics. Id. at 3. Based on this information, Inspector Simmons applied for and received a search warrant for the package. See Simmons Application and Aff., doc. 102-1; Federal Search Warrant, doc. 102-2. Subsequently, law enforcement officers opened the package and discovered four five-gallon plastic buckets containing almost 40 pounds of marijuana in total. Smith Aff., doc. 102-3.

A joint task force involving officers from the Ohio Bureau of Criminal Investigations (BCI), the Meigs County Sheriff's Office, the Columbus Police Department, the Franklin County Sheriff's Office, and the Washington County Sheriff's Office decided to deliver the package to the Plaintiffs' address as part of a sting operation. Shields Dep. Tr. at 13–16, doc. 114.

The Meigs County Sheriff's Office applied for a search warrant for the Plaintiffs' premises. State Search Warrant, doc. 102-4. The search warrant stated:

> These are therefore to command you in the name of the State of Ohio, with the necessary and proper assistance, to enter, even unto the night-time hours, in the [Plaintiffs'] residence . . . along with any garages, outbuildings, sheds, enclosures, or motor vehicles, at said location, and there diligently search for the said goods and chattels, or articles, to-wit:
>
> Marijuana or other drugs, in any form or condition, rolling papers, pipes, bongs, or other devices, instruments, or things used to facilitate consuming or using

Marijuana, an indeterminate quantity of Marijuana plants or parts thereof and Marijuana seeds, a controlled substance, either growing or cut, together with various tools, devices, objects, or things used in the cultivation, preparation/processing or sale of Marijuana and/or the processing of the same, together with any records, including paper copies, notebooks, journals, or writings and computerized records, photographs or videotape recordings evidence the cultivation, preparation/processing or sale of Marijuana, together with any proceeds from the cultivation, preparation/processing or sale of Marijuana, said drugs and contraband, or some part thereof, other illegal drugs, dangerous drugs or controlled substances, concealed in and at the premises described herein and above as being the [Plaintiffs'] residence . . . along with any garages, outbuildings, sheds, enclosures or motor vehicles, at said location, evidence of possession, distribution and cultivation of marijuana and drugs in violation of 2925 of the Ohio Revised Code, along with any related evidence.

Id. at 1.

On August 5, 2009, Inspector Simmons delivered the package to the Plaintiffs' residence. Inside the package, members of the task force placed an electronic transmitter that would alert them when the package was opened. After signing for the package, Robert Six returned inside the residence and opened the package.[2] R. Six Dep. Tr. 64–66, doc. 103. Law enforcements agents responded quickly to the scene and executed the search warrant. Two disassembled firearms were in the living room in plain view as law enforcement agents entered the residence. Id. at 83. During the execution of the search warrant, Mr. Six was handcuffed and detained in a law enforcement vehicle. Id. at 78. Law enforcement officers seized firearms, ammunition, and other alleged contraband[3] in addition to the large quantity of marijuana contained in the package. Based on his possession of narcotics, law enforcement officers arrested Mr. Six on charges of felony drug possession, doc. 102-5, and transported him to the Meigs County Sheriff's Office, R. Six Dep. Tr. at 128–29. Subsequent to his arrest, law enforcement officers catalogued the seized

---

[2] Bobbi Six, Mr. Six's wife and co-plaintiff, was not home at the residence at the time law enforcements officers executed the search warrant. Bobbi Six Dep. Tr. at 55–56, doc. 113.

[3] The contraband included several untagged deer antlers and turkey feathers. Officers from the Ohio Department of Natural Resources Division of Wildlife were called to the scene to investigate.

property and transported the property to the Meigs County Sheriff's Office where it was stored in the evidence room. A. Smith Dep. Tr. at 58–62, doc. 104.

In March 2010, a Meigs County Grand Jury indicted Mr. Six on a charge of aggravated possession of narcotics, a felony. Meigs County Grand Jury Indictment, doc. 102-6. The indictment included a forfeiture specification concerning the firearms and ammunition possessed by Mr. Six at the time of his arrest:

> We the members of the Grand Jury . . . find and specify that the offender, at the time of his arrest incident to the offense, had in his possession or under his control, approximately three hundred firearms and ammunition, which was derived directly or indirectly from the commission of a felony drug offense and subject to forfeiture according to law.

Id. Following his indictment, Mr. Six moved to dismiss the forfeiture specification. The trial judge considered Mr. Six's request and issued a written order granting his request for dismissal of the forfeiture specification.[4] Mar. 4, 2011, Meigs County Judgment Entry, doc. 103-2 at 10–23. On April 8, 2011, the state court entered an additional judgment entry directing the State to return the property identified in the forfeiture specification to Mr. Six. April 8, 2011, Meigs County Judgment Entry, doc. 103-2 at 24–25. On April 11, 2011, law enforcement officers returned the Plaintiffs' property to Mr. Six and his wife. The parties dispute whether law enforcement officers returned all of the Plaintiffs' property to them. Meigs County Sheriff's Deputies Adam and Rick Smith assisted in the return of property to the Plaintiffs. A. Smith Dep. Tr. 90–92; R. Smith. Dep. Tr. 63, 65–67, doc. 105-1. Steve Jagers of Ohio Valley Investigation oversaw the return of property to Mr. Six. Jagers Dep. Tr. *passim*, doc. 110-1.

---

[4] The court cited the State's failure to comply with Ohio Revised Code § 2981.04(A)(1), which required the forfeiture specification to set forth (A) the nature and extent of a defendant's interest in the property at issue; (B) a description of the property; and (C) the alleged use or intended use of the property by a defendant in the commission or facilitation of the offense. Mar. 4, 2011, Meigs County Judgment Entry, doc. 103-2 at 19. Specifically, the court emphasized that the forfeiture specification did not: specify the number or type of firearms involved, state whether the firearms were operable, or make any showing that the firearms or ammunition were used to commit the offense of aggravated possession of marijuana. Id. at 19–20.

In late 2011, Mr. Six resolved the criminal charges against him by pleading guilty to a lesser charge of Attempted Possession of Drugs, a felony of the fourth degree. Meigs County Judgment Entry, doc. 103-2 at 129–131. The Court sentenced Mr. Six to "Intervention in Lieu of Conviction" for a two-year period of rehabilitation followed by a minimum of one year of parole. Id.

On August 3, 2011, Mr. Six and his wife ("the Plaintiffs") filed a Complaint (doc. 1) bringing five claims against the Defendants arising from the events of August 5, 2009: illegal seizure of the Plaintiffs' personal property (Count One), damage of personal property illegal seized (Count Two), illegal seizure of Mr. Six's person (Count Three), malicious prosecution in connection with charges brought against Mr. Six related to untagged deer antlers and turkey feathers (Count Four), and a conspiracy to illegally seize the Plaintiffs' property and to deprive them of various constitutional rights (Count Five). On May 24, 2012, the Plaintiffs filed an Amended Complaint (doc. 58-1) raising the same five claims against the Defendants and incorporating additional factual allegations to support their claims. All of the Plaintiffs' claims are brought pursuant to 42 U.S.C. §1983.

The Defendants are: Meigs County Sheriff Robert Beegle, Meigs County Sheriff's Deputy Adam Smith, Meigs County Sheriff's Deputy Rick Smith, Sergeant William Gilkey of the Meigs County Sheriff's Office, Ohio Bureau of Criminal Investigation Special Agent Jonathan Jenkins, Ohio Bureau of Criminal Investigation Special Agent Supervisor Scott Fitch, Ohio Division of Wildlife Investigator Keith Wood, Ohio Department of Wildlife Officer Josh Shields, Columbus Police Department Detective Jerry Peters, Columbus Police Department Detective Christine Roberts, Washington County Sheriff's Deputy Greg Nohe, Washington

County Sheriff's Deputy  John Staats, Washington County Sheriff's Deputy Scott Parks,[5] and Washington County Sheriff's Deputy Brian Rhodes.


## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary material in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009).  The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465.  "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248).  Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

---

[5] Defendants Nohe, Parks, and Staats were also Major Crime Task Force Agents.

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations.  Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).  Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251–52.  The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III.    Discussion

The Plaintiffs' Amended Complaint raises five claims against the Defendants. The Plaintiffs have filed a Motion for Summary Judgment as to Count One of the Amended Complaint. The Defendants have filed Motions for Summary Judgment as to all five counts in the Plaintiffs' Amended Complaint on grounds of qualified immunity.[6] The Court will address each of these claims in turn.

Qualified immunity protects government officials from personal liability "'for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Jasinksi v. Tyler, — F.3d —, 2013

---

[6] Because Defendants Jenkins and Fitch are entitled to summary judgment on all five counts of the Plaintiffs' Amended Complaint, the Court finds their Motion to Dismiss All Claims Related to Personal Property to be moot.

WL 4711097, at *8 (6th Cir. Sept. 3, 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818

(1982)). The issue of qualified immunity is a legal question for the court to resolve. Everson v.

Lies, 556 F.3d 484, 494 (6th Cir. 2009) (citing Elder v. Holloway, 510 U.S. 510, 516 (1994);

Tucker v. City of Richmond, 388 F.3d 216, 219 (6th Cir. 2004)). In order to determine whether

qualified immunity applies, courts employ a two-part test, asking (1) whether, considering the

allegations in a light most favorable to the party injured, a constitutional right has been violated,

and (2) "whether that constitutional right was clearly established such that a 'reasonable official

would understand that what he is doing violates that right.'" Simmonds v. Genesee Cnty., 682

F.3d 438, 443–44 (6th Cir. 2012) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). In

resolving government officials' qualified immunity claims, courts may address either prong of

the qualified immunity test first. See Pearson v. Callahan, 555 U.S. 223, 236 (2009) ("[t]he

judges of the district courts . . . should be permitted to exercise their sound discretion in deciding

which of the two prongs of the qualified immunity analysis should be addressed first in light of

the circumstances in the particular case at hand"). As the Sixth Circuit has recognized, "[t]he

concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to

the legal constraints on particular police conduct. . . . The doctrine protects all but the plainly

incompetent or those who knowingly violate the law." Dorsey v. Barber, 517 F.3d 389, 394 (6th

Cir. 2008) (internal quotations and citations omitted).

"When, as here, a defendant raises qualified immunity as a defense, the plaintiff bears the

burden of demonstrating that the defendant is not entitled to qualified immunity." Everson, 556

F.3d at 494 (citing Baker v. City of Hamilton, 471 F.3d 601, 605 (6th Cir. 2006)). The defendant

has the burden to show that the challenged conduct was "objectively reasonable in light of the

law existing at the time." Everson, 556 F.3d at 494 (citing Tucker, 388 F.3d at 220). In contrast,

the plaintiff has the burden to establish that a constitutional right was clearly established at the time of the challenged conduct. Everson, 556 F.3d at 494 (citing Barrett v. Steubenville City Sch., 388 F.3d 967, 970 (6th Cir. 2004)).

A.      *Count One – Illegal Seizure*

Count One of the Plaintiffs' Amended Complaint alleges that the Defendants illegally seized the Plaintiffs' personal property, including their firearms, and subsequently failed to return the Plaintiffs' property to them. The Plaintiffs and Defendants have filed cross-motions for summary judgment as to this Count. The Court will address the initial seizure first of the Plaintiffs' property and then turn to the Defendants' alleged failure to return the Plaintiffs' property.

1.      Seizure of Firearms

As to the seizure of the Plaintiffs' firearms, the Court first considers whether the constitutional right in question was "clearly established at the time of the challenged conduct." In articulating the right in question, courts must "examine the right asserted 'at a relatively high level of specificity, and on a fact-specific, case-by-case basis." Jasinski, 2013 WL 4711097, at *8 (quoting O'Malley v. City of Flint, 652 F.3d 662, 668 (6th Cir. 2011) (internal quotation marks and alterations omitted). See also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)) ("It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'").

"'When determining whether a constitutional right is clearly established, [courts] look first to decisions of the Supreme Court, then to [Sixth Circuit] decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal.'" <u>Kovacic v. Cuyahoga Cnty. Dept. of Children and Family Servs.</u>, 724 F.3d 687, 698 (6th Cir. 2013) (quoting <u>Andrews v. Hickman Cnty.</u>, 700 F.3d 845, 853 (6th Cir. 2012)).

> "A mere handful of decisions of other circuit and district courts, which are admittedly novel, cannot form the basis for a clearly established constitutional right in this circuit." <u>Ohio Civil Serv. Employees Assoc. v. Seiter</u>, 858 F.2d 1171, 1177–78 (6th Cir. 1988). We, however, also noted that in certain cases "it may be possible for the decisions of other courts to clearly establish a principle of law." <u>Id.</u> at 1177. In these exceptional cases, the decisions of other courts may provide clearly established law if the decisions "both point unmistakably to the unconstitutionality of the conduct complained of and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." <u>Id.</u>

<u>Fisher v. Harden</u>, 398 F.3d 837, 845–46 (6th Cir. 2005).

> The Plaintiffs contend:

> With regard to the second prong of the qualified immunity standard, Defendants make no argument that the right to be free from seizures of personal property not authorized by a search warrant is somehow unestablished in the law, arguing only that there was no constitutional violation because the seizure was authorized by a warrant or by probable cause.

Pls. Resp. in Opp. to Defs.' Mot. for Summ. J. 10, doc. 134. To support their assertion that the second prong of the qualified immunity test is satisfied, the Plaintiffs argue that "the right to be free from seizures of personal property that are not authorized by a search warrant or any exception thereto is a solidly established bedrock of Fourth Amendment jurisprudence." <u>Id.</u> at 11 (citing <u>United States v. Garcia</u>, 496 F.3d 495, 508 (6th Cir. 2007)). Further, the Plaintiffs contend, "[t]he explicit language of the Fourth Amendment requires items to be seized to be

particularly identified in a warrant." Pls. Resp. in Opp. to Defs.' Mot. for Summ. J. 11–12 (citing

U.S. Const. amend. IV; Groh v. Ramirez, 540 U.S. 551 (2004)).

> The Fourth Amendment provides:
>
> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "The Fourth Amendment protects a person's right to his personal

property without interference from the police absent consent or reasonable suspicion or probable

cause that a crime has been, will be, or is being committed." United States v. Deitz, 577 F.3d

672, 687 (6th Cir. 2009). "'In the ordinary case, the [Supreme] Court has viewed a seizure of

personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it

is accomplished pursuant to a judicial warrant issued upon probable cause and particularly

describing the items to be seized.'" Alman v. Reed, 703 F.3d 887, 904 (6th Cir. 2013) (quoting

United States v. Place, 462 U.S. 696, 701 (1983)). Property is seized "when 'there is some

meaningful interference with an individual's possessory interests in that property.'" Soldal v.

Cook Cnty., 506 U.S. 56, 62–63, (1992) (quoting United States v. Jacobsen, 466 U.S. 109, 113

(1984)). "A constitutional violation occurs only where the seizure is objectively unreasonable, a

determination that entails a careful balancing of governmental and private interests." Hensley v.

Gassman, 693 F.3d 681, 688 (6th Cir. 2012) (internal citations and quotations omitted).

The Court takes no issue with the Plaintiffs' general statement of Fourth Amendment

law. Rather, the Court is concerned with the Plaintiffs' failure to "to examine the right asserted

'at a relatively high level of specificity, and on a fact-specific, case-by-case basis.'" Jasinski,

2013 WL 4711097, at *8 (quoting O'Malley, 652 F.3d at 668). Here, the Plaintiffs argue that the

Defendants illegally seized hundreds of firearms during the execution of a search warrant directed at marijuana trafficking. The Plaintiffs place great weight on the fact that the "majority" of the firearms were "old, collector's items." But the Plaintiffs have not identified any case law, and the Court has not been able to find any precedent, clearly establishing in August 2009 that a law enforcement officer could not seize firearms of varying age during the execution of a search warrant directed at marijuana trafficking.

Here, the plain language of the warrant authorized the seizure of the Plaintiffs' firearms. See State Search Warrant, doc. 102-4 (authorizing the seizure of "tools, devices, objects, or things used in the . . . sale of Marijuana" and "evidence of distribution of marijuana and drugs in violation of 2925 of the Ohio Revised Code."); cf. United States v. Case, 503 F. App'x 463, 466 (6th Cir. 2012) (finding that seizure of firearms "clearly [fell] within the scope of 'marijuana, morphine, other drugs, [and] paraphernalia' as listed in the search warrant"). "[The Sixth Circuit] has held many times that guns are 'tools of the trade' in drug transactions." United States v. Hardin, 248 F.3d 489, 499 (6th Cir. 2001) (citing United States v. Medina, 992 F.2d 573, 587 (6th Cir. 1993) (stating that evidence of firearms tended to prove the existence of a drug conspiracy); United States v. Hatfield, 815 F.2d 1068 (6th Cir. 1987) (stating that weapons are evidence of an intent to distribute drugs); United States v. Arnott, 704 F.2d 322, 326 (6th Cir. 1983) (recognizing guns as "tools of the trade" for drug dealers)). See also United States v. Shields, 664 F.3d 1040, 1046 (6th Cir. 2011) ("Firearms are tools of the trade in drug transactions, and it is easier to see how a firearm facilitates drug trafficking transactions, than it is to see how a firearm facilitates the mere possession of controlled substances" (internal citations and quotations omitted)); United States v. Stafford, 232 F. App'x 522, 525 (6th Cir. 2007) (noting the "general observation that drug dealers generally carry guns for protection");

United States v. Davis, 900 F.2d 260 (6th Cir. 1990) (per curiam) (citing United States v. Marino, 658 F.2d 1120 (6th Cir. 1981) (approving the seizure of firearms during the execution of a search warrant aimed at narcotics and finding, "it is well settled that firearms may be seized pursuant to a search warrant directed at narcotics. Firearms are evidence of drug trafficking.") Rather than clearly establishing a prohibition on the seizure of firearms during the execution of a narcotics search warrant, the Sixth Circuit explicitly has approved such seizures. In this case, the Plaintiffs owned hundreds of firearms ranging in age. Various individual Defendants seized those firearms pursuant to a search warrant directed at evidence of marijuana trafficking, consistent with the Sixth Circuit's repeated finding firearms are evidence of drug trafficking.

The Plaintiffs have not identified any general principle of Fourth Amendment jurisprudence or any specific cases from the Sixth Circuit or its sister circuits that clearly established a constitutional distinction between the seizure of "modern" firearms versus "old" firearms during the execution of a search warrant related to narcotics trafficking. The Sixth Circuit has approved the seizure of firearms during the execution of a search warrant for narcotics because drug traffickers frequently possess guns for protection. See Stafford, 232 F. App'x at 525 (noting the "general observation that drug dealers generally carry guns for protection"). Consequently, the Sixth Circuit has recognized that firearms are evidence of drug trafficking. See Hardin, 248 F.3d at 499 (collecting cases.) In the fact-specific context of this case, there is no evidence that the firearms in question could not be used for protection.[7] The

---

[7]        The Plaintiffs also place great weight on two additional pieces of evidence. First, the Plaintiffs cite the state court's order invalidating the forfeiture specification as to the Plaintiffs' firearms as evidence that the seizure of those firearms was objectively unreasonable. In its order, the state court found that the State had failed to present evidence connecting the firearms seized to the marijuana found at the Plaintiffs' residence. The state court's order is irrelevant to the issue of whether the seizure of the Plaintiffs' firearms was objectively reasonable at the time of the execution of the search warrant. The reasonableness of a seizure must be judged from the perspective of a reasonable officer on the scene, not with the 20/20 vision of hindsight. Ciminillo v. Streicher, 434 F.3d 461, 467 (6th Cir. 2006). In their depositions, various Defendants testified that they seized the Plaintiffs' firearms during the execution of the search warrant because they believed they were evidence of narcotics trafficking. A state court's

Plaintiffs cite Defendant Adam Smith's concession that the "large majority of the firearms that were seized were older collector's item type firearms[.]" A. Smith Dep. Tr. at 41. However, there is no other evidence concerning the condition and functional capabilities of the firearms seized. There is no evidence that the firearms in question were inoperable or otherwise incapable of being used as weapons. Nor is there any evidence that the firearms in question were antiques. The doctrine of qualified immunity "acknowledge[s] that reasonable mistakes can be made as to the legal constraints on particular police conduct" and "protects all but the plainly incompetent or those who knowingly violate the law." Dorsey, 517 F.3d at 394–95. The Court finds dispositive the absence of controlling authority that specifically prohibited the Defendants' conduct in seizing the Plaintiffs' firearms. Therefore, the Defendants are entitled to qualified immunity as to the seizure of the Plaintiffs' firearms.

2.     Seizure of Personal Property

In addition to seizing the Plaintiffs' firearms, the Defendants seized other personal property from the Plaintiffs, including World War II memorabilia, flags, swords, and knives.[8]

---

order issued a year and a half after the seizure of those firearms does not alter the conclusion that clearly established law did not prohibit the Defendants' conduct.

Second, the Plaintiffs argue that several of the Defendants have conceded that they did not have any evidence connecting the Plaintiffs' firearms to the marijuana seized during the execution of the search warrant. This is a misrepresentation of the record. Defendants Adam and Rick Smith discussed the seizure of the firearms at length in their depositions. Both acknowledged that the state court had invalidated the forfeiture specification as to the Plaintiffs' firearms and that no evidence had been discovered *after the execution of the search warrant* linking the marijuana to the firearms. From this, the Plaintiffs argue that the Defendants seized the firearms without a reasonable belief that they were connected to the marijuana and that clearly established law prohibited such conduct. However, reading this testimony in context, it is clear that the Defendants did not admit that they had no reason to believe the firearms were connected to the marijuana *at the time the search warrant was executed*. In their depositions, they testified that they seized the Plaintiffs' firearms during the execution of the search warrant because they believed they were, in fact, evidence of narcotics trafficking. *After the execution of the search warrant*, the Defendants conceded that they did not discover any evidence connecting the guns to the marijuana, but such a concession does not undermine the objective reasonableness of their actions in seizing the firearms *at the time the search warrant was executed*.

[8] What the Plaintiffs refer to as "World War II artifacts," the Defendants refer to as "Nazi paraphernalia."

The Plaintiffs assert that seizure of the World War II memorabilia was clearly not authorized by the search warrant executed by the Defendants. In the Plaintiffs' view, the seizure of this memorabilia exceeded the scope of the search warrant and constituted a Fourth Amendment violation.

a.      Defendants Rhodes, Adam Smith, Rick Smith, Nohe, Parks, Peters, Roberts, and Staats

Defendants Rhodes, Adam Smith, and Rick Smith broadly argue they had probable cause to seize the Plaintiffs' firearms and other contraband pursuant to a valid search warrant. Defs.' Mot. for Summ. J. 8–11, doc. 102 Defs.' Resp. in Opp. to Pls.' Mot. for Summ. J. 4–7, doc. 133. Beyond this general argument, these Defendants offer little analysis or explanation of why they believe the seizure of the Plaintiffs' World War II memorabilia was constitutional.[9] Defendants Nohe, Parks, Peters, Roberts, and Staats argue that it was "not inherently unreasonable to determine that Nazi paraphernalia found near the drugs and firearms could be evidence of Plaintiffs' possible involvement in a militia or hate groups, who often times use drugs sales to finance their militia operations." Defs.' Mot. for Summ. J. 8, doc. 117 (citing United States v. Graham, 275 F.3d 490, n.1 (6th Cir. 2001)). See also Defs.' Resp. in Opp. to Pls.' Mot. for Summ. J. 7–8, doc. 132 (citing United States v. Griffith, 362 F. Supp. 2d 1263 (D. Kan. 2005) and asserting that "Defendants had probable cause to believe that Nazi paraphernalia was evidence of Plaintiffs' possible connection to a militia. Anti-government militias often times use drug sales to fund the acquisition of large amounts of guns.")

---

[9] The Plaintiffs contend that Defendants Beegle, Gilkey, Rhodes, Adam Smith, and Rick Smith "make no argument that there was probable cause to seize the WWII collector's items that were not firearms, such as the Nazi flags, the coin and currency collection, the Austrian deersfoot knife, and the Bulldog knife collection, and Defendants motion for summary judgment does not address these items." Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J. 10 n.4, doc. 134. Although this overstates the case, the Plaintiffs are correct in that Defendants Rhodes, Adam Smith, and Rick Smith do not explicitly address these items. Rather, these Defendants refer generally to these items as "other contraband" and broadly argue that language of the search warrant permitted the seizure of the "other contraband."

"It is well-settled that items to be seized pursuant to a search warrant must be described with particularity to prevent the seizure of one thing under a warrant describing another in violation of the Fourth Amendment." United States v. Wright, 343 F.3d 849, 863 (6th Cir. 2003) (citation and internal quotation marks omitted). The particularity requirement ensures that the warrant contains "enough information to guide and control the agent's judgment in selecting what to take." United States v. Richards, 659 F.3d 527, 537 (6th Cir. 2011). The requirement also protects against warrants that are "too broad in the sense that [they include] items that should not be seized." Id. (quotation omitted). "Seizing items beyond the scope of a warrant's authorization violates the Fourth Amendment rights of the subject of a search." Shamaeizadeh v. Cunigan, 338 F.3d 535, 554 (6th Cir. 2003) (citing Andresen v. Maryland, 427 U.S. 463, 480 (1976)).

The parties agree that the Defendants seized the Plaintiffs' World War II memorabilia during the execution of the search warrant for the Plaintiffs' residence. But the parties dispute whether the language of the search warrant authorized the seizure of that paraphernalia. In the context of qualified immunity, the defendant has the burden to show that the challenged conduct was "objectively reasonable in light of the law existing at the time." Everson, 556 F.3d at 494 (citing Tucker, 388 F.3d at 220). The Court will hold the Defendants to that burden. Defendants Rhodes, Adam Smith, Rick Smith, Nohe, Parks, Peters, Roberts, and Staats argue that the search warrant authorized the seizure of the Plaintiffs World War II memorabilia as evidence of marijuana distribution. Specifically, the Defendants assert that officers at the scene could have reasonably believed the World War II memorabilia, including Nazi paraphernalia, was related to the Plaintiffs membership in a militia or hate group that funded the purchase of firearms through the sale of marijuana. Multiple Defendants testified that they recognized Nazi paraphernalia

among the Plaintiffs' World War II memorabilia. See A. Smith Dep. Tr. at 35–36; R. Smith Dep. Tr. 31–32; Peters Dep. Tr. 55; Roberts Dep. Tr. 22. On the evidence before the court, whether the seizure of that memorabilia was objectively reasonable under the circumstances of this case is a question for the jury to decide. The parties will be permitted to develop the evidence at trial concerning the basis for seizing the Plaintiffs' World War II memorabilia. Therefore, the Court will allow the Plaintiffs to proceed with their claim against Defendants Rhodes, Adam Smith, Rick Smith, Nohe, Parks, Peters, Roberts, and Staats.

b.  Defendants Beegle, Gilkey, Shields, Woods, Jenkins, and Fitch

Defendants Beegle, Gilkey, Shields, Woods, Jenkins, and Fitch maintain that there is no evidence of their personal involvement in the seizure of the Plaintiffs' World War II memorabilia.[10]  The Court agrees.

According to the Plaintiff:

> It is undisputed that during the execution of the search warrant Defendants seized Plaintiff Robert Six's entire collection of old guns (which included over 300 firearms), along with other World War II collector's items having nothing to do with drugs. All Defendants have admitted participating in the seizure of the personal property in one way or another, whether by actually searching for and seizing the weapons, loading them onto trucks, or providing backup for those performing those tasks.

Pl.'s Mot. for Summ. J. 3–4, doc. 116. Further, the Plaintiffs argue, "While Defendants Fitch and Jenkins do not admit to seizing items other than firearms, they were directly involved in seizing firearms, and had the opportunity and provided support and back up to those who did, as did all

---

[10] The Plaintiffs argue that because Defendants Fitch and Jenkins "admit that there was no reason to seize any of the collector's items (other than the firearms)[,] the Court should grant summary judgment as to all of the collector's items that are not firearms." Pls.' Reply to Defs.' Resp. in Opp. 1–2, doc. 144. The Court does not believe this is a fair reading of Defendants Fitch and Jenkins pleading. Even if Defendants Fitch and Jenkins made this concession, the Plaintiffs would still be obligated to establish the Defendants personal liability for the seizure of the WWII memorabilia and such an admission would have no effect as to the remaining Defendants.

of the officers present that day." Pls.' Reply to Defs.' Resp. in Opp. 2, doc. 144. The Plaintiffs

make similar arguments as to Defendants Beegle, Gilkey,[11] Shields, and Woods. However,

"[e]ach defendant's liability must be assessed individually based on his own actions." Binay v.

Bettendorf, 601 F.3d 640, 650 (6th Cir. 2010) (citing Dorsey v. Barber, 517 F.3d 389, 399 n. 4

(6th Cir. 2008)). The Plaintiffs have failed to identify evidence establishing the personal liability

of Defendants Beegle, Gilkey, Shields, Woods, Jenkins, and Fitch as to the seizure of the World

War II memorabilia. Instead, the Plaintiffs rely on general allegations that these Defendants are

liable because they were present at the scene and had the opportunity to seize the Plaintiffs'

World War II memorabilia. This is insufficient to establish personal liability. "As a general rule,

mere presence at the scene of a search, without a showing of direct responsibility for the action,

will not subject an officer to liability." Ghandi v. Police Dep't of Detroit, 747 F.2d 338, 352 (6th

Cir. 1984). Therefore, Defendants Beegle, Gilkey, Shields, Woods, Jenkins, and Fitch are

entitled to qualified immunity and summary judgment will be granted in their favor.


### 3.    Retention of the Firearms

The Plaintiffs also contend that the Defendants violated their Fourth Amendment rights

when the Defendants retained and failed to return their firearms to them.[12] The Plaintiffs present

---

[11] The Plaintiffs assert that Defendant Gilkey "directly admits having handled Mr. Six's personal property during the raid while hauling items to the transport vehicles." Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J. 34, doc. 134. The Plaintiffs, however, do not designate any evidence to support this allegation, and a district court is not obligated to comb through the entire record to determine if any available evidence supports such an allegation, see Emerson v. Novartis Pharm. Corp., 446 F. App'x 733, 734 (6th Cir. 2011) (citing Chicago Title Ins. Corp. v. Magnuson, 487 F.3d 985, 995 (6th Cir. 2007)).

[12]      The Plaintiffs agreed to dismiss their Fourteenth Amendment claims against the Defendants. See Pls.' Resp. in Opp. to Defs.' Mot. for Summ. J. 24, doc. 134 ("Because Defendant[s'] conduct in illegally seizing and failing to return Plaintiffs' personal property is prohibited by the Fourth Amendment to the United States Constitution [,] Plaintiffs do not assert claims for violations of procedural or substantive due process, or for equal protection violations. Plaintiffs concede that to the extent their Amended Complaint may have stated claims for procedural or substantive due process violations, or for equal protection violations, those claims should be dismissed

significant evidence, including receipts, logbooks, and other documentation of the Plaintiffs' firearm collection, that purportedly demonstrates the Defendants' failure to return their firearms. The Defendants insist that the evidentiary record demonstrates that all of the Plaintiffs' property was returned, and that therefore they are entitled to summary judgment. Alternatively, numerous Defendants argue that the Plaintiffs have failed to present evidence establishing their personal liability for the alleged failure to return the Plaintiffs' firearms. The parties offer limited discussion of this claim in the context of the Fourth Amendment.

The Sixth Circuit has addressed Fourth Amendment claims for failure to return personal property in two related cases. First, in Fox v. Van Oosterum, 176 F.3d 342 (6th Cir. 1999), the plaintiff brought a § 1983 action against a sheriff's department and its officers after they failed to return his driver's license to him. During the course of a traffic stop, officers seized the plaintiff's wallet and driver's license as part of an inventory search. Id. at 345. Following his release from jail several months later and after he paid multiple outstanding traffic tickets, the plaintiff attempted to collect his wallet and driver's license from the county Sheriff's Office. Id. The defendants returned the plaintiff's wallet but refused to return his license because of additional traffic violations. Id. In addition to claims relating to his arrest and detention, the plaintiff brought a Fourteenth Amendment due process, Fourth Amendment illegal seizure, and

---

because the more specific constitutional violations are violations of the Fourth Amendment to the United States Constitution.")

Under 42 U.S.C. § 1983, procedural due process claims may be dismissed pursuant to Parratt v. Taylor, 451 U.S. 527 (1981), overruled in part on other grounds Daniels v. Williams, 474 U.S. 327 (1986), where the state provides an adequate postdeprivation remedy if: "1) the deprivation was unpredictable or 'random'; 2) predeprivation process was impossible or impracticable; and 3) the state actor was not authorized to take the action that deprived the plaintiff of property or liberty." Copeland v. Machulis, 57 F.3d 476, 479 (6th Cir. 1995). "State tort remedies generally satisfy the postdeprivation process requirement of the Due Process Clauses." Fox v. Van Oosterum, 176 F.3d 342, 349 (6th Cir. 1999) (citing Hudson v. Palmer, 468 U.S. 517, 534–36 (1984)). Because the Plaintiffs have waived their Fourteenth Amendment claim, the Court will not address whether their claim against the Defendants would be barred by Parratt under the circumstances in this case.

state law conversion claim against the defendants based on their failure to return his license to him. Id. at 347.

After affirming the district court's dismissal of the plaintiff's procedural due process claim, Fox, 176 F.3d at 348–49, the Sixth Circuit addressed the plaintiff's Fourth Amendment claim, id. at 349–52. In his complaint, the plaintiff made clear that he was not complaining about the initial seizure of his license during the traffic stop. Id. at 349. Rather, the Sixth Circuit observed, the plaintiff contended that his license was "seized" in violation of the Fourth Amendment when law enforcement officers refused to return his license to him. Id. Reviewing the Supreme Court's Fourth Amendment jurisprudence, the court noted that "[w]hatever the breadth of Fourth Amendment protection of property interests, that protection is limited to the breadth of the meaning of the word 'seizure' in the Fourth Amendment." Id. at 350. The court then considered Soldal's definition of "seizure' under the Fourth Amendment and its impact on the plaintiff's Fourth Amendment claim. Id. The court concluded that "no unreasonable seizure occurred when the defendants refused to return Fox's driver's license to him," explaining:

> The Supreme Court has only applied the "meaningful interference with possessory interests" definition of seizure to cases where there is no debate that the challenged act is one of taking property away from an individual and the issue is whether that act of taking property away constitutes a meaningful interference with possessory interests. The instant case presents an issue that precedes the work performed by the Supreme Court's Soldal definition of seizure-the issue of whether the government actor's action can be characterized as a seizure in the sense of taking away property from its owner. *Put another way, the Fourth Amendment protects an individual's interest in retaining possession of property but not the interest in regaining possession of property.* Cf. Brown, 460 U.S. at 747 (Stevens, J., concurring in judgment) ("The [Fourth] Amendment protects two different interests of the citizen-the interest in retaining possession of property and the interest in maintaining personal privacy."); Thomas K. Clancy, What Does the Fourth Amendment Protect: Property, Privacy, or Security?, 33 Wake Forest L. Rev. 307, 356 (1998) (arguing that the Fourth Amendment's prohibition on unreasonable seizures as defined in Soldal protects "the individual['s] . . . right to remain in possession" of property); see also Soldal, 506 U.S. at 63 (citing J. Stevens's opinion in Brown as support for its definition of a

seizure); Jacobsen, 466 U.S. at 109 & n. 5 (same). *Once that act of taking the property is complete, the seizure has ended and the Fourth Amendment no longer applies.*

Fox, 176 F.3d at 351 (emphasis added) (footnote omitted). Consequently, because the Fourth Amendment did not provide relief for the failure to return property, the Sixth Circuit affirmed the district court's grant of summary judgment to the defendants on the plaintiff's Fourth Amendment claim.

Latler, in Farm Labor Organizing Community v. Ohio State Highway Patrol, 308 F.3d 523 (6th Cir. 2002), the Sixth Circuit distinguished its holding in Fox. The Farm Labor plaintiffs were two legal permanent residents driving from Chicago to visit their family in Toledo, Ohio. Id. at 528–29. An Ohio State High Patrol officer initiated a traffic stop of the plaintiffs based on their car's faulty headlight. Id. at 529. A second Highway Patrol officer arrived and requested identification from the plaintiffs. Id. The plaintiffs presented their driver's licenses and green cards to the officers. Id. Based on a miscommunication about how the plaintiffs obtained their green cards, the defendants seized the plaintiffs' green card but permitted the plaintiffs to continue on their travels. Id. at 529. The defendants retained the green cards for four days. Farm Labor, 308 F.3d at 529. The plaintiffs brought suit against the defendants for violating their Fourth Amendment rights by seizing and failing to return their green cards.

The Farm Labor court reviewed the Supreme Court's decision in United States v. Place, 462 U.S. 696 (1984) and noted that "the Supreme Court has recognized that some brief detentions of personal effects may be permitted based upon reasonable suspicion falling short of probable cause, provided that such detentions are 'minimally intrusive.'" Farm Labor, 308 F.3d at 543–44 (quoting Place, 462 U.S. at 706). Because the defendant conceded that he did not have probable cause to seize the plaintiffs' green card, the court conducted a two-step inquiry to

determine the reasonableness of that seizure. Farm Labor, 308 F.3d at 544–47. The plaintiffs conceded that the defendant had reasonable suspicion to believe that their green cards were forged; however, the argued that the defendant's detention of their green cards for four days was of excessive duration. Id. at 544–45. The Sixth Circuit agreed with the plaintiffs and found that "the fact alleged by the plaintiffs sufficiently demonstrate that the length of the detention was excessive in light of 'the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.'" Id. at 545–46 (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)).

The Sixth Circuit rejected the defendant's argument that Fox prohibited the plaintiffs' Fourth Amendment claim for failure to return their green cards. The court noted that the Fox plaintiff did not challenge the initial seizure of his license and that after his license had been seized and stored for several months, "the plaintiff had been completely dispossessed of his possessory interests in the license, and the seizure was complete." Farm Labor, 308 F.3d at 547. The court placed particular emphasis on the fact that Fox did not involve a Terry seizure of an individual's personal effects in contrast to the case before it. Id. The court concluded that Fox was distinguishable because did not involve law enforcement officers seizing someone's property "for a very short time on less than probable cause to pursue a limited course of investigation." Id. at 548 (citing Fox, 176 F.3d  at 351 n.6). Finding that the Fourth Amendment was violated because the defendants exceeded the permissible scope of a Terry seizure, the Sixth Circuit affirmed the district court's denial of qualified immunity to the officers.

The Court finds that Fox is controlling under the facts of this case. This case does not involve a Terry seizure of personal property "for a very short time on less than probable cause to pursue a limited course of investigation," Farm Labor, 308 F.523 at 548, like that one at issue in

<u>Farm Labor</u>. Here, the Defendants seized the Plaintiffs' firearms pursuant to a valid search warrant for narcotics trafficking. The seizure of the Plaintiffs' firearms took place in August 2009. A year and a half later, in April 2011, the state court issued an order invalidating the forfeiture specification for the Plaintiffs' firearms and directing that the Plaintiffs' firearms be returned to them. The Plaintiffs allege that their Fourth Amendment rights were violated beginning in April 2011 when the Defendants failed to return all of the Plaintiffs' firearms to them. But <u>Fox</u> makes clear that the Fourth Amendment does not provide grounds for recovery after the seizure of the Plaintiffs' firearms was complete in August 2009. <u>See Fox</u>, 176 F.3d at 351("[T]he Fourth Amendment protects an individual's interest in retaining possession of property but not the interest in regaining possession of property. . . . Once that act of taking the property is complete, the seizure has ended and the Fourth Amendment no longer applies."); <u>see also Lee v. City of Chicago</u>, 330 F.3d 456, 461–66 (7th Cir. 2003) (citing <u>Fox</u> and concluding that Fourth Amendment interests were limited to retaining of property, and once meaningfully dispossessed, seizure of property was complete); <u>United States v. Jakobetz</u>, 955 F.2d 786, 802 (2d Cir. 1992) (finding that "continued possession" of evidence did not constitute an illegal seizure and that such a claim was not deserving of "the special protections of the Fourth Amendment"); <u>Mathis v. Dept. of Public Safety, Impound Unit</u>, Civil Action No. 2:12–cv–00363, 2012 WL 1987078, at *2 (S.D. Ohio June 4, 2010) (citing <u>Fox</u>, 176 F.3d at 351) ("Plaintiff's claims do not appear to challenge the actual seizure of her vehicle, but instead focus on her inability to regain possession of her vehicle. Plaintiff's interest in regaining her vehicle, however, is outside the scope of the Fourth Amendment."); <u>McLeod v. City of Melvindale</u>, No. 04-73202, 2005 WL 2313932, at *5–6 (E.D. Mich. Sept. 21, 2005) (applying <u>Fox</u> and rejecting Fourth Amendment claim against defendants who seized the plaintiff's personal property during

the execution of a narcotics search warrant and failed to return that property to the plaintiff). The Plaintiffs' Fourth Amendment claim therefore fails as a matter of law and the Defendants are entitled to qualified immunity.

B.    *Count Two – Damage to the Plaintiffs' Firearms*

Count Two of the Plaintiffs' Amended Complaint alleges that "each Defendant" damaged "some" of the Plaintiffs firearms, violating the Plaintiffs' Fourth, Fifth, Sixth, and Fourteenth Amendment rights. In the Plaintiffs' view, this damaging of their firearms constituted an illegal seizure of their property. Although the Plaintiffs initially brought this claim against each of the Defendants, they have agreed to dismiss Count Two of the Amended Complaint as to Defendants Parks, Peters, Nohe, Roberts, Staats, Woods, and Shields. See Pls.' Br. In Resp. to Defs.' Mot. for Summ. J. 28, doc. 136 (agreeing to dismiss Count Two as to Defendants Parks, Peters, Nohe, Roberts, and Staats); Pls.' Br. In Resp. to Def.'s Mot. for Summ. J. 14–15, doc. 139 (agreeing to dismiss Count Two as to Defendant Shields); Pls.' Br. In Resp. to Def.'s Mot. for Summ. J. 14– 15, doc. 140 (agreeing to dismiss Count Two as to Defendant Woods). Further, the Plaintiffs' pleadings address only Defendant Adam Smith's liability for the alleged damage to their firearms. The Plaintiffs argue that the Defendants damaged their firearms when the Defendants placed adhesive evidence stickers to the wooden gun stocks. As a result, Mr. Six had to refinish the gun stocks to repair the damage caused by the adhesive stickers. These repairs required a significant amount of time and effort on the part of Mr. Six and would have cost $100 per firearm had Mr. Six hired someone else to do the work. In contrast, the Defendants maintain that the Plaintiffs' firearms were not damaged. According to the Defendants, the attachment of adhesive stickers to the Plaintiffs' firearms did not constitute a meaningful interference with the

Plaintiffs' firearms and Mr. Six was able to make the necessary repairs at a de minimus cost to himself.

To survive summary judgment, the Plaintiffs must present facts demonstrating (1) that the Defendants' actions constituted a seizure within the meaning of the Fourth Amendment and (2) that the Defendants' actions were unreasonable in light of the surrounding circumstances. As previously noted, property is seized "when 'there is some meaningful interference with an individual's possessory interests in that property.'" Soldal, 506 U.S. at 62–63 (quoting Jacobsen, 466 U.S. at 113). "Law-enforcement activities that unreasonably damage or destroy personal property, therefore 'seizing' it within the meaning of the Fourth Amendment, can give rise to liability under § 1983." Gordon v. Louisville/Jefferson Cnty. Metro Gov't, 486 F. App'x 534, 540–41 (6th Cir. 2012) (citing Soldal, 506 U.S. at 61–62).

In Bonds v. Cox, 20 F.3d 697 (6th Cir. 1994), police officers executed a search warrant at a residence in Memphis, Tennessee, which led to the discovery of drug paraphernalia. Id. at 699. The plaintiff filed a § 1983 complaint against those officers, alleging that they executed an illegal search and seizure that caused $20,000 of damages to her residence. Id. at 700. Considering the plaintiff's claim that the officers illegally "seized" her property by damaging it, the Sixth Circuit concluded that "[t]he damage to Bonds' house, which included broken doors, mutilated vinyl siding, a cracked commode, holes in walls, broken dishes, and trampled personal belongings, clearly rises to the level of a 'meaningful interference' with her possessory interests." Id. at 702 (citing Jacobsen, 466 U.S. at 124–25 (destruction of a quantity of cocaine during testing constituted a seizure, because test affected defendant's possessory interests)).

Construing the facts in the light most favorable to the Plaintiffs, the facts are as follows: between August 5, 2009 and April 11, 2011, Deputy Adam Smith was the custodian of the

Evidence Room at the Meigs County Sheriff's Office. A. Smith Dep. Tr. at 11–13. After the seizure of the Plaintiffs' firearms on August 5, 2009, Deputy Adam Smith was responsible for securing those firearms in the Evidence Room. Id. at 62–63. At some point following the search of the Plaintiffs' residence, "adhesive evidence tickets" were applied to some of the Plaintiffs' firearms. Id. at 68. When removed from the gun stocks, the adhesive evidence tickets took the finish off of the wood. R. Six Dep. Tr. at 218. Mr. Six had to refinish the gun stocks as a result of the damage from the removal of the evidence tickets. Id. at 218–19.

The Court first addresses the Defendants' argument that the Plaintiffs' damages were de minimis and therefore insufficient to support a claim against the Defendants. The Defendants do not cite case law to support this position. However, in Streater v. Cox, 336 F. App'x 470, 477 (6th Cir. 2009), the plaintiff challenged law enforcement officers' conduct in breaking of a lock on his briefcase during the execution of a search warrant. The Sixth Circuit noted that "'officers executing search warrants on occasion must damage property in order to perform their duty,'" id. (quoting Dalia v. United States, 441 U.S. 238, 258 (1979)), and found that because the alleged damage to the briefcase was de minimis, it did not form the basis for a constitutional claim, Streater, 336 F. App'x at 477. Construing the facts in the light most favorable to the Plaintiffs and drawing all reasonable inference in their favor, the Court does not believe that the damages in this instance were de minimis and will allow the Plaintiffs to proceed with their claim.

Further, the Court finds that there is a genuine issue of material fact as to whether the placement of adhesive evidence stickers on the wooden stocks of the Plaintiffs' firearms was objectively reasonable under the circumstances. The evidence indicates that adhesive evidence tickets were attached to the Plaintiffs' firearms to assist in their identification and organization. See R. Six Dep. Tr. 218 (stating that the evidence tags with written descriptions were wrapped

around the stock of the firearms). However, additional evidence suggests that other, less damaging types of evidence tags were available for use. See A. Smith Dep. Tr. (stating that "there was every type of evidence ticket used from tie-ons, wires, whatever they had"). Moreover, there is a genuine issue of material fact as to Defendant Adam Smith's liability for the damages to the firearms. A reasonable jury could infer that Defendant Adam Smith was responsible for the conduct that damaged the Plaintiffs' firearms from the evidence that he was in charge of the property room at the time of their seizure and subsequent tagging and storage. Consequently, Defendant Adam Smith is not entitled to qualified immunity and the Plaintiffs may proceed with their claim against him as to Count Two. The remaining Defendants are entitled to qualified immunity as to Count Two because there is no evidence that they were personally liable for the challenged conduct.

C.    *Count Three – Illegal Seizure and Detention of Mr. Six*

In their Amended Complaint, the Plaintiffs allege that law enforcement agents detained Mr. Six in the backseat of a police cruiser, with the windows rolled up and no air conditioning on, for over two hours while law enforcement officers searched his house. The Plaintiffs argue that this constituted excessive force under the Fourth Amendment. While all parties involved cite general case law concerning the Fourth Amendment, they offer little analysis of Sixth Circuit case law relevant to the facts in this case.

1.    Fourth Amendment Violation

"Claims of excessive force are analyzed under an objective-reasonableness standard, which depends on the facts and circumstance of each case viewed from the perspective of a

reasonable officer on the scene." Miller v. Sanilac Cnty., 606 F.3d 240, 251 (6th Cir. 2010) (citing Graham v. Connor, 490 U.S. 386, 395–96 (1989)). "Unnecessary detention in extreme temperatures . . . violates the Fourth Amendment's prohibitions on unreasonable searches and seizures." Miller, 606 F.3d at 251 (quoting Burchett v. Kiefler, 310 F.3d 937, 945 (6th Cir. 2002)) (internal alterations and quotation marks omitted).

In Burchett, members of the Ohio Bureau of Criminal Identification and Investigation (BCI) and the Jackson County Sheriff's Department executed a search warrant at the house of the plaintiff's brother. 310 F.3d at 939. As unmarked cars approached his brother's house, the plaintiff, who lived next door, walked towards the edge of the property line between the two residences. Id. As they approached the brother's house, one of the BCI agents spotted the plaintiff and yelled for him to get on the ground. Id. at 940. The plaintiff turned and ran back onto his porch. Id. BCI agents followed the plaintiff and handcuffed him on the porch. Id. After detaining the plaintiff, law enforcement officers placed him in a marked Sheriff's Department patrol car. Id. The plaintiff was subsequently detained for three hours while law enforcement officers executed the search warrant at his brother's residence. Burchett, 310 F.3d at 940. During those three hours, the temperature remained high (ninety degrees by the plaintiff's account), the windows of the car were rolled up, and the car and air conditioning were turned off. Id. According to the plaintiff, he asked the officers to roll the windows down, which they refused to do, telling the plaintiff, "No, shut your mouth." Id. At least two law enforcement officers acknowledged that they were aware of the heat that day. Id. The Jackson County Sheriff testified that he saw the plaintiff "three or four" times during the three hour period he was detained in the patrol car. Id. at 941. Towards the end of the three hours, the Sheriff asked the plaintiff's wife and daughter to speak with the plaintiff. Id. Officers rolled down the window so that the plaintiff

could speak with them. Burchett, 310 F.3d at 941. The plaintiff informed his wife and daughter that his hands were swollen and blue, which the plaintiff's daughter reported to the Sheriff. Id. After obtaining a promise from the plaintiff to "behave," the Sheriff removed the plaintiff from the car and released his handcuffs. Id.

Following his detention, the plaintiff and his wife (the plaintiffs) filed suit against the officers allegedly responsible for his detention, asserting, among other claims, a Fourth Amendment claim for excessive force resulting in physical and mental injury to the plaintiff and mental anguish to his wife. Id. The defendants moved for summary judgment, which the district court granted, finding that there was no Fourth Amendment violation because the police reasonably detained the plaintiff during the execution of the search warrant to prevent flight, ensure safety, and to protect evidence. Id. On appeal, the Sixth Circuit reversed the district court's grant of summary judgment as to the plaintiffs' excessive force claim.

The Sixth Circuit evaluated the plaintiffs' claims under the traditional qualified immunity framework. Id. at 942. First, the court considered whether officers' initial seizure of the plaintiff violated the Fourth Amendment. Burchett, 310 F.3d at 942–44. Considering the plaintiff's flight from the area near his brother's residence, the court concluded that officers properly seized the defendant based on a reasonable belief that he might pose a risk of flight or threat to their safety during the execution of the search warrant. Id. Second, the court then turned its attention to the issue of the officers' use of force in detaining the plaintiff. Id. at 944–46. After affirming the officers' use of force in handcuffing the plaintiff, id. at 944–45, the court reviewed the plaintiff's claim that his detention in the police car constituted excessive force, id. 945–46.

> We agree that unnecessary detention in extreme temperatures, like those that could be reached in an unventilated car in ninety-degree heat, violates the Fourth Amendment's prohibitions on unreasonable searches and seizures. The Supreme Court has noted that under certain circumstances "unnecessary exposure to the

> heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom
> breaks" can violate the Eighth Amendment's prohibition on "unnecessary and
> wanton infliction of pain." Hope v. Pelzer, 536 U.S. 730, 737–38 (2002). Such
> actions *a fortiori* violate the Fourth Amendment, which requires a showing of
> objective unreasonableness rather than any particular subjective motivation. See
> Graham v. Connor, 490 U.S. 386, 398 (1989).

Burchett, 310 F.3d at 945. Weighing the government's interesting in seizing the plaintiff against

the plaintiff's interest in remaining free from the use of government force, the court concluded

that the balance of interests "did not justify the imposition of extreme heat on the [plaintiff]." Id.

The court emphasized that the officers had less dangerous and equally effective methods of

detaining the plaintiff that would not have subjected him to unnecessary exposure to heat. Id. In

the court's view, officers could have left the windows slightly open or turned the air conditioning

on while still ensuring officer safety and the plaintiff's detention. Id.

In contrast to Burchett, a number of courts, however, have found that detention in a hot

car for periods of twenty, thirty, or even forty-five minutes does not violate the Constitution. See

Emmerick v. City of Gatlinburg, No. 08 C 305, 2010 WL 3861047, at *3–4 (E.D.Tenn. Sept. 24,

2010) (collecting cases). The plaintiff in Emmerick brought a § 1983 claim excessive force claim

against the city of Gatlinburg and various law enforcement officers, alleging that "he was forced

to sit in a police cruiser in the sweltering summer heat, with the windows rolled up and no air

conditioning on, for over 30 minutes while the officers searched his vehicle." Id. at *3. The

district court considered the Sixth Circuit's decision in Burchett, and compared Burchett to a

number of other cases[13] from around the country. In contrast to Burchett, the court noted that the

---

[13] Specifically, the district court in Emmerick stated:

> In Burchett v. Kiefer, 310 F.3d 937, 945 (6th Cir. 2002), the Sixth Circuit agreed that plaintiff's
> "detention in the police car with the windows rolled up in ninety degree heat for three hours
> constituted excessive force" in violation of the Fourth Amendment. The Court noted that the
> officers' "denial of [plaintiff's] request that they roll down the windows to allow [plaintiff] air
> indicated a wanton indifference to this important safety factor." Id. The Fifth Circuit, however, has
> found that a post-arrest detention for approximately one-half hour in an unventilated police vehicle

plaintiff did not allege that he asked the defendants to roll down the windows of the police car and did not allege to have suffered any physical injury from his detention in the cruiser. Id. at *4. Cf. Burchett, 310 F.3d 937, 945 ("[the defendants] denial of [the plaintiff's] request that they roll down the windows to allow him air indicates a wanton indifference to this important safety factor.") In light of these circumstances, the court found that the defendants did not violate the Fourth Amendment when they left the plaintiff in an unventilated car for more than 30 minutes. Emmerick, 2010 WL 3861047, at *4.

In Miller v. Sanilac Cnty., the Sixth Circuit considered Burchett's prohibition on unnecessary detention in extreme temperatures. 606 F.3d 240, 251–52 (6th Cir. 2010). The plaintiff in Miller alleged that a deputy sheriff officer subjected him to "extremely cold weather" for more than 45 minutes while performing a field sobriety test. Id. at 251. The temperature that night was approximately zero degrees with a significant wind-chill. Id. at 245. The plaintiff alleged that he began to shake as a result of the cold and eventually passed out. Id. at 251. A medical technician at the scene corroborated the plaintiff's claim that he was visibly shaking. Id. However, the court identified several factors that weighed against the plaintiff's allegations of excessive force:

---

in the sun did not violate the Fourth Amendment. Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001). Another judge in this district has found that placing the plaintiff in an unventilated vehicle for 35–45 minutes in hot weather did not violate a constitutional right. Wright v. Depew, Civil Action No. 2:07–cv–166, 2010 WL 2594398 at *8 (E.D.Tenn. June 22, 2010).

Other district courts have found that post-arrest detention in a hot, unventilated police vehicle for a relatively short period of time does not state a constitutional violation. Kennedy v. City of New York, Civil Action No. 07–cv–10622, 2010 WL 1779235 at *7 (S.D.N.Y. Apr. 26, 2010) (plaintiff held in hot patrol car for approximately 22 minutes); Kanvick v. City of Reno, Civil Action No. 3:06–cv–58, 2008 WL 873085 at * 11 (D.Nev. Mar. 27, 2008) (plaintiff detained in police van for approximately 17 minutes; no proof of physical injury); Wintermantel–Baptista v. Hanohano, Civil Action No. 05–cv–00485, 2007 WL 1201655 at *9 (D.Hawai'i Apr. 23, 2007) (suspect left in squad car in hot sun with windows rolled up for ten minutes; no allegation of physical injury); Esmont v. City of New York, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005) (suspect left in unventilated squad car for ten minutes; no allegation of physical injury).

2010 WL 3861047, at *3–4.

> [the plaintiff] had recently been at an outdoor event and helped a friend who had
> driven into a ditch, admits he never told Deputy Wagester he was cold while on
> the side of the road or elsewhere, indicated during the booking process that he did
> not need medical attention and described his present physical condition as good,
> and does not appear to have presented any notable symptoms during a medical
> evaluation a week later for hypothermia.

Id. at 251. Further, the plaintiff made no allegations that he was outside longer than was necessary for him to perform the field sobriety tests. Miller, 606 F.3d at 251. Consequently, the court agreed with the district court that a jury could not reasonably find that the plaintiff was subjected to unnecessary detention in extreme temperatures. Id. at 251–52 (citing Burchett, 310 F.3d at 945).

Here, in the Plaintiffs' factual account of Mr. Six's detention, on a hot,[14] sunny day in August, R. Six Dep. Tr. at 119, Mr. Six was placed in the back of the patrol car at 4:15 P.M. and was not released until shortly before 7:00 P.M. after he arrived at the police station, id. at 123. The windows were rolled up and the car and air conditioning were turned off. Id. at 117. Mr. Six attempted to draw officers' attention to his situation by yelling and moving around in the back of the car, "but it was almost like they never really looked at [him] or heard [him]." Id. at 117–18. After being in the patrol car for approximately 15-20 minutes, Mr. Six passed out due to the heat. Id. at 124. By Mr. Six's own estimation, he passed out for approximately two hours. Id. at 122. Mr. Six regained consciousness around 6:00 P.M., R. Six Dep. Tr. at 127, when one of the officers opened the patrol car, at which time Mr. Six requested a drink, id. at 110, 127. The unidentified officer brought Mr. Six some water. Id. at 111.

---

[14] The Defendants challenge the Plaintiffs assertion that it was hot on the day in question and have presented the Court with local weather reports indicating that the high temperature at the time Mr. Six was detained in the patrol car was 75 degrees Fahrenheit. Although relevant, these weather reports do not definitively establish the temperature inside the allegedly unventilated patrol car during the time Mr. Six was detained. Mr. Six testified at length to the temperature inside the unventilated patrol car and the physical effects of his extended exposure to the heat while detained in the patrol car. In light of this evidence, there is a genuine issue of material fact as to the temperature inside the allegedly unventilated patrol car at the time of Mr. Six's detention.

The Defendants have presented extensive evidence contradicting Mr. Six's account of his detention in the patrol and identified numerous alleged inconsistencies in Mr. Six's deposition testimony concerning his detention. Specifically, the Defendants emphasize that: (1) Mr. Six did not inform officers of his concerns for his safety when they opened the door to the patrol car after his detention for more than two hours; (2) Mr. Six did not request or receive medical attention after he passed out in the patrol car; (3) Mr. Six did not inform jail personnel of any injury or need for medical care upon arriving at the police station; and (4) Mr. Six did not inform the booking officer of any injury or need for medical care when the officer asked while filling out Mr. Six's medical questionnaire. However, at summary judgment, "[a] court must view all of the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." Fuhr v. Hazel Park Sch. Dist., 710 F.3d 668, 670 (6th Cir. 2013). The fact that the Defendants have identified extensive evidence discrediting or contradicting Mr. Six's account does not warrant a grant of summary judgment in their favor. Rather, such evidence goes to Mr. Six's credibility, which a jury, and not the court, must judge.

Construing the facts in the light most favorable to the Plaintiffs, the Court must determine whether they have presented facts creating a genuine issue of material fact as to the alleged violation of Mr. Six's Fourth Amendment rights. The facts identified by the Plaintiffs present a case similar to Burchett, where the Sixth Circuit found a Fourth Amendment violation based on the plaintiff's unnecessary exposure to extreme temperatures. Like in Burchett, the facts presented by the Plaintiffs show that Mr. Six was detained in a patrol car on a hot summer day, with the windows rolled up and with the car and air conditioning turned off, resulting in extended exposure to extreme heat. These conditions led to Mr. Six passing out for almost two hours. On these facts as presented by the Plaintiffs, a jury could reasonably find that Mr. Six's

Fourth Amendment rights were violated. Therefore, the Court finds that there is a genuine issue of material fact as to whether the Defendants' detention of Mr. Six in the patrol car was objectively reasonable under the circumstances.

## 2.     Personal Liability

All 14 remaining individual Defendants argue that there are no facts in evidence establishing their personal liability for Mr. Six's detention in the patrol car on August 5, 2009. The Plaintiffs broadly argue that all individual Defendants were aware or should have been aware that Mr. Six was detained in the back of the patrol car under dangerous conditions. The Court must determine which Defendants, if any, could potentially be personally liable for Mr. Six's alleged detention and unnecessary exposure to extreme temperatures.

"Each defendant's liability must be assessed individually based on his own actions." Binay, 601 F.3d at 650 (citing Dorsey, 517 F.3d at 399 n. 4). See also Burley v. Gagacki, — F.3d —, 2013 WL 4767178, at *7 (6th Cir. Sept. 6, 2013) (citing Binay, 601 F.3d at 650) ("To establish liability against an individual defendant acting under color of state law, a plaintiff must show that the defendant was 'personally involved' in the use of excessive force."). "To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer '(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" Binay, 601 F.3d at 540 (quoting Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997) (internal citations omitted)). "As a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability." Ghandi v. Police Dept. of City of Detroit, 747 F.2d 338, 352 (6th Cir. 1984).

At the outset, the Court notes that Mr. Six was unable to identify who placed him in the patrol car or any officers that were aware of the conditions of his confinement. Nonetheless, the Plaintiffs argue that the Defendants are liable under a failure-to-intervene theory of liability. "[A] police officer who fails to act to prevent the use of excessive force may still be held liable where '(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.'" Floyd v. City of Detroit, 518 F.3d 398, 406 (6th Cir. 2008) (quoting Turner, 119 F.3d at 429). In Turner, after arresting and detaining the plaintiff and members of her family, Officer Michael Scott brought the plaintiff and her family to the police station to be interviewed and booked. 119 F.3d at 426. While in the squad room completing paperwork, Officer Scott's colleague, Officer Daly, entered the squad room. Id. Officer Scott was seated at a counter with his back to the plaintiff. Id. While standing next to the plaintiff with a shotgun in his left hand, Officer Daly began rummaging through a bag he had brought with him. Id. As Officer Daly looked through his bag, the butt of the shotgun "bumped" the plaintiff in the back of the head. Id. at 427. Shortly thereafter, the plaintiff felt a second blow to her head, causing her to fall forward and hold on to the sides of her chair to avoid falling off. Id. Officer Scott remained with his back to the plaintiff throughout this time. Turner, 119 F.3d at 427. Thereafter, the plaintiff filed suit against multiple law enforcement officers, including Officer Scott, and the city of Newport for alleged use of excessive force. Id. at 426. The plaintiff alleged that Officer Scott failed to prevent Officer Daly from using excessive force against her. Id. Officer Scott brought an interlocutory appeal challenging the district court's denial of qualified immunity. Id.

The Sixth Circuit recognized that a police officer could be held liable for the use of excessive force when "(1) the officer observed or had reason to know that excessive force would

be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring," id. at 429 (citation omitted), but found that the plaintiff could not satisfy either requirement with respect to Officer Scott, id. at 429–30. First, the court noted, there was no evidence that Officer Scott "actually observed or should have known" that Officer Daly struck the plaintiff with butt of a shotgun. Turner, 119 F.3d at 429. The evidence demonstrated that: Officer Scott's back was turned to the plaintiff and Officer Daly during the incident, Officer Scott and Officer Daly did not communicate while in the squad room together, and no one, the plaintiff and her family members included, alerted Officer Scott to the plaintiff being struck in the head until after the incident. Id. Second, the court emphasized, there was no evidence to suggest that Officer Scott had the opportunity to prevent the harm from occurring. Id. at 429–30. Because he was unaware of the first bump to the plaintiff's head, "he could have hardly prevented the second." Id. at 430. Therefore, the court reversed the district court's denial of qualified immunity. Id.

In Burchett, in addition to setting forth the standard for excessive force case involving unnecessary exposure to extreme temperatures, the Sixth Circuit addressed the personal liability of the law enforcement officers involved in the plaintiff's detention in the back of a patrol car. 310 F.3d at 946. The court first addressed the liability of BCI Agent Paul Bliss. Id. With respect to Agent Bliss, the court found that the evidence demonstrated he was "aware of the heat and the length and nature of Burchett's confinement." Id. Although Agent Bliss did not place the plaintiff in the car, Agent Bliss observed the plaintiff being detained and placed into the cruiser. Id. Agent Bliss saw the plaintiff in the cruiser several times during his three hour detention and saw that windows on the cruiser were up. Id. Further, Agent Bliss recognized that it was an "extremely hot" day, stating that the heat forced him to abandon his search of the plaintiff's

brother's residence multiple times. Id. Therefore, the court concluded that there were genuine issues of material facts with respect to Agent Bliss's liability. Burchett, 410 F.3d at 946. Similarly, the court found that Sheriff Greg Kiefer was present when law enforcement officers placed the plaintiff in the patrol car and that Sheriff Kiefer saw the plaintiff in the cruiser several times during his detention. Id. Given his knowledge of the length of the plaintiff's detention, the court found that a reasonable officer in Sheriff Kiefer's place would have recognized the danger and excessive nature of that detention. Id. Therefore, the court concluded that there were genuine issues of material facts with respect to Sheriff Kiefer's liability as well. Id. The Burchett court then turned to the personal liability of the remaining officers and found that that the evidence did not show that any of the other defendants were aware or should have been aware of facts indicative of excessive force:

> Deputy Sheriff R.H. Copas's car was used for the detention, but there is no evidence that he was aware of that fact, let alone aware of the conditions of Burchett's detention. BCI Agent Jon Dozer knew of the heat, as he was in the attic with Agent Bliss, but there is no evidence in the record that he knew of Burchett's detention. BCI Agent Dennis Lowe testified that he saw Burchett in the cruiser, but there is no evidence that he knew of the length of the detention, a key aspect of the detention's dangerousness. We do not find the evidence sufficient to impose liability on Copas, Dozer, or Lowe. There is no evidence in the record linking Deputy Sheriff Tony Robinson or BCI Agent William Morris to Burchett's detention.

Id.

Burchett's guidance as to the personal liability of law enforcement officers in the context of excessive force case involving unnecessary exposure to extreme temperatures, while useful, is susceptible to multiple interpretations. On the one hand, the court's finding as to Agent Bliss appears to set forth a clear standard for personal liability in cases involving unnecessary exposure to extreme temperature: a plaintiff must present evidence that an officer knows or has reason to know of (1) the extreme temperature, (2) the length of detention, and (3) the

nature/conditions of confinement. See Burchett, 310 F.3d at 946 ("BCI Agent Paul Bliss is shown to have been aware of the heat and the length and nature of Burchett's confinement. . . . Given the heat and Bliss's awareness of the conditions and length of Burchett's detention, there are genuine issues of material fact with respect to Bliss's liability.") On the other hand, the court appears to have found a genuine issue of material fact as to Sheriff Kiefer's personal liability because of Sheriff Kiefer's knowledge of the length of the plaintiff's detention alone. See id. ("Similarly, Sheriff Greg Kiefer was present when the officers detained Burchett in the cruiser and when Burchett was released, and Kiefer stated that he saw Burchett in the cruiser several times during the detention. Accordingly, Kiefer knew the length of Burchett's detention in the car, and a reasonable officer in Kiefer's place would have recognized the danger and the violation.")

In the view of this Court, knowledge of the length of detention alone is insufficient to establish the personal liability of an officer on an excessive force claim for unnecessary exposure to extreme temperature. Burchett provides support for this conclusion. In Burchett, the court found that BCI Agent Dennis Lowe was not personally liable for any violation of the plaintiff's Fourth Amendment rights because, although he saw the plaintiff in the patrol car, there was no evidence that he knew of the length of the detention. Id. Specifically, the court noted that length of detention was "*a key aspect* of the detention's dangerousness." Id. (emphasis added). Implicitly, the use of the singular indicates that knowledge of the length of detention is one of multiple factors that a court should consider in determining personal liability. Common sense supports this conclusion as well. Law enforcement officers frequently detain individuals for extended periods of time in patrol cars following an arrest or during the execution of a search warrant. Such detentions ensure the safety of officers, protect evidence from being destroyed,

and prevent the flight of criminal suspects. Given that extended detention of criminal suspects is a common law enforcement practice, it would be illogical to conclude that knowledge of length of detention alone supports a finding of personal liability in cases like the one at hand. Excessive force claims are ultimately predicated on the application of unnecessary force—in this case, alleged unnecessary exposure to extreme temperatures. Absent knowledge of the unnecessary force in question, a defendant cannot be held personally liable for such a claim.

According to the Plaintiffs, "[t]he unreasonable and life threatening conditions under which Mr. Six was being held were right out in the open for all to see and the officers would have to have seen Mr. Six being detained there." Pls.' Br. In Resp. to Defs.' Mot. for Summ. J. 25, doc. 134. Continuing, the Plaintiffs maintain that "[t]here is no dispute that [Mr. Six] was kept in the cruiser parked near the house that was being searched for time in the neighborhood of two hours." Id. at 26. Further, the Plaintiffs assert that "[i]t is simply a matter of common knowledge that vehicles heat up inside in the summer time if they are left with the windows rolled up and no ventilation or air conditioning." Id. at 27. In conclusion, the Plaintiffs contend that "Defendants argue that none of them have admitted to being the person who actually placed Mr. Six in the vehicle. Regardless of the dubiousness of everyone denying putting him in the vehicle, Mr. Six was detained in this manner right out in the open for everyone to see." Id. at 30.

While all of this may be true, the Plaintiffs are nonetheless obligated to present evidence establishing the personal involvement of the individual defendants. See Binay, 601 F.3d at 650 (citing Dorsey, 517 F.3d at 399 n. 4). Here, they have failed to do so. The Plaintiffs have not identified facts establishing a genuine issue of material fact as to Defendant Adam Smith's personal liability. Defendant Adam Smith testified that he was aware that Mr. Six was being detained in a patrol car but that he never spoke with Mr. Six during his detention. A. Smith Dep.

Tr. 42. The Plaintiffs have not identified any evidence that Defendant Adam Smith knew or should have known the length of Mr. Six's detention, the conditions of Mr. Six's detention, or the extreme temperatures to which Mr. Six was exposed. With respect to Defendant Beegle, the Plaintiffs cite his deposition testimony in which he stated as a general proposition that holding a detainee in a police cruiser on a hot day with the windows rolled up and no air conditioning was "an inappropriate manner of restraint." Beegle Dep. Tr. 24, doc. 107. However, the Plaintiffs have not identified any evidence of Defendant Beegle's personal knowledge or involvement in Mr. Six's detention. The Plaintiffs present no evidence that Defendant Beegle knew or should have known the length of Mr. Six's detention, the conditions of Mr. Six's detention, or the extreme temperatures to which Mr. Six was exposed. Defendant Joshua Staats, a canine handler present at the scene, was aware that it was a "somewhat hot" day. Staats Dep. Tr. 17–18, doc. 120-1. But the Plaintiffs have not identified any evidence of Defendant Staats personal knowledge or involvement in Mr. Six's detention. There is no evidence that Defendant Staats knew or should have known the length of Mr. Six's detention, the conditions of Mr. Six's detention, or the extreme temperatures to which Mr. Six was exposed. Personal liability does not attach to Defendants Rick Smith, Gilkey, Rhodes, Nohe, Parks, Roberts, Shields, Woods, Fitch, or Jenkins for the same reason.

Defendant Peters sat in the vehicle with Mr. Six "early on" in Mr. Six's detention and for a "brief period of time, . . . a few minutes." Peters Dep. Tr. 54–55, doc. 111. When asked about his time in the patrol car, Defendant Peters could not remember whether the windows were rolled up, whether the air conditioning was turned on, or whether it was hot inside the patrol car. Id. The Court is obligated to construe all facts and make all inferences in the light most favorable to the Plaintiffs. But even construing these facts in the light most favorable to the Plaintiffs, like

Agent Lowe in <u>Burchett</u>, "there is no evidence that [Defendant Peters] knew of the length of the detention, a key aspect of the detention's dangerousness," <u>Burchett</u>, 310 F.3d at 946. Consequently, the Plaintiffs have not identified facts establishing a genuine issue of material fact as to Defendant Peters' personal liability.

The Court finds that the Defendants are therefore entitled to qualified immunity as to Count Three of the Plaintiffs' Amended Complaint.


D.      *Count Four – Malicious Prosecution*

The Plaintiffs have agreed to dismiss this count. <u>See</u> Pls.' Resp. to Def. Shields's Mot. for Summ. J. 1–2, doc. 139; Pls.' Resp. to Def. Wood's Mot. for Summ. J. 1–2. Count Four of the Plaintiffs' Amended Complaint is dismissed accordingly.


E.      *Count Five – Civil Conspiracy*

Reviewing the legal standard for a civil conspiracy under 42 U.S.C. § 1983, the various Defendants offer several arguments to support their requests for summary judgment. Some Defendants argue that the Plaintiffs' Amended Complaint failed to set forth sufficient factual allegations in support of their conspiracy claim. Other Defendants argue that the Plaintiffs have failed to establish any facts in discovery that would support their civil conspiracy case. All Defendants maintain that the Plaintiffs' civil conspiracy claim must fail because there was no underlying constitutional violation. Citing the Court's August 16, 2012 Order (doc. 63) denying the Defendants' Motion for Judgment on the Pleadings, the Plaintiffs respond that the Court has already found the Plaintiffs' civil conspiracy claim to be well-pled. To the extent that the

Defendants assert that there was no underlying constitutional violation, the Plaintiffs contend that there are genuine issues of material fact on this issue.

To establish a § 1983 conspiracy claim, a plaintiff must show that "'an agreement (existed) between two or more persons to injure another by unlawful action.'" Bazzi v. City of Dearborn, 658 F.3d 598, 602 (6th Cir. 2011) (quoting Revis v. Meldrum, 489 F.3d 273, 290 (6th Cir. 2007)). Specifically, a plaintiff must prove that: (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiff of his or her rights, and (3) an overt act was committed. Revis, 489 F.3d at 290. "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved." Hensley, 693 F.3d at 695 (quoting Hooks v. Hooks, 771 F.2d 935, 943–44 (6th Cir. 1985)) (internal quotation marks omitted). A plaintiff may rely on circumstantial evidence to establish the existence of an agreement among the conspirators. Spadafore v. Gardner, 330 F.3d 849, 854 (6th Cir. 2003) (citing Weberg v. Franks, 229 F.3d 514, 528 (6th Cir. 2000)).

To the extent that the Defendants argue that the Plaintiffs failed to properly plead their civil conspiracy claim, the Plaintiffs are correct that the Court previously resolved this issue in its August 16, 2012 Order (doc. 63) denying the Defendants' Motion for Judgment on the Pleadings. However, the Defendants correctly argue that the Plaintiff has failed to identify any facts to support their civil conspiracy claim. After the Defendants demonstrated an absence of the evidence to support the Plaintiffs' civil conspiracy claim, the Plaintiffs, as the nonmoving party, were obligated to set forth specific facts showing a triable issue. Mosholder v. Barnhardt, 679 F.3d 443, 448–49 (6th Cir. 2012) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); Fed. R. Civ. P. 56(e)). The Plaintiffs have failed to do so here. The

42

Plaintiffs have identified no evidence, direct or circumstantial, demonstrating that: (1) a single plan existed, (2) the Defendants shared a conspiratorial objective to deprive the Plaintiffs of their civil rights, or (3) an overt act was committed. Consequently, the Defendants are entitled to summary judgment on the Plaintiffs' civil conspiracy claim.

## IV.    Conclusion

For the foregoing reasons, the Plaintiffs' Motion for Summary Judgment (doc. 116) is DENIED; Defendants Beegle's, Gilkey's, Rhodes's, Adam Smith's, Rick Smith's and Scott Trussell's Motion for Summary Judgment (doc. 102) is GRANTED IN PART AND DENIED IN PART; Defendants Nohe's, Parks's, Peters's, Robert's, and Staats's Motion for Summary Judgment (doc. 117) is GRANTED IN PART AND DENIED IN PART; Defendant Shields' Motion for Summary Judgment (doc. 118) is GRANTED; Defendant Woods' Motion for Summary Judgment (doc. 122) is GRANTED ; and Defendants Fitch's and Jenkins's Motion for Summary Judgment (doc. 126) is GRANTED and Defendants Fitch's and Jenkins's Motion to Dismiss (doc. 126) is DENIED AS MOOT.

The Defendants are entitled to summary judgment as to the seizure of the Plaintiffs' firearms.

The Plaintiffs will be allowed to proceed with their claims against Defendant Rhodes, Adam Smith, Rick Smith, Nohe, Parks, Peters, Roberts, and Staats for illegal seizure of the World War II memorabilia. Defendants Beegle, Gilkey, Shields, Woods, Jenkins, and Fitch are entitled to summary judgment as to the seizure of the World War II memorabilia.

The Defendants are entitled to summary judgment as to the retention and failure to return the Plaintiffs' firearms.

The Plaintiffs will be allowed to proceed with Count II of their Amended Complaint against Defendant Adam Smith for damaging their firearms. The remaining Defendants are entitled to summary judgment as to Count II of the Amended Complaint.

The Defendants are entitled to summary judgment as to Count III of the Amended Complaint.

The Plaintiffs have voluntarily dismissed Count IV of the Amended Complaint.

The Defendants are entitled to summary judgment as to Count V of the Amended Complaint.

IT IS SO ORDERED.

S/ James L  Graham
James L. Graham
UNITED STATES DISTRICT JUDGE

Date: October 18, 2013